EXHIBIT 4

CONFIDENTIAL

### EXCLUSIVE MANUFACTURING, DISTRIBUTION, AND LICENSE AGREEMENT

AN AGREEMENT ("Agreement") dated as of August 17, 2012 ("Effective Date") by and between Universal Republic Records, a division of UMG Recordings, Inc., 1755 Broadway, New York, New York 10019 ("Universal") and XO&co Inc. c/o Shalinsky & Company, 40 Holly Street, Suite 302, Toronto, Ontario M4S 3C3 ("Label" or "you").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Universal and Label, intending to be legally bound, hereby agree as follows:

1.    Term; Delivery Commitment.

1.1.    Initial Period.  The term of this Agreement (the "Term") will begin on the Effective Date and will end, unless suspended, extended, or sooner terminated as provided herein, one (1) year after Label has Delivered all of the Masters required to be Delivered in fulfillment of Label's Recording Commitment.  The period commencing on the Effective Date and ending one (1) year after Label has Delivered Album One is referred to as the "Initial Period".

1.2.    Option Periods.  Notwithstanding the provisions of paragraph 1.1 above, Label hereby irrevocably grants to Universal four (4) separate options (each a "Term Extension Option"), to extend the Term hereof for additional period(s), each of which will end one (1) year following Label's Delivery to Universal of the Recording Commitment for the corresponding period referred to in subparagraph 1.5 below (such additional period(s) are hereinafter referred to as the "Option Period(s)").  The Initial Period and, if applicable, the Option Period(s) are referred to each as a "Contract Period" and collectively as "Contract Period(s)".  Universal has the right to exercise its Term Extension Option(s) by giving Label written notice at any time up to and including the last day of the then current Contract Period.  If Universal exercises any Term Extension Option, the Option Period will begin immediately after the end of the preceding Option Period (or the Initial Period, if applicable).  Notwithstanding the foregoing, you shall have the right to reject Universal exercise of the fourth Term Extension Option hereunder by written notice to Universal to be given within five (5) business days following Universal's notice to you that it is exercising such Term Extension Option, unless the sum of all Domestic Revenue earned, plus the gross monies received by or credited to Universal in the United States from its Foreign Licensees in connection with Distributed Product hereunder, during the period one (1) year prior to the date required hereunder for Universal to exercise such Term Extension Option, exceeds ▮▮▮▮▮▮▮

1.2.1    Notwithstanding anything to the contrary contained in this paragraph 1.2, if Universal has not exercised its option to extend the Term for an additional Contract Period as of the date the then-current Contract Period would otherwise expire, the following will apply:

(i)    You will notify Universal (the "Option Warning") that the applicable option has not yet been exercised.

(ii)    Universal will have the right to exercise such option at any time until the date ten (10) business days after its receipt of the Option Warning (the "Extension Period").

W000004

CONFIDENTIAL

(iii)    The then-current Contract Period will continue in effect until <u>either</u> the end of the Extension Period, <u>or</u> Universal's notice to you ("Termination Notice") that Universal does not wish to exercise such option, whichever is sooner.

(iv)    For the avoidance of doubt, nothing herein will limit Universal's right to send a Termination Notice to you at any time, nor limit Universal's right to exercise an option at any time if you fail to send Universal an Option Warning in accordance with clause 1.2.1(i) above.

1.3    <u>Minimum Exploitation Period</u>.  Notwithstanding any of the foregoing, Universal will have the right to exploit all Distributed Product hereunder until the date five (5) years after Universal's initial commercial release of the last Album Delivered in fulfillment of Label's Recording Commitment (the "Exploitation Period").

1.4.    <u>Intentionally Omitted</u>

1.5    <u>Recording Commitment</u>.  Label will Deliver to Universal newly recorded and previously unreleased "studio" Masters (other than the Existing Recordings) sufficient to comprise the product in each Contract Period ("Recording Commitment") as described below:

1.5.1    <u>Initial Period Recording Commitment</u>:  Label shall Deliver in the Initial Period those Masters contained on three (3) previously released "mix-tape" albums entitled, respectively, "House Of Balloons", "Thursday" and "Echos of Silence" (the "Existing Recordings") plus a number of newly recorded Masters sufficient to comprise one Album ("Album One").  Without limiting the foregoing, although Masters recorded by Artist prior to the commencement of the Term that are not deemed Existing Recordings hereunder are not required to be Delivered hereunder to Universal, no Person other than Universal has or will have the right or authority to manufacture, distribute, license, advertise, market, promote, release or otherwise exploit such Recordings during the Term hereof.

1.5.2    <u>Option Period(s) Recording Commitment</u>:  Label shall Deliver in each Option Period a number of Masters sufficient to comprise one (1) Album ("Album Two", "Album Three" etc.).

1.6    <u>Delivery Obligations and Recording Procedure</u>

1.6.1    During each Contract Period you will deliver to Universal commercially satisfactory Masters. Such Masters will embody the featured vocal performances of Artist of contemporary selections, not recorded "live" or "in concert", and that have not been previously released by Artist, whether hereunder or otherwise. For the avoidance of doubt, the immediately preceding sentence is intended solely to denote that "live" or "in concert" Recordings will not be counted as Masters in fulfillment of the Recording Commitment rather than to imply that Universal will not release such Recordings or that such Recordings are not included within the definition of Distributed Product hereunder. Without limiting the foregoing, Universal has the right to reject any Master (other than Existing Recordings) that Universal reasonably believes is either offensive to reasonable standards of public taste or in violation of the rights of others.

1.6.2    Intentionally omitted.

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000005

CONFIDENTIAL

1.6.3. Each Album in fulfillment of your Recording Commitment will be Delivered to Universal within four (4) months after the commencement date of the Contract Period concerned; except that the Existing Recordings shall be Delivered contemporaneously with the full execution of this Agreement.

1.6.4    You agree to Deliver to Universal each Master hereunder in the form of a Digital Master. You will concurrently deliver: (i)  all multitrack tapes recorded in connection with the recording project, including, without limitation, all twenty-four (24) track master tapes and (ii) a detailed list in the form of Schedule "1" attached hereto and incorporated herein by this reference setting forth the location, format and number of all such multitrack tapes and the facilities used in connection with the particular recording project, and you hereby warrant and represent (and shall cause Artist to warrant and represent via Artist's acknowledgement in the Inducement Letter attached hereto) that all such information supplied by you or the Artist in connection therewith is and shall be complete and accurate. Upon Universal's request, you agree to Deliver a 96Khz/24 bit 2 channel stereo version and a 5.1 channel surround sound version of each recording embodied on a Master hereunder for use on DVD Audio discs, and all costs incurred in connection with creating such versions will constitute Recording Costs hereunder. Without limiting any of Universal's rights or remedies hereunder, not less than two (2) weeks prior to Universal's authorization of pre-mastering (e.g., equalization and the making of reference dubs or the equivalent thereof in the applicable configurations) for a particular set of Master Recordings hereunder (including remixes of Master Recordings, regardless of whether such remixes will be commercially released), you shall deliver to Universal for the applicable set of Master Recordings the lyrics to the Compositions embodied on such Masters, which lyrics shall be typed and in an easily readable form. In connection with each Master delivered hereunder to Universal, you will provide Universal in written form with all necessary information, consents, licenses and permissions such that Universal may manufacture, distribute and release Records embodying the Masters concerned, including, without limitation, lyrics to each musical composition contained on a Record, mechanical licenses, sideartist and producer agreements and/or applicable consents.

1.6.5    You shall make your best commercial efforts to comply with Universal's policies with respect to samples, and you and Artist hereby warrant and represent that all information supplied by you or the Artist to Universal in that regard is and shall be complete and correct. As of the date hereof, Universal's policies with respect to all samples embodied in any Master Recording (including remixes of Master Recordings, regardless of whether such remixes will be commercially released) are as follows:

(i)    Prior to Universal's authorization of pre-mastering (e.g., equalization and the making of reference dubs or the equivalent thereof in the applicable configurations) for a particular set of Master Recordings hereunder, you shall deliver the following to Universal for the applicable set of Master Recordings:

(a)    A detailed list of any and all samples embodied in each Master Recording;

(b)    A written clearance or license for the perpetual, non-restrictive use of each such sample interpolated in each Master Recording in any and all media from the copyright holder(s) of the Master Recording and the Composition sampled.

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000006

CONFIDENTIAL

(c)    Any and all necessary information pertaining to credit copy required by the copyright holder(s) of each sample interpolated in each Master Recording.

(ii)    No Master Recording will be scheduled for release and no Master Recording shall be deemed to be Delivered to Universal hereunder (and no Advances due on Delivery, if any, will be paid) until such written sample clearances (including credit copy, if any) have been obtained and approved by Universal.

(iii)    If any such sample clearance provides for an advance, a flat-fee "roll-over" payment and/or a royalty payment for Net Sales of the applicable Master Recording and your account for Distribution Proceeds hereunder is in an unrecouped position at the time such royalties are due, then, notwithstanding anything to the contrary contained herein, you shall be solely responsible for making, and shall make, such payment(s) to the applicable Person promptly upon receipt from Universal of such Person's accounting statement thereof. If at your request or with your authorization Universal makes any such payment(s), such payment(s) will constitute an Advance and will be recoupable from all monies becoming payable by Universal to you or Artist under this agreement.

(iv)    Without limiting any of your obligations or warranties pursuant to this subparagraph 1.6.5, Universal will use reasonable efforts to coordinate with you and direct you to third party vendors in order to assist you in obtaining clearances for samples and/or interpolations embodied in Masters hereunder.

1.6.6.    Universal's election to make a payment to you which was to have been made upon Delivery of Masters or to release a Record derived from such Masters will not be deemed to be its acknowledgment that such "Delivery" was properly made, and Universal will not be deemed to have waived either its right to require such complete and proper performance thereafter or its remedies for your failure to perform in accordance therewith.

1.6.7    You and Artist acknowledge the importance of securing all Recordings made hereunder and of preventing "leaks" of Recordings, and you and Artist will cooperate with Universal in taking measures to insure that Artist's Recordings are not made available to any Person other than Universal without prior written authorization from Universal. ~~The scheduling and booking of all studio time will be done by Universal.~~

1.6.8    You will engage all artists, producers, musicians, and other personnel for the recording sessions hereunder. Universal has the right to have a representative attend all recording sessions conducted pursuant to this agreement at its sole non-recoupable expense. Notwithstanding anything to the contrary herein contained, subject to the provisions of subparagraph 4.2.3 below, while you will not be required to submit a budget in connection with the recording and Delivery of any Album hereunder, and irrespective of whether you elect to submit a budget, you will be solely responsible for the payment of all Recording Costs incurred in connection with Masters hereunder; Universal's election to pay Recording Costs that you request Universal pay directly (which election shall remain solely within Universal's discretion) will constitute an accommodation to you. Without limiting Universal's other rights or remedies, if it reasonably appears to Universal that the Recording Costs for any Masters will exceed the Authorized Budget therefor, Universal has the right to immediately cease paying Recording Costs unless you establish to Universal's reasonable satisfaction that you can and will pay or reimburse Universal for any Recording Costs in excess of the Authorized Budget (defined as a budget

W000007

CONFIDENTIAL

approved in writing by Universal). Nothing contained in this agreement will be deemed to make you or Artist Universal's agent or authorize you or Artist to incur any costs on Universal's behalf under this agreement.

1.6.9. In the event you request that Universal administer Recording Costs hereunder on your behalf and subject to Universal's approval of the applicable budget(s), Universal agrees to advance Recording Costs for the production of each particular Record of the Recording Commitment in an amount not in excess of the Authorized Budget therefor. In the event you request that Universal administer Recording Costs hereunder on your behalf, you will deliver copies of substantiating invoices, receipts, Form Bs, vouchers and similar satisfactory documentary evidence of such costs, and if you fail to do so, Universal's obligation to pay further Recording Costs will be suspended until delivery thereof. With respect to Recordings made in the United States under Universal's license, you agree to deliver (or cause the individual producer of the Masters to deliver) the U.S. Citizenship and Immigration Services certificates described in paragraph 1.6.11 below, Form Bs and W-4s or such other applicable tax documentation as may be required to Universal promptly following each session hereunder so that Universal may timely make all required union payments. Without limiting your obligations to deliver pursuant to this subparagraph 1.6.9, Universal will use reasonable efforts to assist you in, or instruct you regarding the proper manner of, completing such documentation. You agree, represent and warrant that all Masters delivered by you to Universal hereunder will be free and clear of any claims by any Person.

1.6.10. Without limiting the foregoing, your obligations include furnishing the services of the individual producers of Masters hereunder, and you are responsible for engaging and paying them. Without limiting the foregoing, at your written request pursuant to Universal's standard letter of direction executed by you prior to the initial United States release of the Album concerned, Universal will pay a royalty to independent third party producer(s) engaged by you and to whom you are obligated to pay a royalty (the "Producing Royalty") in respect of Net Sales of Records released hereunder. The Producing Royalty will be computed, adjusted and paid in accordance with the terms contained in your agreement with the applicable producer, but at a basic rate of no more than ▇▇▇▇▇▇▇▇▇▇. The Producing Royalty will not be payable to the producer concerned until the Recording Costs for the applicable Masters have been recouped at a rate that you shall determine provided such rate shall not exceed ▇▇▇▇▇▇▇▇▇▇. After such recoupment, the Producing Royalty will be computed retroactively and paid (as provided above) on the Net Sales of the Record concerned from the first such Record sold. The amount of the Producing Royalty will be deducted from all monies payable or becoming payable to you hereunder. Universal's compliance with your request to pay any such Producing Royalty will not constitute the producer, or any payee on behalf of the producer, a beneficiary of or a party to this agreement. All Producing Royalty payments hereunder will constitute payments to you, and Universal will have no liability by reason of any such payment. You hereby indemnify and hold Universal harmless (pursuant to the terms hereof) against any claims asserted against Universal in connection with any such Producing Royalty.

1.6.11. In connection with each recording session conducted hereunder in the United States, you will comply with the following procedures required by United States immigration law and Universal shall provide guidance, form documentation and any reasonable assistance that may be required at Label's request:

W000008

CONFIDENTIAL

(i)    Before any individual renders services in connection with the recording of any Master hereunder (including, without limitation, each background instrumentalist, background vocalist, producer and engineer):

(a)    You will require each such individual to complete and sign the EMPLOYEE INFORMATION AND VERIFICATION ("employee section") of a U.S. Citizenship and Immigration Services (or to any successor federal agency whose function most closely resembles the current functions of the CIS) ("CIS") Employment Eligibility Certificate ("Form I-9"), unless you have already obtained (and retained) such certificate from that individual within the three years preceding the date of such recording session;

(b)    You will complete and sign the EMPLOYER REVIEW AND VERIFICATION ("employer section") of each such certificate; and

(c)    You will attach copies of the documents establishing identity and employment eligibility that you examine in accordance with the instructions in the employer section.

(ii)    You will not permit any such Person who fails to complete the employee section (or to furnish you with the required documentation) to render any services in connection with Recordings made under this agreement.

(iii)    You will deliver the employee and employer certificates (with copies of the necessary documents attached) to Universal within seventy-two (72) hours after the conclusion of the session concerned.

(iv)    You will comply with any revised or additional verification and documentation procedures required by the CIS in the future.

1.6.12 Universal's Remedies For Label's Failure to Full its Recording Commitment. If Label fails to fulfill its Recording Commitment for any Contract Period hereof, then, without limiting any of Universal's rights or remedies, Universal will have the following rights, each exercisable by written notice to Label; provided, if your failure to fulfill your Recording Commitment is on account of a catastrophe beyond your control which materially impairs Artist's ability to record ("Force Majeure Event"), Universal's remedies pursuant to this subparagraph 1.6.12 shall not be exercised during the pendency of such Force Majeure Event:

(i)    Universal will have the right to suspend its obligation to pay any Distribution Proceeds to Label otherwise payable under this agreement until Label has fulfilled its Recording Commitment for the applicable Contract Period; or

(ii)    Universal will have the right at any time thereafter to terminate the Term of this agreement ("Recording Commitment Termination Right").  If Universal exercises its Recording Commitment Termination Right, then: (a) the Term of this agreement will be deemed to be terminated as of the date of Universal's notice to Label; and (b) Universal will have the right to require Label to repay to Universal the amount of any and all Advances previously paid by Universal not then recovered from Distribution Proceeds hereunder.

2.    Grant of Rights; Third Party Licenses.

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000009

CONFIDENTIAL

2.1.    <u>General Grant of Rights</u>.  Subject to the terms and conditions contained herein, Label hereby grants to Universal and any Person authorized by Universal the following rights with respect to Artist (and shall be deemed to have granted Universal and any Person authorized by Universal the following rights with respect to Persons other than the Artist) during the Term and Exploitation Period as applicable throughout the Territory, which rights shall be exclusive except as otherwise provided for specifically herein:

2.1.1.  the right to manufacture, distribute, sell, and otherwise exploit all Distributed Product and all Artwork Materials by any and all methods now or hereafter known or devised, including, without limitation, through Normal Retail Channels and Ancillary Exploitation Channels. Without limiting the provisions of the immediately preceding sentence, Universal's exclusive (except as otherwise provided herein) rights hereunder throughout the Territory include, without limitation the right: (i) to solicit and fulfill orders for Distributed Product; (ii) to grant licenses to third parties for the exploitation or other use of Masters or other items of Distributed Product (subject to the provisions of paragraph 2.2. hereinbelow); (iii) to advertise, promote and otherwise market Distributed Product (and to authorize other Persons to do so) through any mediums and channels and by any means whatsoever now or hereafter known, including, without limitation, (x) the right to use and authorize other Persons to use the approved artwork of each Record distributed hereunder in the packaging of such Record and all other Artwork Materials and all other Materials for the purposes of trade, advertising, marketing, promotion, and publicity, in any manner and in any medium now or hereafter known and (y) the right to publicize, advertise, and exploit Distributed Product and to cause or permit others to do so; and (iv) the right to perform Distributed Product publicly and to permit the public performances thereof in any medium and by any means whatsoever, whether now or hereafter known.

2.1.2.  the right to use, reproduce, print, publish or disseminate (and allow others the right to use, reproduce, print, publish, or disseminate) in any medium or by any method now or hereafter known the name of Label, the name of Principal, and the name of Artist and the professional names, approved portraits, approved pictures and approved likenesses of Artist and the individual producers and all other Persons performing services in connection with or whose performance is embodied in Distributed Product (including, without limitation, all professional, group and other assumed or fictitious names used by them) of the foregoing Persons (or any reproduction or simulation thereof) and approved biographical material concerning them for purposes of advertising, promotion, and trade in connection with Label, Distributed Product, or the Artist, the making and exploitation of Records hereunder, Universal's exploitation of Distributed Product, the marketing, promotion, and advertising of Records embodying Distributed Product, on websites, and general goodwill advertising.

2.1.3.  the right to use all Artwork Materials and all other Materials in any and all media now or hereafter known or devised in connection with manufacturing, distributing, advertising, marketing, promoting, selling, and otherwise exploiting Distributed Product.

2.1.4.  You warrant and represent that each Person who renders any services in connection with the recording of Masters will grant to you and Universal the rights referred to in this agreement and will have the right to so render such services and grant such rights. You warrant and represent that you will ensure no Person whose performance is embodied in a Master hereunder or whose services are used in the recording of a Master hereunder will be bound by any agreement that prevents or restricts such performances or services, unless you

    (Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000010

CONFIDENTIAL

deliver a waiver (e.g., side artist clearance) waiving any restriction(s) on such Person's performances or services.

2.2    Special Provisions with respect to Certain Third Party Licenses.  Notwithstanding anything to the contrary contained in this Agreement, during the Exploitation Period, Label will have the non-exclusive right to license any Master of Distributed Product to any Person in the Domestic Territory for use in motion pictures, television productions, television commercial or other similar synchronization uses so long as the origination of the license for the particular motion picture, television production, television commercial or other audiovisual production occurs in the Domestic Territory and the request for such use is made by a Person located in the Domestic Territory directly to Label in the first instance, whether or not the territory for such license includes territories outside of the Domestic Territory ("Direct Label Licenses").  With Respect to Direct Label Licenses, Label will notify Universal in writing within three (3) business days after granting the applicable license and Universal will not be entitled to its License Fee (as defined in Article 5 hereinbelow) in connection with each such license or any applicable royalties associated therewith.  The grant by Universal of all other licenses for third parties to exploit Masters or other Materials hereunder, e.g. without limitation, premiums, third party compilations, etc., shall be subject to Label's written consent, other than blanket licenses for substantially all of Universal's catalogue.  Notwithstanding anything to the contrary set forth herein, other than with respect to excluded Direct Label Licenses, Universal will have the right hereunder to grant licenses for a worldwide territory for synchronization and/or compilation uses of Masters if the applicable license originates in a portion of the Territory other than Canada.

2.3.    Security Agreement.  Simultaneously with Label's execution of this Agreement, Label agrees to execute and deliver to Universal the security agreement (the "Security Agreement") attached hereto as Exhibit "A-1" and incorporated herein by this reference.  The Security Agreement grants to and in favor of Universal, and Universal will retain a security interest in, the "Collateral" (as defined in the Security Agreement) to secure the recoupment by or repayment to Universal of any obligation, indebtedness, or unrecouped amount due to Universal (e.g., without limitation, any unrecouped co-op advertising charges, manufacturing charges, Advances, unrecovered returns charges) that is outstanding as of what would otherwise be the expiration or termination of the Exploitation Period of this Agreement. The security interest herein granted and retained by Universal attaches to the Collateral immediately upon execution of this Agreement; provided, Universal will be solely responsible for registering its security interest as required by applicable law. Label agrees to execute all documents required by Law to perfect or modify (if necessary) the security interest granted herein. Label will not, without Universal's written approval, grant a security interest in the Collateral that would be superior or prior to the security interest of Universal.

2.4.    Side Artist Appearances:  Notwithstanding anything to the contrary contained herein, Artist has the right, during the term hereof, to perform as a background vocalist or background instrumentalist for the purpose of making audio Records for others subject to the following:

2.4.1    You have then fulfilled all of your material obligations hereunder, and the engagement does not interfere with the continuing prompt performances of your obligations to Universal nor with any professional engagements to which you or Artist are committed that are intended to aid in the promotion of Records hereunder;

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000011

CONFIDENTIAL

2.4.2   Artist will not record any material embodied on a Master theretofore or thereafter delivered by you hereunder;

2.4.3   The Artist's name may be on the Album liners used for such Records, in the same position as the credits accorded to other sideartists and in type identical in size, prominence and all other respects. Except as provided in this subparagraph 2.4.3, neither the Artist's name, nor likeness nor biographical material may be used in any manner that presents Artist in a manner that undermines Artist's image or artistic integrity in connection with such Recordings. Without limiting the foregoing, Artist's name and/or likeness will not be used in any way in connection with Singles, or in advertising, publicity or other forms of exploitation, without Universal's express written consent, which Universal may withhold in its absolute discretion.

2.4.4   Before the Artist accepts the sideartist engagement for Artist to render a featured vocal performance, you will notify Universal of the names of the Person for whom the recordings are being made and the record company that will have the right to release the Record. Your acceptance of the sideartist engagement will be conditioned upon the other record company's permitting Universal to make similar uses of the services of recording artists of comparable stature under contract to that record company upon Universal's request; provided, Universal's approval will not be unreasonably or arbitrarily withheld.

3.   Matters Related to Artwork Materials.

3.1.   Record Packaging Artwork. Label will have the option to produce and deliver to Universal the Record packaging artwork for each Record of Distributed Product hereunder and all other Artwork Materials related thereto. All such artwork will be in the form of film from the "camera ready" artwork comprised of uncombined color separations (free of logos, bar coding or other indicia of your prior licensees or distributors) for any jacket, sleeve, container, cover, inlay card, booklet, and insert for Records to be derived from such Record and must comply with Universal's then-standard packaging format. All Record packaging artwork must be delivered to Universal not later than ninety (90) days before the initial scheduled release date of the Record concerned, unless otherwise agreed as between the parties, together with all licenses and consents required in connection with it and will be so delivered in the format and manner as designated by Universal in Universal's sole reasonable discretion. If Label elects to have Universal prepare such Record packaging artwork and/or any other Artwork Materials hereunder, or Label otherwise fails to deliver applicable artwork in a timely manner, Universal shall produce such artwork. Such artwork produced by Universal shall be subject to your approval and Universal will make such reasonable changes in the artwork as you reasonably request; provided, Universal will not be required to make any changes to artwork produced by Universal that may delay the release of the Album beyond the scheduled date Universal and no inadvertent non-routine failure to so obtain approval will be a breach hereof.

3.2.   Use of Universal Mark and Other Logos. All Record packaging artwork and other Artwork Materials hereunder will contain both the Label Mark and the Universal Mark. Notwithstanding the foregoing, all matters relating to Universal's and Label's trademarks (including without limitation, the placement and size of logos) used on the Record packaging will be determined in Universal's reasonable judgment in consultation with Label.

3.3.   Approval Of Artwork Materials. Label will submit to Universal all Artwork Materials hereunder and other materials manufactured, printed, or otherwise created by Label or Label's

W000012

CONFIDENTIAL

agents or on Label's behalf or that are otherwise under Label's control and that are related in any manner to marketing, promoting, advertising and/or selling Distributed Product. Universal will not reject Label's use of any Artwork Materials that Label submits to Universal for use in connection with Distributed Product unless Universal in its reasonable discretion determines that such Artwork Materials are offensive or otherwise likely to be harmful to the reputation of Label, Artist and or Universal.

    3.4.   Parental Advisory Logo.  If Universal determines in its sole discretion that any Record of Distributed Product must be identified as containing "explicit content" then Label agrees to include the R.I.A.A. "Parental Advisory Logo" (as provided by Universal to Label) on and as part of the front outside Record packaging artwork of the applicable Distributed Product in the size, manner, and placement as designated and instructed by Universal in its sole reasonable discretion and on all materials (including, without limitation, Artwork Materials) related to the particular Record of Distributed Product (e.g., without limitation, advertisements and promotional and marketing materials).

    3.5.   Other Information for Inclusion on Artwork Materials.  All Record packaging artwork and other Artwork Materials hereunder will contain all such, trademarks, trade names, information, logos and other items as instructed by Universal and that Universal customarily includes on  the Record packaging artwork and related artwork material for Universal's own Records, including, without limitation, Internet Addresses, so-called "watermarks", "meta-data", "hyperlinks" to Internet Addresses, and consumer-related information and anti-piracy warnings (e.g., an F.B.I. Anti Piracy Notice). Any Artwork Materials approved by Label in connection with Distributed Product shall be deemed approved hereunder for use for marketing and promotional purposes.

4.   Advances

    4.1   Definition of Advances:  All monies paid to you or Artist hereunder, as well as all monies paid on behalf of you or Artist with your consent, at your request or pursuant hereto, other than Distribution Proceeds and Mechanical Royalties paid pursuant to this agreement, constitute Advances unless otherwise expressly agreed to in writing by Universal.

    4.2.   Advance Payment Schedule

    4.2.1  In connection with your Delivery to Universal of the Masters constituting an Album in fulfillment of your Recording Commitment, Universal will pay you an Advance in the amount by which the applicable sum indicated below ("Recording Fund") exceeds the Recording Costs for the Album concerned:



            (i)    Recordings in fulfillment of your Recording Commitment for the Initial Period:                          ; and

            (ii)   Recordings in fulfillment of your Recording Commitment for each Option Period:           .

    4.2.2  This subparagraph 4.2.2 will apply to each timely Delivered Album recorded in fulfillment of your Recording Commitment for the Option Periods hereof (each an "Option Album") and to no other Albums. The Recording Fund for each Album specified in the

W000013

CONFIDENTIAL

preceding sentence will be the greater of (i) the sum equal to ████████████ of the total Distribution Proceeds earned hereunder during the period which runs from the beginning of the accounting period hereunder in which the previous Album was released until the end of the accounting period that immediately precedes the accounting period in which Artist commences recording the Album concerned ████████████ or (ii) the amount set forth in subparagraph 4.2.1 above:

      4.2.3   Each Advance referred to in this paragraph 4.2 will be paid according to the following schedule:

          (i)   Initial Period Advance:

             (a)   ████████████████████
████████████ (the "Execution Advance").   Without altering the treatment of the full amount referred to in the immediately preceding sentence as an Advance against Label's share of Distribution Proceeds hereunder, which for the avoidance of doubt is cross-collateralized across all Distributed Product, such amount will be deemed allocated as follows: ████████ in respect of each of the three (3) albums of Existing Recordings and $500,000 in respect of Album One (out of which ████████ you hereby authorize and direct Shalinsky & Company to deduct ████████ in respect of your legal fees).   Notwithstanding the foregoing, you hereby authorize and direct Universal (and Universal agrees to accept such direction), to pay the full sum of the Execution Advance to the account of Sander Shalinsky In Trust ("Shalinsky Trust Account"); provided, Universal's compliance with this authorization will constitute an accommodation to you alone; Shalinsky Trust Account is not a beneficiary of it. All payments to the Shalinsky Trust Account will constitute payment to you alone and Universal will have no liability by reason of any erroneous payment or failure to comply with this authorization.   You will indemnify and hold Universal harmless against any claims asserted against Universal and any damages, losses or expenses Universal incurs by reason of any such payment or otherwise in connection herewith;

             (b)   ████████████████████████████████ promptly following January 2, 2013; and

             (c)   the balance, less any Recording Costs, if any, incurred by Universal (in its sole discretion and without any obligation on its part to do so) during the Initial Period at your request or with your consent, promptly after Delivery of Album One (the "Initial Period Balance Of Fund").

          (ii)   With respect to each subsequent Album:

             (a)   Promptly after you notify Universal in writing that you have commenced recording of the applicable Album required to be Delivered in fulfillment of your Recording Commitment, Universal will pay ████████████ of the applicable Advance set forth in paragraph 4.2.1 above less any amounts previously paid to you in connection with the Album concerned (hereinafter the "Commencement Advance"); and

             (b)   The balance promptly after Delivery of the Album concerned.

W000014

CONFIDENTIAL

4.2.4  If any Album is not Delivered within ninety (90) days after the time prescribed in paragraph 1.6.3 above, other than solely as a result of Universal's wrongful or negligent acts or omissions, the Recording Fund for that Album will be reduced by ▮▮▮▮▮ for each full month from the last date for timely Delivery to the date of actual Delivery, provided that the applicable Recording Fund will not be reduced pursuant to this subparagraph 4.2.4 below an amount equal to the actual Recording Costs or Authorized Budget approved by Universal and incurred in connection with the Album concerned. Additionally, Universal will not reduce the Recording Fund for the applicable Album unless Universal has given you written notice of your failure to timely Deliver the applicable Album and you do not Deliver such Album within one hundred twenty (120) days following the date of such notice.

4.2.5.  If the Recording Costs and other Advances paid or reimbursed by Universal for any Recording in fulfillment of your Recording Commitment exceed the applicable Recording Fund payable with respect to such Recording (where such excess was not solely due to the wrongdoing or negligence of Universal) ("Excess Costs"), you will be solely responsible for such Excess Costs.  In the event Universal elects to pay all or any portion of Excess Costs (including, without limitation, those paid pursuant to a revised or re-forecasted Authorized Budget and any other approved costs), such payment will be a direct debt from you to Universal which, in addition to any other available remedies, Universal may recover from any sums payable to you and/or Artist or your designees (other than Mechanical Royalties).

5.    Distribution and Services Fee; Licensing Fee; Domestic Net Proceeds; Foreign Royalty.

5.1.    Additional Defined Terms.  As used herein:

(i)    "Distribution Charges" has the meaning set forth in paragraph 5.4.1 hereinbelow.

(ii)    "Domestic License Income" means all monies (including, without limitation, royalties and flat payments) received by Universal in the United States in connection with the subject matter thereof solely attributable to Masters, Videos, or other items of Distributed Product in connection with the exploitation of such Distributed Product by Universal or its licensees or designees through Ancillary Exploitation Channels in the Domestic Territory, less all actual third party costs or expenses paid or incurred by Universal in connection therewith.  For clarity, with respect to any license or other arrangement entered into or initiated within the Domestic Territory in respect of Ancillary Exploitation of Distributed Product that involves exploitation in the Domestic Territory (whether or not such license also involves exploitation outside of the Domestic Territory), all exploitation under such license or arrangement shall be deemed to occur within the Domestic Territory for purposes of the definition of Domestic License Income.

(iii)    "Domestic Net Billings" means any and all monies actually received by or credited to Universal in connection with sales made or other Normal Retail Channel exploitations of Distributed Product authorized hereunder in the Domestic Territory of Distributed Product invoiced during each accounting period, less actual returns of Distributed Product distributed by Universal during the accounting period concerned and/or credits to Universal's customers (or the customer's of Universal's distributor) for such returns made during the accounting period concerned.

(iv)    "Domestic Net Proceeds" means Domestic Revenue less the Distribution Charges.

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000015

CONFIDENTIAL

(v)    "Domestic Revenue" means the sum of Domestic License Income plus Domestic Net Billings.

5.2.    Distribution and Services Fee.    In consideration of Universal providing certain services in connection with the distribution and exploitation of Distributed Product through Normal Retail Channels in the Domestic Territory, Universal will have the right to deduct from Domestic Net Billings and retain for its own account a distribution and services fee in the amount equal to ▮▮▮▮▮▮▮▮ of Domestic Net Billings ("Distribution and Services Fee"). Notwithstanding the foregoing, the Distribution and Services Fee solely with respect to Records sold in the form of Electronic Transmissions will be reduced by ▮ commencing in the first accounting period following which the overall US music-industry wide proportion of Album sales in the form of permanent downloads reaches ▮ of the combined market for physical and digital Albums, and will be reduced by an additional ▮ once such share reaches ▮.

5.3.    License Fee. In consideration of Universal providing certain services in connection with the distribution and exploitation of Distributed Product through Ancillary Exploitation Channels in the Domestic Territory, Universal will have the right to deduct from Domestic License Income and retain for its own account a license fee in the amount equal to ▮▮▮▮▮▮▮ of Domestic License Income ("License Fee"). For clarity, the License Fee shall not apply to those certain third party licenses procured by Label pursuant to subparagraph 2.2 above.

5.4.    Domestic Net Proceeds.

5.4.1. In connection with the sale or other exploitation of Records of Distributed Product in the Domestic Territory by Universal or its licensees, Universal will pay to you the amount equal to Domestic Revenue less the following (the "Distribution Charges"), subject to the other terms and conditions of this Article 5 and Article 6 hereinbelow:

(i)    the Distribution and Services Fee as set forth in subparagraph 5.2 above;

(ii)    the License Fee as set forth in subparagraph 5.3 above;

(iii)    All Advances paid or incurred by Universal hereunder;

(iv)    Any and all charges for the manufacturing or handling of Distributed Product or the reproduction of Artwork Materials and all other artwork, sleeves, labels, covers or other containers of such Records in accordance with Universal's then-current standard rate card charges for similar quantities of Records ("Manufacturing Costs");

(v)    Any and all applicable taxes imposed on Universal with respect to the manufacture, distribution, license, sale, and/or other exploitation of Distributed Product hereunder (e.g., sales tax, VAT, etc.);

(vi)    Any and all advertising monies paid or incurred in accordance with the provisions of this Agreement;

W000016

CONFIDENTIAL

(vii)    Universal's standard charges for returns handling and refurbishing,

(viii)    all third party marketing, promotion and publicity costs;

(ix)    all Recording Costs, Video production costs and other recoupable amounts paid to or on behalf of Artist

(x)    Mechanical Royalties and other copyright license fees and/or synchronization fees;

(xi)    Outside legal costs paid or incurred by Universal that are related to Artist and/or Recordings that are subject to this agreement;

(xii)    A reasonable reserve against anticipated returns of Distributed Product distributed by Universal and/or credits for such returns during and after the expiration or termination of the Exploitation Period; provided, in establishing reserves, Universal will take into consideration the sale and returns history of previous Records shipped hereunder as well as that of the Record concerned, Soundscan reports (or similar retail sales reports) and reports from Universal's distributor regarding to what extent the Record concerned is "selling through" at retail outlets, and for the avoidance of doubt, no reserves are applied in connection with Electronic Transmissions;

(xiii)    Credits to Universal's customers for actual returns of Distributed Product not shipped by Universal hereunder made during each accounting period;

(xiv)    all special program discounts and/or price reduction programs. As used in the preceding sentence, "special program discounts" means price discounts given to Universal's (or its distributor's) customers in respect of any special discount program; and

(xv)    Any other amounts due Universal in connection with or related to Distributed Product or any and all other costs of any other service rendered by Universal in connection with or related to Distributed Product or monies spent by Universal on Label's behalf hereunder, provided any such service, product, or monies are provided or spent in the normal course of handling Distributed Product hereunder and are consistent with similar services, products or monies that are provided or spent for similar-type arrangements and are spent in accordance with this Agreement;

(xiii)    any and all other actual, out of pocket costs actually incurred or paid by Universal which are directly attributable to the Artist or Artist's Recordings hereunder.

5.4.2.    Without limiting any of the terms and conditions contained in this Agreement, Label acknowledges and agrees that Universal may invoice free goods in accordance with Universal's (or its distributor's) standard policies.

5.5.    Royalty for the exploitation of Distributed Product in the License Territory.    In connection with the sale or other exploitation of Records of Distributed Product in the License Territory by Universal or its licensees, Universal will pay to Label a royalty ("Foreign Royalties") in the following applicable amounts in accordance with the terms and conditions of this paragraph 5.5 and the terms and conditions of Article 6 hereinbelow.

W000017

CONFIDENTIAL

5.5.1  On Albums embodying solely Masters of Distributed Product sold for distribution at top-line prices through Normal Retail Channels in the License Territory by Universal's direct and immediate licensee(s) outside of the Domestic Territory (each such licensee, a "Foreign Licensee"):  a royalty calculated at a basic rate of ████████████ of the applicable Royalty Base Price for the Record concerned (the foregoing applicable royalty rate, the "Basic Album Rate").  Such Basic Album Rate will increase to ████ on a prospective basis for any country of the Territory in which an Album hereunder achieves platinum status in such country; provided, such increase will take effect starting with income accounted for during the first accounting period following the period in which such status is achieved.

5.5.2.  On (i) Records (other than Albums) embodying solely Masters of Distributed Product sold for distribution in the Foreign Territory by Universal's Foreign Licensee(s), (ii) Records embodying solely Masters of Distributed Product sold for distribution in the Foreign Territory at prices other than top-line prices by Universal's Foreign Licensee(s), and (iii) Records embodying solely Masters of Distributed Product sold for distribution through Ancillary Exploitation Channels in the Foreign Territory by Universal's Foreign Licensee(s): a royalty calculated at the applicable percentage below of the Basic Album Rate:

    (A)    EPs:    ████████.

    (B)    singles:    ████████████.

    (C)    midline Records:    ████████████.

    (D)    budget Records and all other sales or exploitations of Records solely embodying Masters of Distributed Product in the License Territory by Universal's Foreign Licensee(s) (except as provided in paragraph 5.5.4 hereinbelow): ████████████.

    (iv)    For the purposes of this agreement, (x) the term "single" means a Recording of not less than three (3) minutes of continuous sound; (y) the term "midline" Record means a Record bearing a Suggested Retail List Price equal to more than two-thirds (2/3), but no more than eighty percent (80%), of the Suggested Retail List Price in the country concerned of top-line single-unit Records in the configuration concerned; and (z) the term "budget" Record means a Record bearing a Suggested Retail List Price equal to no more than two-thirds (2/3) of the Suggested Retail List Price in the country concerned of top-line single-unit Records in the configuration concerned.

5.5.3.  On Records embodying Masters of Distributed Product with other Masters sold for distribution in the Foreign Territory by Universal's Foreign Licensee(s): a royalty calculated at the applicable percentage of the Royalty Base Price for the Record concerned pursuant to paragraph 5.5.1 or 5.5.2 hereinabove (as applicable) multiplied by a fraction, the numerator of which is the number of Masters of Distributed Product embodied on the Record concerned, and the denominator of which is the total number of Masters (including, without limitation, all Masters of Distributed Product) embodied on the Record concerned.

5.5.4.  With respect to licenses of Masters of Distributed Product in the License Territory on a flat-fee or other royalty basis: ████████████ of the net receipts received by Universal in the United States (subject to paragraph 5.5.5 hereinbelow).  As used in the

W000018

CONFIDENTIAL

preceding sentence, "net receipts" means royalties or flat payments received by Universal in the United States in connection with the subject matter thereof solely attributable to Masters, Videos or other items of Distributed Product, less all third party costs or expenses actually paid or incurred by Universal in connection therewith.

5.5.5. Notwithstanding anything to the contrary contained herein, Label acknowledges and agrees that Label will not receive or otherwise be entitled to any portion of advances or guarantees paid to Universal or any of Universal's licensees (including, without limitation, any Universal Foreign Licensee), unless solely attributed to a particular Master of Distributed Product.

6.    Accountings; Audits.

6.1.    Statements and Payments.    Universal will prepare accounting statements in respect of Domestic Net Proceeds and Foreign Royalties (collectively referred to herein as "Distribution Proceeds") hereunder on a semi-annual basis. On or before the date ninety (90) days after the close of the applicable semi-annual period, Universal will send such accounting statements to Label for the semi-annual period concerned together with payment of Domestic Net Proceeds and Foreign Royalties hereunder, if any, for the accounting period concerned, less any unrecouped Advances and less the amount, if any, that Universal may be required to withhold pursuant to the applicable state tax laws, the U.S. Tax Regulations, or any other applicable statute, regulation, treaty, or law. If Universal makes any overpayment to Label (e.g., by reason of an accounting error or by paying Domestic Net Proceeds on Records returned later), Universal may recover such sums from any other monies due Label hereunder (other than Mechanical Royalites). The calculation of Domestic Net Proceeds and Foreign Royalties will be made irrespective of the tax treatment of a particular expense, i.e. the fact that the tax authorities requires amortization of a particular cost or expense will not diminish the deductibility of that expense in the accounting period expended. In addition, any cost or expense chargeable hereunder will be deductible in the accounting period incurred irrespective of the possibility that the actual payment might be delayed into the following accounting period.

6.2    Foreign Sales. Foreign Royalties will be computed in the same national currency and at the same rate of exchange as Universal is accounted to by its licensees with respect to the sale concerned and will be subject to costs of conversion and any taxes applicable to royalties remitted by or received from foreign sources. Foreign Royalties are not due and payable by Universal until payment therefor has been received by or credited to Universal in the United States in United States dollars. For purposes of accounting hereunder, Universal will treat any sale in the Foreign Territory as a sale made during the same six (6) month period in which Universal receives its licensee's accounting and payment or credit for that sale. If any law, government ruling or other restriction affects the amount that a Universal licensee can remit to Universal, Universal may deduct from Foreign Royalties an amount proportionate to the reduction in such licensee's remittances. If Universal cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to Label for that sale, except as provided in the next sentence. Universal will, at Label's request and at Label's expense, deduct from the monies so blocked and deposit in a foreign depository the equivalent in local currency of the portion of royalties that would be payable to Label pursuant to the terms hereof on the foreign sales concerned, to the extent such monies are available for that purpose. All such deposits will constitute payments to Label for accounting purposes, and such deposits will fulfill Universal's obligations in connection therewith.

W000019

CONFIDENTIAL

6.3    Objections.  All accounting statements rendered by Universal hereunder will be conclusively binding and not subject to any objection by Label for any reason unless specific objection in writing, stating the basis thereof, is given to Universal within three (3) years from the date such statement is rendered and an audit pursuant to paragraph 6.4 hereinbelow for that statement is completed within said three (3) year period. Each statement will be deemed rendered when due unless Label notifies Universal in writing that the applicable statement was not received by Label and such notice is given within ninety (90) days after the applicable due date specified in paragraph 6.1 hereinabove, in which event the statement will be deemed rendered on the date actually sent by Universal.  Failure to make such written objection or conduct the audit within said time periods will be deemed to be Label's approval of such accounting statement, Label's waiver of such audit rights, and Label's waiver of the right to sue Universal for additional sums owed for the applicable accounting period. Label will not have the right to sue Universal in connection with any accounting, or to sue Universal for recovery of sums owed for a particular accounting period, unless Label commence the suit within three (3) years from the date such statement is rendered.

6.4.    Audits.  Label may, at Label's own cost and expense, audit Universal's books and records directly relating to this Agreement that report the sales or other exploitation of Records for which monies are payable hereunder. Label may make such audit only for the purpose of verifying the accuracy of statements sent to Label hereunder and only as provided herein. Label may initiate such audit only by giving notice to Universal at least thirty (30) days prior to the date Label intends to commence Label's audit. Label's audit will be conducted by a reputable independent certified public accountant experienced in recording industry audits in such a manner so as not to disrupt Universal's other functions and will be completed promptly subject to Universal's cooperation in providing adequate access to the applicable books and record. Label may audit a particular statement only once and only within three (3) years after the date such statement is rendered as provided in paragraph 6.3 above. Label's audit may be conducted only during Universal's usual business hours and at the place where Universal keeps the books and records to be examined. Label will not be entitled to examine any records that do not specifically report sales of Records on which Net Proceeds or Foreign Royalties are payable hereunder.  Label will be permitted to examine records that reflect the number of Records hereunder that are manufactured, the movement of Universal's inventory of such Records, and any credits or rebates that are given in respect of such Records, for each accounting period that is the subject of the audit. Label's auditor will review his or her tentative written findings with a member of Universal's finance staff designated by Universal before rendering a report to Label so as to remedy any factual errors and clarify any issues that may have resulted from misunderstanding.

7.    Services to be Provided By Universal; Videos; Approvals.

7.1    Services to be Provided by Universal.  Provided that Label has fulfilled all of its material obligations hereunder, during the Term Universal will provide the services of its in-house personnel from the following departments to render services in connection with each Album of Distributed Product released by Universal hereunder (collectively, "Label Services"): marketing, publicity, radio promotion, video production, video promotion, and creative, subject to the terms and conditions of this Agreement. The foregoing services will be rendered in accordance with a marketing plan and budget which will be developed in consultation with Label ("Approved Marketing Plan").  All costs and expenses paid or incurred by Universal in connection with rendering such services, including, without limitation, all costs and expenses paid or incurred by

W000020

CONFIDENTIAL

Universal in connection with advertising, marketing, and promoting the Album concerned (including, without limitation, "independent promotion" costs and expenses) and Universal creating any Artwork Materials or other works or materials on behalf of Label (e.g., without limitation, Record packaging artwork or Videos) will constitute additional Advances hereunder and Universal will have the right to deduct all such costs and expenses from any and all monies otherwise payable to Label hereunder. All such costs will be in addition to any co-op advertising monies spent on the Record concerned. Notwithstanding the foregoing, Label will pay all costs in excess of the Approved Marketing Plan for a particular Record of Distributed Product. If Universal pays any such costs that are Label's responsibility pursuant to the immediately preceding sentence (which Universal is in no way obligated to do), Universal will have the right to deduct an amount equal to such excess from all monies (other than Recording Funds) otherwise payable to Label hereunder. All decisions with respect to how Universal provides any Label Services will be made in Universal's sole good faith discretion. Without otherwise limiting the foregoing, during the Initial Period, Universal agrees that the Approved Marketing Plan shall provide for a total expenditure in an amount not less than ▓▓▓▓▓▓ (the "Initial Period Marketing Fund") and in connection with Albums hereunder subsequent to Album One, Universal agrees that the Approved Marketing Plan shall provide for a total expenditure of not less than ▓ ▓▓▓▓▓ of the Advance payable hereunder by Universal in connection with the Album concerned. Without limiting the foregoing, Universal will coordinate with you to direct disbursements of mutually agreed amounts of monies provided for in the Approved Marketing Plan in order to maximize your ability to obtain financial subsidies available in Canada for the production of Videos and/or other marketing or promotional support from the Canadian government and/or applicable Canadian arts funding organizations. Additionally, Universal agrees to pay you ▓▓▓▓ from the Initial Period Marketing Fund promptly following the full execution hereof for you to disburse for the costs of bona fide third party advertising, marketing and/or promotional expenses incurred during the Initial Period (the "Independent Marketing Allocation"). You shall submit to Universal detailed invoices describing the basis for all expenditures of made from the Independent Marketing Allocation and verification of your payment thereof; provided, to the degree any amount of the Independent Marketing Allocation is not supported by such documentation, Universal shall have the right to hold in reserve monies otherwise payable to you pursuant to subparagraph 4.2.3(i)(b) in an amount equal to the amount of such Independent Marketing Allocation that is not so supported.

    7.2.   <u>Videos</u>.

       7.2.1   Universal shall at Label's request, produce and/or advance the costs or expenses in connection with producing one (1) Video per Contract Period (or more, subject to mutual agreement) embodying Masters of Distributed Product and Universal agrees to expend at least ▓▓▓▓▓ per Contract Period on producing Video(s). Such costs and expenses shall be treated as Advances hereunder but shall not form a portion of the Recording Fund hereunder nor shall the amount expended on Videos hereunder be deducted from the Initial Period Marketing Fund. Each such Video shall be subject to Label/Artist approval only but Universal shall have the right to reject any Video that Universal reasonably believes is either offensive to reasonable standards of public taste or in violation of the rights of others. For clarity, any and all right, title and interest in the Videos not granted herein, including the copyright therein, shall remain with Label. In connection with such Video(s) following terms and conditions will apply in connection therewith: (i) all creative elements related to each such Video (e.g., treatment, script, concept, director, Master to be embodied in the particular Video) will be subject to the mutual approval of Label and Universal

W000021

CONFIDENTIAL

(such approval not to be unreasonably withheld or delayed by either party); (ii) each such Video will be filmed on a date or dates and at a location or locations to be mutually designated by Universal and Label; (iii) the costs and expenses related to producing each such Video will be subject to a written budget mutually approved in advance by Universal in writing; and (iv) Label and Universal will mutually determine in good faith at such time whether Label or Universal will engage the director, producer, and other production personnel for the Video concerned.

7.2.2   Universal is and will be the sole and exclusive worldwide licensee during the Exploitation Period and in the Territory of all rights in and to each Video produced during the Term, including, without limitation, the right to exploit Videos promotionally as well as commercially.

7.2.3   You shall cause Artist to issue (or cause the music publishing companies having the right to do so to issue) (a) worldwide, perpetual synchronization licenses, and (b) perpetual licenses for public performance in the United States (to the extent that ASCAP and BMI are unable to issue same), to Universal at no cost for the use of all Controlled Compositions (as defined in Article 8 hereof) in any Video effective as of the commencement of production of the applicable Video (and your execution of this agreement constitutes the issuance of such licenses by any music publishing company that is owned or controlled by you, Artist or any Person owned or controlled by you or Artist). In the event that you fail to cause any such music publishing company to issue any such license to Universal, or if Universal is required to pay any fee to such music publishing company in order to obtain any such license, Universal will have the right to deduct the amount of such license fee from any and all sums otherwise payable to you hereunder other than Mechanical Royalties. At Label's request, Universal will use reasonable efforts to assist Label in obtaining such licenses.

7.3.   <u>Approvals and Marketing Restrictions</u>.

7.3.1. During the Term, with respect to audio Records manufactured for sale in the United States, Universal will, in addition to any other limitations or restrictions set out in this Agreement, not without your written consent:

(i)     initially release any Album in fulfillment of your Recording Commitment under any Record label other than Universal Republic Records, or other label then used by UMG Recordings, Inc. for performances by Universal's best selling artists then under exclusive term contract to Universal;

(ii)    couple during any one year period more than two (2) Masters made hereunder with Recordings not embodying Artist's performance, except promotional Records, non-retail jukebox compilations, consumer compilation Records, sampler-type Records, and programs for use on public transportation carriers and facilities. Notwithstanding the foregoing, if any Master hereunder is released as a Single, then such Master shall be deemed automatically approved for inclusion on the compilation Records with the brand names "Now #____" and "Universal Smash Hits", and such use(s) shall not be applied towards the two (2) Master uses set forth in the opening clause of this subparagraph 7.3.1(ii)

(iii)   use Masters made under this agreement on premium Records to promote the sale of any product or service other than Records embodying Artist's performances.

W000022

CONFIDENTIAL

(iv)    release any Album Delivered in fulfillment of your Recording Commitment as a Budget Record within eighteen (18) months or as a Midline Record within twelve (12) months after such Album's initial release. The foregoing restriction will not apply to Records initially released by Universal at a Budget Record price or Midline Record price as part of a "new or developing artist" type of program.

(v)    sell Records Delivered in fulfillment of your Recording Commitment as "cutouts" within twenty four (24) months after the initial United States release of the Master concerned;

(vi)    release any Joint Recordings subject hereto;

(vii)    release "out-takes", i.e. Masters made during recording sessions during the term hereof that have never been mixed including false starts, errors and mistakes.

(viii)    license Albums in fulfillment of your Recording Commitment to record clubs prior to the date one (1) year after the initial United States release of the Album concerned;

(ix)    release so-called demonstration recordings;

(x)    resequence the Masters on Albums Delivered hereunder; provided the restriction set forth in this subparagraph 7.3.1(x) shall not be construed to limit Universal's right to sell Masters individually (by means of Electronic Transmission or otherwise), on compilation or soundtrack Albums (subject to 10.04(b) above), or in any sequence on a Records released in any format or configuration other than Albums.

(xi)    release any Multiple Record Albums or recordings made live in concert.

7.3.2. With respect to sales or uses of audio Records manufactured outside the United States, Universal will request that its licensees outside of the United States to comply with the provisions of subparagraph 7.3.1 above. If you notify Universal of sales of Records or uses of Masters outside the United States in violation of the provisions of such subparagraphs, Universal will instruct its licensees to discontinue such violative sales or uses, but neither Universal nor its licensees will have any liability by reason of such sales or uses occurring prior to Universal's receipt of such notice, and Universal will have no liability by reason of such sales or uses at any time.

7.4    Universal Artist Website

7.4.1    During the Exploitation Period hereof, Universal will have the right to host and maintain a Universal Artist Website; provided, such Universal Artist Website is integrated within the Universal's Website that contains Websites of the majority of the other recording artists distributed by Universal. With respect to the Universal Artist Website, Universal Website Material and all artwork and other creative elements produced in connection therewith shall be mutually approved by you and Universal, provided, however, that any Artwork Materials or other materials furnished or approved by you or Artist for any other purpose hereunder shall be deemed approved by you for use in connection with such Universal Artist Websites and Universal Website Material.

W000023

CONFIDENTIAL

7.4.2    You will issue (or use reasonable efforts to cause the music publishing companies having the right to do so to issue) (1) worldwide, perpetual synchronization licenses, and (2) worldwide, perpetual licenses for public performance to Universal at no cost for the use of all Controlled Compositions in Website Material, ECD Material and Mobile Material effective as of the commencement of production of the applicable Website Material, ECD Material or Mobile Material (and your execution of this agreement constitutes the issuance of such licenses by you, Artist and any music publishing company that is owned or controlled by you, Artist or any Person owned or controlled by you or Artist). In the event that you fail to cause any such music publishing company to issue any such license to Universal, or if Universal is required to pay any fee to such music publishing company in order to obtain any such licenses in respect of Controlled Compositions, Universal will have the right to deduct the amount of such license fee from any and all sums otherwise payable to you hereunder (it being understood that Universal shall first seek to deduct such amount from any monies other than Mechanical Royalties hereunder before deducting same from Mechanical Royalties hereunder).

7.4.3    Universal will have the right to use and allow others to use the Universal Artist Website, and Website Material, ECD Material, and Mobile Material for advertising and promotional purposes and for commercial purposes subject to the terms of this agreement.

7.4.4    Each Universal Artist Website, and all Universal Website Material, ECD Material, and Mobile Material will be deemed a Artwork Materials as provided herein. Universal will have the rights in and to each Universal Artist Website, Universal Website Material, ECD Material and Mobile Material as are otherwise applicable hereto with respect to Masters made hereunder, including, without limitation, the right to use and publish, and to permit others to use and publish, your and Artist's name and approved likeness in each Universal Artist Website, Universal Website Material, ECD Material, and Mobile Material and for advertising and purposes of trade in connection therewith.

7.4.5    The foregoing is not intended to imply that you shall be precluded from maintaining Website(s) related to Artist and/or Label ("Label Controlled Website(s)") independent of the Universal Artist Website.

8.    License for Musical Compositions

8.1    You hereby are deemed to have caused Artist and all applicable co-writers to grant Universal an irrevocable license under copyright to reproduce each Controlled Composition on Records and distribute such Records in the United States and Canada. For that license, Universal will pay Artist or Artist's designee Mechanical Royalties, on the basis of Net Sales, at the following rate (the "Controlled Rate"):

8.1.1    On Records distributed in the United States:

(i)    If the copyright law of the United States provides for a minimum compulsory rate: The rate equal to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ of the minimum compulsory license rate applicable to the use of musical compositions on audio Records under the United States copyright law (hereinafter referred to as the "U.S. Minimum Statutory Rate") at the time of Delivery of the recording of the Master concerned but in no event later than the last date for timely

W000024

CONFIDENTIAL

Delivery of such Master (the applicable date is hereinafter referred to as the "Copyright Fixing Date"). (The U.S. Minimum Statutory Rate is $.091 per Composition as of January 1, 2006);

       (ii)    If the copyright law of the United States does not provide for a minimum compulsory rate: The rate equal to ▮▮▮▮▮▮▮▮▮▮ of the minimum license rate agreed to by the major record companies and major music publishers in the United States (hereinafter referred to as the "U.S. Agreed Rate") as of the Copyright Fixing Date of the Master concerned.

     8.1.2  On Records distributed in Canada:

       (i)    If the copyright law of Canada provides for a minimum compulsory rate: The rate equal to ▮▮▮▮▮▮▮▮▮▮ of the minimum compulsory license rate applicable to the use of musical works on audio Records under the copyright law of Canada at the Copyright Fixing Date of the Master concerned;

       (ii)    If the copyright law of Canada does not provide for a minimum compulsory rate, but the major record companies and major music publishers in Canada (collectively the "Canadian Record Industry") have agreed to a mechanical license rate: The rate equal to ▮▮▮▮▮▮▮▮ of the minimum license rate agreed to as of the Copyright Fixing Date of the Master concerned;

     8.1.3  The total Mechanical Royalty for all Compositions (including Controlled Compositions) will be (i) with respect to each Album other than Multiple Record Albums, not more than twelve (12) times the Controlled Rate, except that for any configuration of such Album that contains so-called "bonus tracks" comprised of Recordings of distinct Compositions (i.e., Compositions not already embodied on the applicable Album) which are contained solely on a version of the Album specially requested by Universal to be for sale or other distribution through a specific retailer or in connection with a specific promotion (a "Deluxe Version"), the total Mechanical Royalty payable by Universal in connection with such Deluxe Version of the Album will be increased by the number of such bonus tracks, not to exceed two (2), multiplied by the Controlled Rate (provided that with respect to each Long Play Single embodying three (3) different Compositions, the total Mechanical Royalty shall be not more than three (3) times the Controlled Rate); (ii) with respect to each single Record released hereunder, not more than two (2) times the Controlled Rate; (iii) with respect to any EP released hereunder, not more than five (5) times the Controlled Rate; and (iv) with respect to Multiple Record Albums (if any), the maximum aggregate Mechanical Royalty will not be more than the maximum Mechanical Royalty applicable to an Album not in the form of a Multiple Record Album multiplied by a fraction, the numerator of which is the Suggested Retail List Price of such Multiple Record Album and the denominator of which is the Suggested Retail List Price of "top-line" Albums. With respect to the exploitation or sale of Records at a midline price or lower, the Mechanical Royalty maximums will be three fourths (3/4) of the amounts prescribed in this subparagraph. Any amounts in excess of the applicable maximums pursuant to this subparagraph 8.1.3 will be treated as described in subparagraph 8.1.7 below.

     8.1.4  Mechanical Royalties will not be payable with respect to Records otherwise not royalty bearing hereunder, with respect to nonmusical material, with respect to Compositions of one minute or less in duration, and with respect to more than one (1) use of any one (1) Composition per Record. No Mechanical Royalties will be payable in respect of Controlled

              (Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000025

CONFIDENTIAL

Compositions in the public domain or arrangements of Compositions in the public domain except that if such arrangement is credited by ASCAP or BMI, then the Mechanical Royalty otherwise payable hereunder will be apportioned in the same ratio used by ASCAP or BMI in determining the credits for public performance of the work, provided you furnish Universal with satisfactory evidence of that ratio.

8.1.5    Universal will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to Artist and applicable co-authors. On or before the next May 15, August 15, November 15, or February 15, Universal will send a statement covering those royalties and will pay any Mechanical Royalties then due. Mechanical Royalty reserves maintained by Universal against anticipated returns and credits may be held for a reasonable period of time, and in any event will be liquidated within eight (8) full quarterly accounting periods after the period in which such reserves were initially established.    In establishing reserves, Universal will take into consideration the sale and returns history of previous Records shipped hereunder as well as that of the Record concerned (including the nature of the sale, i.e., whether it is returnable by the retailer or sold on a non-returnable basis), Soundscan reports (or similar retail sales reports) and reports from Universal's distributor regarding to what extent the Record concerned is "selling through" at retail outlets.    If Universal makes any overpayment of Mechanical Royalties on Controlled Compositions (e.g., but without limitation, by reason of an accounting error or by paying Mechanical Royalties on Records returned) such excess will be treated as described in subparagraph 8.1.7 below. Your right to audit Universal's books and records as the same relate to Mechanical Royalties for Controlled Compositions is subject to the terms and conditions set forth in Article 6.4 above.

8.1.6    Any assignment made of the ownership of copyright in, or the rights to license or administer the use of, any Controlled Composition will be made subject to the provisions of this Article 8.

8.1.7    You agree to indemnify and hold Universal harmless (from the payment of Mechanical Royalties in excess of the applicable amounts in the provisions of this Article 8. If Universal pays any such excess, such payments may be deducted from any other monies payable hereunder.

8.2    Without limiting the foregoing, you hereby are deemed to have caused Artist to grant to Universal and any licensee of Universal (and will issue or will use reasonable efforts to cause the music publishing companies having the right to do so to issue licenses granting) the irrevocable right in perpetuity throughout the Territory and without liability to any Person, subject to the terms and conditions of this Agreement, to print, reproduce and/or otherwise recreate the title and/or lyrics to each Controlled Composition embodied on a Master hereunder in connection with (i) Masters, Videos, Audiovisual Records and other Records hereunder and on the Artwork and packaging therefor; and (ii) Artist Websites, Website Material and in the "enhanced" or "multimedia" portion of an enhanced CD, CD Plus, CD Rom, DVD, DVD-A, or any other similar configuration (whether now known or hereafter existing).  If Universal is required to pay any monies to any Person for the exercise of any of the rights granted to Universal pursuant to this paragraph 8.2, Universal will have the right to deduct such amount from any and all sums otherwise payable to you hereunder.

9.    Provisions with respect to Uses of the Label Mark and the Universal Mark.

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000026

CONFIDENTIAL

9.1.   Use of the Label Mark.  Label grants to Universal and Universal's licensees and grantees a royalty-free license throughout the Territory during the Exploitation Period  and Universal will be obligated to use the Label Mark in connection with all items of Distributed Product and all Artwork Materials. Universal's rights with respect to the use of the Label Mark as described in the immediately preceding sentence will be exclusive during the Term hereof in the Territory. Any use of the Label Mark other than in connection with Distributed Product hereunder and the marketing, promotion and other exploitation thereof will be subject to written approval by Label.  All uses of the Label Mark will inure to the benefit of Label.  Universal acknowledges and agrees that all rights, title, interest, and ownership in and to the Label Mark (including, without limitation, all associated goodwill and all intellectual property rights) are and will remain the exclusive property of Label (subject to the provisions of the Security Agreement). Label's submission to Universal of any Artwork Materials that include the Label Mark will be deemed to be Label's approval for Universal to use the Label Mark as so submitted.

9.2.   Use of the Universal Mark.  Label acknowledges and agrees that all rights, title, interest, and ownership in and to the Universal Mark (including, without limitation, all associated goodwill and all intellectual property rights) are and will remain the exclusive property of Universal. Any use of the Universal Mark by Label will be subject to the prior written approval of Universal in each instance, will only be in the form provided or approved by Universal, such approval not to be unreasonably or arbitrarily withheld, and will comply with all trademark usage guidelines provided by Universal.  All uses of the Universal Mark will inure to the benefit of Universal.  Label agrees that it will not at any time during or after the Term of this Agreement: (i) challenge or contest Universal's ownership of, use of the Universal Mark or the validity of the Universal Mark or any of Universal's rights in and to the Universal Mark or any registrations derived from such rights in any part of the Territory; (ii) register or attempt to register in any part of the Territory any mark or logo identical or substantially similar to the Universal Mark or that is confusingly similar to the Universal Mark or that includes any portion of the Universal Mark; (iii) remove, alter or add to the Universal Mark; (iv) incorporate any Universal Mark into the Label Mark or any of Label's product names, service marks, company names, slogans, domain names, or any other similar designations; (v) infringe the Universal Mark or any associated intellectual property rights; (vi) use any permutations of the Universal Mark, any secondary or combination marks including or derived from the Universal Mark, or any new words, devices, designs, slogans, or symbols derived from the Universal Mark.

10.   Failure of Performance

10.1.   Universal will have the right to suspend the operation of this Agreement and its obligations hereunder in the event Universal is materially hampered in its recording, manufacture, distribution or sale of Records, or in the event its normal business operations become commercially impracticable, as the result of any cause beyond Universal's control, including but not limited to labor disagreement, fire, earthquake, catastrophe, riot, shortage of materials, etc. If such contingency does not affect Universal's ability to account to you and pay Advances otherwise required to be paid hereunder and Distribution Proceeds then Universal will account to you and pay such Advances and Distribution Proceeds during any such suspension of this agreement. Such right may be exercised by written notice to you, and such suspension will last for the duration of the applicable event so long as Universal continues to be unable to account to you and pay such Advances and/or Distribution Proceeds. A number of days equal to the total of all such days of suspension plus an additional seven (7) days will be added to the Contract Period in

W000027

CONFIDENTIAL

which such contingency occurs and the dates for the exercise by Universal of its options as set forth in Article 2, the dates of commencement of subsequent Contract Periods, the date any other action is required hereunder, and the Term will be deemed extended accordingly. If such suspension of the Term exceeds six (6) consecutive months and affects no record manufacturer or distributor other than Universal, you may, by notice to Universal, request that Universal terminate the suspension by notice given to you within thirty (30) days after its receipt of your notice. If Universal does not do so, the Term will terminate at the end of such thirty (30) day period and all parties will be deemed to have fulfilled all of their obligations except those that survive the end of the term subject to Universal returning to you any Masters delivered during the Contract Period in which such termination occurs, including, without limitation Existing Masters if applicable.

10.2.    If Universal wrongfully refuses or prevents as the result of negligence to allow you to fulfill your Recording Commitment for any Contract Period, and if, not later than one hundred twenty (120) days after that refusal takes place, you notify Universal of your desire to fulfill such Recording Commitment, then Universal may permit you to fulfill such Recording Commitment by notice to you to such effect within thirty (30) days of Universal's receipt of your notice. Should Universal fail to give such notice, you will have the option to terminate the Term by notice given to Universal within ninety (90) days after the expiration of the thirty (30) day period referred to above, and on receipt by Universal of such notice the Term will terminate. If you fail to give Universal either notice within the period specified in this paragraph 10.2, Universal will be under no obligation to you for failing to permit you to fulfill such Recording Commitment. In the event the term terminates under this paragraph, all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations that survive the end of the term (e.g., warranties, rerecording restrictions and obligation to pay Distribution Proceeds), subject to Universal first returning any and all Masters delivered during the Contract Period in which such termination occurs, including, without limitation Existing Masters if applicable, and Universal will be obligated to promptly pay you, in full settlement of its obligations hereunder, an Advance in the amount equal to:

(i)    The aggregate of the Recording Funds fixed in subparagraph 4.2 for each Album of the Recording Commitment then remaining unrecorded for the Contract Period in effect when such termination occurs:

less:

(ii)    The average amount of the Recording Costs for the last two (2) Albums recorded hereunder in fulfillment of your Recording Commitment (or, if only one Album has been recorded hereunder, the amount of the Recording Costs for that Album or, if no Album has been recorded hereunder, ██████ of the applicable Recording Fund for the first Album hereunder) multiplied by the number of such unrecorded Albums referred to in subparagraph 12.02(a);

less:

(iii)    any portion of the Recording Funds previously paid (or approved for payment by Universal and actually due to a third party) for the Albums then remaining unrecorded;

less:

W000028

CONFIDENTIAL ---

(iv)    any other Advances previously paid to you or at your direction during the Contract Period in effect at the time the term is terminated.

11.    Universal's Additional Remedies

11.1.    Without limiting any other rights and remedies of Universal hereunder, if you fail to Deliver any Masters hereunder within the time prescribed in paragraph 1.6.3, subject to paragraph 17.2, Universal will have the following options, each exercisable by written notice to you:

11.1.1  Universal may suspend its obligations to make payments to you under this agreement until you have cured the default.  After Delivery of the Masters concerned, any Distribution Proceeds held by Universal pursuant to this subparagraph and then due you will be credited to your account.

11.1.2  Intentionally omitted.

11.1.3  Universal may notify you at any time thereafter that it intends to require you to repay the amount not then recouped of any Advance previously paid by Universal and not specifically attributable under paragraph 4.2 to an Album that has been Delivered, unless you Deliver the Master(s) concerned within ninety (90) days after such notice is given.  If you fail to Deliver the Master(s) concerned prior to the expiration of said ninety (90) day period, Universal may require you to repay the amount not then recouped of any Advance previously paid by Universal and not specifically attributable under paragraph 4.2 to an Album that has been Delivered, except you will not be required to repay any documented approved Recording Costs incurred: (A) in connection with Masters that have been Delivered to and accepted by Universal prior to the date of such termination and that were recorded in connection with the then-current Album project or (B) with Universal's approval in connection with Masters recorded prior the date Universal notifies you of the default.

11.2    If Universal terminates the Term under subparagraph 11.1 above, all parties will be deemed to have fulfilled all of their obligations under this agreement except those obligations that survive the end of the Term [e.g., indemnification obligations, Universal's obligation to account and pay Distribution Proceeds to you, rerecording restrictions]. No exercise of an option under this paragraph will limit Universal's rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

11.3.    If Artist's voice should be or become materially and permanently impaired for a period in excess of six (6) consecutive months or if Artist otherwise becomes physically unable to perform recording and/or personal appearances for a period in excess of six (6) consecutive months and/or if Artist ceases to pursue a career as a recording artist, Universal will have the right to terminate the Term by notice to you at any time during the period in which such contingency continues and thereby be relieved of any liability for the executory provisions of this agreement (except, for the avoidance of doubt, those obligations that survive the end of the term, e.g., obligations to account and pay Distribution Proceeds).

11.4.    You acknowledge, recognize and agree that Artist's services hereunder are of a special, unique, unusual, extraordinary and intellectual character, giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action at law. Inasmuch as a breach of such services will cause Universal irreparable damages, Universal

W000029

CONFIDENTIAL

will be entitled to injunctive and other equitable relief, in addition to whatever legal remedies are available, to prevent or cure any such breach or threatened breach. Nothing in this agreement will prevent you from opposing such injunctive relief on any grounds that do not negate your acknowledgments in this paragraph.

11.5.  The rights and remedies of each party hereunder as specified in this agreement are not to the exclusion of each other or of any other rights or remedies of such party. Either party hereto may decline to exercise one or more of its rights and remedies as such party may deem appropriate without jeopardizing any other of its rights or remedies. All of your and Universal's rights and remedies will survive the expiration of the Term. Notwithstanding anything in this agreement, each party may at any time exercise any right it now has or at any time hereafter may be entitled to as a member of the public as though this agreement were not in existence.

11.6.  In the event of your dissolution or the liquidation of your assets, or the filing by or against you of a petition for liquidation or reorganization under Title 11 of the United States Code as now or hereafter in effect or under any similar statute relating to insolvency, bankruptcy, liquidation or reorganization, or in the event of the appointment of a trustee, receiver or custodian for you or for any of your property, or in the event that you make an assignment for the benefit of creditors or commit any act for or in bankruptcy, or you become insolvent, or in the event you fail to fulfill any of your obligations under this agreement for any other reason, then at any time after the occurrence of any such event, in addition to any other remedies which may be available, Universal will have the right, exercisable by notice to you, either to (a) terminate the Term, or (b) to require Artist to grant all rights granted by Label hereunder with respect to Artist's Recordings directly to Universal for the remaining balance of the Term, including any extension thereof, for the purpose of fulfilling your obligations hereunder, upon all the same terms and conditions as are herein contained.  In the event Universal exercises option (b) above, Artist will be deemed substituted for you as a party to this agreement as of the date of Universal's option exercise, and, in respect of Masters subsequently Delivered hereunder, the royalties and any Advances payable hereunder will be those payable pursuant to the Artist Agreement.

11.7  If Universal elects to receive the results and proceeds of Artist's services directly under the terms of the Inducement Letter pursuant to a claim by Artist that you are no longer entitled to Artist's services, then Universal's obligations to you under this agreement will be automatically suspended until it is determined, through final, non-appealable award (judgment or arbitration) or written settlement agreement, whether you are entitled to Artist's recording services as required by this agreement. Further, Universal will have access to your books and records as they relate to Records so that Universal may, at its election, account and make payments directly to Artist in accordance with the Artist Agreement, which payments will fully satisfy Universal's obligations to make payments to you hereunder during such suspension. If and when you are so determined to have been entitled to Artist's services as required herein, then (a) such suspension will terminate, (b) Universal will pay you any amounts withheld during the suspension, less any amounts paid by Universal to Artist, to any producer of Masters or other Recordings and to any other Persons who may be entitled to receive royalties or other sums in respect of Masters or other Recordings, any and all of which will be deemed to have been paid hereunder, and (c) any Masters and other Recordings recorded by Artist during such suspension will be deemed to be Masters or other Recordings, as applicable, recorded hereunder. In the event you are so determined not to have been entitled to Artist's services as required hereunder, then you will be deemed to be in material breach of this agreement, and, without limiting any of Universal's rights or remedies, Universal may terminate the Term by notice to you at any time, in which event the

W000030

CONFIDENTIAL

term hereof will be deemed to have been terminated as of the date the suspension commenced. In the event Universal so terminates the term hereof, Recordings made directly for Universal under the terms of the Inducement Letter will be and remain Artist's sole and exclusive property (subject to Universal's distribution rights hereunder), and any monies owing to you hereunder shall be paid to Artist. If Artist breaches the Artist Agreement as it relates to this Agreement, you will immediately notify Universal in writing of the details of such breach. If you do not enforce any of your rights under said agreement, Universal may, without limitation of Universal's rights or remedies, enforce such rights in your name and/or the name of Universal.

12.    <u>Representations, Warranties and Indemnification</u>

    12.1    <u>Representations and Warranties</u>: You hereby represent and warrant the following:

        12.1.1  During the Exploitation Period and throughout the Territory, Universal will have the exclusive rights (and non-exclusive rights during the Sell-Off Period) to exploit the Recordings of Abel Tesfaye p/k/a "The Weeknd" (hereinafter referred to as "Artist").

        12.1.2. You are authorized, empowered and able to enter into and fully perform your obligations under this agreement. Neither this agreement nor the fulfillment hereof, in accordance with the terms hereof, by any party infringes upon the rights of any Person. You have no knowledge of any claim or purported claim that may interfere with Universal's rights hereunder or create any liability on the part of Universal. There is in existence between you and Artist a valid and enforceable written agreement (the "Artist Agreement") pursuant to which Artist is required to perform exclusively for you during the Term of this Agreement and that contains appropriate provisions to allow you to comply with your obligations hereunder. You will not modify or amend the Artist Agreement nor waive your rights thereunder in any manner that might impair the rights granted to Universal hereunder. You will take all reasonable steps necessary and desirable to keep the Artist Agreement in full force and effect during the Term. Simultaneously with the execution of this agreement, you will deliver to Universal an agreement between Universal and Artist in the form annexed hereto as Exhibit "A-2" (the "Inducement Letter"); you hereby give your consent and approval to the contents thereof and said Exhibit "A-2" is hereby made a part hereof. You will require full and complete performance by the Artist of the Artist Agreement. You are and at all times during the Term will be a corporation in good standing in the jurisdiction of your incorporation. Abel Tesfaye is and during the term hereof will be your principal.

        12.1.3  Artist is not a resident of the state of California.

        12.1.4  As of the commencement of the term hereof, (i) there are no unreleased recorded performances by Artist other than the Masters embodying the Compositions set forth on Schedule "2" attached hereto and incorporated herein by this reference (each such Recording an "Unreleased Prior Recording" and collectively the "Unreleased Prior Recordings"), (ii) no Records have been manufactured from the Unreleased Prior Recordings by you or any other Person (other than the Existing Recordings, which you warrant and represent you will stop exploiting as of the date hereof), nor have any other uses of the Unreleased Prior Recordings been made by you or any other Person; and (iii) none of the Compositions embodied in the Unreleased Prior Recordings has been performed by Artist for the making of any other Recordings.  You warrant and represent that Schedule "2" is a complete and accurate list of all of the unreleased recorded performances by Artist as of the commencement of the term hereof. Subject to the foregoing, you shall retain all right title and interest in and to the Unreleased Prior Recordings that are not

W000031

CONFIDENTIAL

submitted to Universal hereunder with your permission that Universal exploit such Recording; provided, all Unreleased Prior Recordings, together with all Videos embodying any of the Unreleased Prior Recordings or created in connection therewith (collectively, "Existing Recordings") submitted to Universal with your permission that Universal exploit such Recording shall be deemed recorded during the Term and Universal shall have the right to exploit such Existing Recording during the Term and the Exploitation Period, subject to the terms and conditions hereof. Without limitation, no Person other than Universal has or will have the right or authority to manufacture, distribute, license, advertise, market, promote, release or otherwise exploit the Existing Recordings during the Exploitation Period subject to paragraph 2.2 hereinabove.

12.1.5. All Masters recorded in the United States hereunder and performances embodied thereon will be produced in accordance with the rules and regulations of the American Federation of Musicians, the American Federation of Television and Radio Artists and all other unions having jurisdiction. You warrant and represent and covenant that Artist is or will become, and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds in which membership may be required for the performance of Artist's services hereunder.

12.1.6. You warrant and represent that Artist will not perform for any Person other than Universal (and neither you nor Artist will license or consent to or permit the use by any Person other than Universal of Artist's name or likeness) for or in connection with the recording or exploitation of any Record embodying a Composition recorded by Artist in fulfillment of the Recording Commitment under this agreement prior to the later of (i) the date five (5) years after the date of Delivery hereunder to Universal of the last Master embodying that Composition, or (ii) the date two (2) years after the expiration or termination of the Exploitation Period of this agreement. Notwithstanding the foregoing, if Universal has not released a Record embodying a particular Composition recorded by Artist hereunder before the date twelve (12) months after the expiration date of the Term this agreement (or, if applicable a subsequent agreement as described in the preceding sentence), the foregoing rerecording restriction shall not apply to such Composition. Neither you nor Artist, during the Exploitation Period, will perform or authorize the recording for use in advertisements of a Composition embodied on a Master Delivered hereunder. Your agreement with the individual producer of each Master hereunder will restrict said producer from producing a Composition produced by such individual hereunder on another Master for any Person other than Universal for at least two (2) years from the date of Delivery to Universal of such Master, and your agreement with each such producer (in the event the producer is a writer of, or otherwise has a publishing interest in, the applicable Composition) and all other co-writers of each Composition embodied on a Master hereunder will restrict each of them from granting (or allowing their respective music publishing companies and any other Persons with an interest in their respective music publishing rights to grant) a so-called "first use" mechanical license to any Person other than Universal with respect to any such Composition. In addition, you will use reasonable efforts to restrict Artist's publishing company and any other Person with an interest in your or Artist's music publishing rights and all co-writers any Composition embodied on a Master hereunder (which Composition and Master are first released hereunder) from granting a voluntary mechanical license to any Person other than Universal with respect to any such Composition prior to the date one (1) year after the initial commercial release of the applicable Composition hereunder.

W000032

CONFIDENTIAL

12.1.7 None of the Distributed Product hereunder, nor the performances embodied thereon, nor any other Materials, nor any authorized use thereof by Universal or its grantees, licensees or assigns will violate or infringe upon the rights of any Person.

12.1.8 Without limiting the foregoing, Universal will not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of rights pursuant to this agreement, except as specifically provided herein. You are solely responsible for and will pay all sums due Artist, the individual producers of each Master hereunder, and all other Persons entitled to receive royalties or other payments in connection with the exploitation of Distributed Product hereunder (subject to subparagraph 4.04 (c) below), including the sale of Records derived therefrom (other than Mechanical Royalties, union "per-record" royalties, and A&R incentive royalties payable to Universal's employees).

12.1.9 Neither you nor Artist will authorize or knowingly permit the Artist's performances to be recorded during the Term for any purpose without an express written agreement prohibiting the use of such recording on Records in violation of Universal's exclusivity hereunder. You and Artist will take reasonable measures to prevent the manufacture, distribution and sale at any time by any Person other than Universal of such Records (other than with respect to the use of Artist's name as a songwriter, publisher or producer in accord with the customary practice in the recording industry) during the Term in the Territory.  Neither you, Artist, nor any Person deriving any rights from you or Artist, will use or authorize or permit any Person other than Universal to use your or Artist's name (including any professional name or sobriquet) (individually and collectively referred to herein as "Artist Name"), likeness (including picture, portrait or caricature) or biography in connection with the exploitation of Distributed Product hereunder or in connection with the sale or other exploitation of Records during the Term and in the Territory hereof. Except as otherwise set forth herein, neither you, Artist, nor any Person deriving any rights from you or Artist, will use, authorize or permit any Person other than Universal during the Exploitation Period to create, host or maintain any Websites which incorporate Artist's Masters or Videos. Notwithstanding the foregoing, Universal will coordinate with you to enable Label Controlled Websites to feature Artist's Masters and Videos provided the use of such Masters and Videos thereon is in compliance with Universal's standard policies and procedures. Notwithstanding anything to the contrary contained herein, nothing in this agreement is intended to prohibit Artist from rendering a non-musical performance in theatrical motion pictures or television productions and from granting home video rights to third persons with respect to such performances. Nothing herein is intended to prevent Artist from performing customary producer services, mixer and/or remixer services and receiving customary credit (without the use of your likeness) as an independent producer in connection with Recordings of other artists.

12.1.10.  Artist is the sole owner of the professional name The Weeknd and no other Person has or will have the right to use such name in connection with Records during the Exploitation Period.  Artist will not use a different name in connection with Records unless you and Universal mutually agree in writing.  Universal may cause a search to be instituted to determine whether there have been any third party uses of such name. Universal may cause an application for federal registration of the name to be made in favor of Artist for Record and/or entertainment purposes. You agree that, with respect to each such name, any amounts up to but not exceeding ███████████████████████ expended by Universal pursuant to this paragraph will be deemed Advances hereunder. If the search indicates that such name should not be so used, Universal and you will mutually agree upon a substitute name for Artist. Nothing contained herein releases you from your indemnification of Universal in respect of Universal's use of such name;

W000033

CONFIDENTIAL

provided that in the event Label and Universal do not agree on a substitute name, the Label's decision shall prevail.

12.1.12. Neither you, nor Artist will at any time do or authorize any Person to do anything inconsistent with, or that might diminish, impair or interfere with, any of Universal's rights hereunder or the full and prompt performance of your obligations hereunder, nor will you authorize any Person deriving any rights from you or Artist to do any of the foregoing. During the Term hereof, neither Artist nor you will endorse any product or service related to home audio duplication, including, without limitation, blank recording tape, tape recording equipment, compact disc burning, or recording equipment, or digital file storage services, but excluding blank recording media intended solely for professional use or recording equipment intended solely for professional use.

12.1.13. Neither you nor Artist is under any disability, restriction or prohibition respecting Compositions recorded hereunder.

12.1.14. You hereby represent and warrant that each member comprising Artist is above the legal age of majority pursuant to the laws governing this agreement and the performance hereunder.

12.1.15 You are and will continue to be during the Term of this Agreement, the Exploitation Period the sole and exclusive owner or the sole and exclusive licensee of all rights of every kind throughout the Territory to all Distributed Product, including, without limitation, (x) all right, title and interest in and to the copyright in and to all Masters and Videos of Distributed Product and Artwork Materials and other all other works and materials submitted, supplied or otherwise delivered to Universal hereunder; and (y) the exclusive right throughout the Territory during the Term, the Exploitation Period to grant Universal the exclusive right to manufacture, distribute, sell, license, market, promote, advertise and/or otherwise exploit all Distributed Product hereunder and all Artwork Materials by any and all methods now or hereafter known.

12.1.16. You have not sold, assigned, transferred, leased, conveyed, encumbered, granted a security interest in, or otherwise disposed of or encumbered, and during the Term hereof and Exploitation Period will not sell, assign, transfer, lease, convey, encumber, grant a security interest in, or otherwise dispose of, any Distributed Product, or any of the Records or Masters or Videos of Distributed Product, or any item of Artwork Materials, or any other item of Collateral (as defined in the Security Agreement) adverse to or in derogation of the rights granted to Universal herein or in the Security Agreement.

12.1.17. During the Term and the Exploitation Period, in the Territory, neither nor Artist nor any other Person claiming or deriving rights through or from any of the foregoing will at any time do or authorize any Person to do anything inconsistent with, or that might diminish, impair or interfere with, any of Universal's rights hereunder or the full and prompt performance of your obligations hereunder.

12.1.18. Universal will not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of rights pursuant to this Agreement, except as specifically provided herein.

12.2.    Indemnification

W000034

CONFIDENTIAL

12.2.1. You agree to and do hereby indemnify, save and hold Universal and its licensees harmless from any and all liability, loss, damage, cost and expense (including reasonable "out of pocket" legal expenses and reasonable outside attorney fees) arising out of or connected with any breach or alleged breach of this agreement or any third party claim that is inconsistent with any of the warranties or representations made by you in this agreement. You agree to reimburse Universal on demand for any payment made or incurred by Universal with respect to the foregoing sentence, and, without limiting Universal's rights or remedies, Universal may deduct any amount not so reimbursed by you from any monies Universal or an affiliate of Universal owes you, whether hereunder or otherwise.

12.2.2. Pending the determination of any claim in respect of which Universal is entitled to be indemnified, Universal may withhold monies otherwise payable to you hereunder in an amount not to exceed your potential liability to Universal pursuant to this paragraph 12.2.2. If you make bonding arrangements, satisfactory to Universal in its reasonable discretion, to assure Universal of reimbursement for all damages, liabilities, costs and expenses (including reasonable out-of-pocket legal expenses and reasonable outside counsel fees) that Universal or its licensees may, in Universal's reasonable business judgment, incur as a result of such a claim, Universal will not withhold monies otherwise payable to you. At your written request, Universal will release any such monies withheld if (a) no action has been commenced on such claims; and (b) no settlement discussions have taken place; and (c) no further demand has been made on the claim for a period of one (1) year after the date of the last claim, demand or settlement discussions, whichever last occurred.    If Universal pays a claimant more than ████████████████████████ ███████████ (the "Pre-authorized Amount") in settlement of any claim not reduced to judgment, you will not be obligated to reimburse Universal for any of the settlement in excess of the Pre-authorized Amount unless you have consented to the settlement in writing. If you do not consent to a settlement proposed by Universal for an amount exceeding the Pre-authorized Amount, you will nevertheless be required to reimburse Universal for the full amount unless you make bonding arrangements, satisfactory to Universal in its sole discretion, to assure Universal of reimbursement for all damages, liabilities, costs and expenses (including legal expenses and reasonable outside counsel fees) that Universal and its licensees may incur as a result of that claim.

12.2.3. Universal will notify you promptly of any action commenced on any claim subject to your indemnity hereunder. You may participate in the defense of any such claim through counsel of your selection at your own expense, but Universal will have the right at all times, in its sole discretion, to retain or resume control of the defense of such claim.

13.    Provisions Relating to the End of the Exploitation Period.

13.1    Universal's Rights if Account hereunder has a Deficit Balance If, upon what would otherwise be the expiration or termination of the Exploitation Period of this Agreement, Label's account hereunder has a deficit balance (such as, by way of example only, if as of such date Label has any outstanding obligation, indebtedness, or unrecouped amount due to Universal in connection with or otherwise related to Distributed Product (e.g., without limitation, any unrecouped manufacturing charges, Advances, unrecovered returns charges) (hereinafter "Debt"), then notwithstanding anything to the contrary contained herein, the Exploitation Period hereof will not expire or terminate and instead will automatically be extended until the end of the accounting period during which all such Debt is repaid to or otherwise recovered by Universal.  Universal will

W000035

CONFIDENTIAL

have the right to continue to exercise any or all of its rights hereunder, including, without limitation, the right to continue to manufacture, distribute, promote, market, advertise, sell, and otherwise exploit Distributed Product, until such time as Universal has recovered the full amount of such Debt out of monies otherwise payable to Label hereunder.

13.2   Security Agreement.   Notwithstanding anything to the contrary contained herein, in the event of the termination or the expiration of the Term for any reason whatsoever, the Security Agreement (including the security interest thereunder) will continue in full force and effect until all of the Debt is repaid and satisfied.

14.   Definitions.   For the purposes of this Agreement, the following terms will have the applicable meanings set forth below, unless the context requires otherwise.  Other terms are defined elsewhere in this Agreement.

14.1   "Advance" means a prepayment of any Distribution Proceeds payable to Label hereunder.

14.2   "Album" means a sufficient number of Masters primarily featuring a single recording artist's performance to comprise one (1) or more compact discs, or the equivalent, of not less than forty (40) minutes of playing time and containing at least ten (10) different Compositions.

14.3   "Ancillary Exploitation Channels" means any and all distribution channels other than Normal Retail Channels, including, without limitation, so-called "secondary exploitation channels," as that term is understood within the United States recorded music industry, such as, by way of example only, Master use licenses (including, without limitation, Master use synchronization licenses and licenses to include Masters on compilation Records), licenses or sales to record clubs, sales by or through direct mail and mail order, and premium sales.

14.4   "Artist" means Abel Tesfaye professionally known as "The Weeknd".

14.5   "Artwork Material" means all photographs, liner notes, pictorial works, graphic works, literary or textual works or materials, and any other works or materials of any kind or nature now or hereafter known owned or controlled, in whole or in part, directly or indirectly, by you, or used or created for use in connection with the packaging, distribution, advertising, marketing, promotion, sale, and/or other exploitation of Masters and Videos of Distributed Product and Records derived from such Masters and Videos.

14.6   "Composition" means a single musical composition, irrespective of length, including all spoken words and bridging passages, including a medley.

14.7   "Container Charge" means: (i) ▮▮▮▮▮▮▮▮▮▮ of the Suggested Retail List Price for a single-fold analog disc Record in a standard sleeve with no insert; (ii) ▮▮▮▮▮▮▮▮ ▮▮▮▮ of the Suggested Retail List Price for an analog disc Record in a double-fold or gatefold jacket, in a nonstandard sleeve or jacket, or with inserts; (iii) ▮▮▮▮▮▮▮▮▮▮ of the Suggested Retail List Price for analog cassette tape Records and for audiovisual Records; and (iv) ▮▮▮▮▮▮▮▮▮▮ of the Suggested Retail List Price for Records in the form of Compact Discs, Digital Compact Cassettes, Mini-Discs, Records sold in the form of other digital configurations, audiophile Records, Records sold in the form of any other new configurations,

W000036

CONFIDENTIAL

and for any other Record other than as herein provided. Without limiting the foregoing, there will not be a Container Charge with respect to Records not in physical form.

14.8    "Contract" means any written or oral agreement, contract, license, instrument, arrangement, commitment, or other understanding that is binding under applicable law.

14.9    "Delivery" -- the receipt by Universal of the Masters subject to this agreement, as well as the submission by you in written form of all necessary information, consents, licenses and permissions, including without limitation those relating to all samples, if any, interpolated in the Master Recordings, such that Universal may manufacture, distribute and release the Records concerned, including, without limitation, all label copy, publishing and songwriting information (including, without limitation, applicable music performance rights organizations, song splits, and the names, addresses and telephone numbers of publishers), Album credits, the timings of and lyrics to each Composition contained on a Record, ancillary materials prepared by or for you which are required hereunder, first use mechanical licenses, sideartist permissions and any information required to be delivered to unions, guilds or other third parties.

14.10    "Digital Master" means a fully mixed, edited, equalized and leadered digital stereo tape Master ready for the production of parts from which satisfactory Records can be manufactured.

14.11    "Distributed Product" means (i) all Masters, Videos, and all other works (including, without limitation, audio-only and audio-visual works) and materials, recorded, acquired or otherwise owned and/or controlled, in whole or in part, directly or indirectly, by you and/or Artist prior to or during the Term, (ii) Mobile Content that is owned or controlled, in whole or in part, by Distributed Product or that contains any Artwork Materials hereunder or that is created by Label or Artist during the Term, and (iii) all other works of every kind and nature that embody the results and proceeds of the services of rendered or otherwise created by Artist during the Term. Without limiting the generality of the foregoing, Universal agrees that it will not release Distributed Product not Delivered in fulfillment of your Recording Commitment hereunder without you prior written approval.

14.12.    "Domestic Territory" means the United States.

14.13.    "Download" means an Electronic Transmission of a copy of a Recording (whether an audio-only Recording, a Video or other type of Recording) or other work in the form of a digital file to a local storage device (e.g., the hard drive of the user's computer, Personal Playback Device or other device or media, etc.). The temporary residence of a digital file on a recipient device while waiting to be transferred between two devices or locations does not by itself constitute a Download for purposes hereof (as in the case of "buffering" or "caching" while a Stream is being transmitted).

14.14.    "Electronic Transmission" means any transmission to the consumer, whether sound alone, sound coupled with an image, sound coupled with data, or any combination thereof, in any form, analog or digital, now known or later developed (including, but not limited to, Downloads (including, without limitation, Permanent Downloads and Limited Downloads), Streams, Master Tones, "cybercasts", "webcasts", direct broadcast satellite, point-to-multipoint satellite, multipoint distribution service, point-to-point distribution service, cable system, telephone system, broadcast station, and any other forms of transmission now known or

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000037

CONFIDENTIAL

hereafter devised) whether or not such transmission is made on-demand or near on-demand, whether or not a direct or indirect charge is made to receive the transmission and whether or not such transmission results in a specifically identifiable reproduction by or for any transmission recipient.

14.15. "Territory" means the Universe excluding Canada.

14.16. "Label Affiliate" means (i) any Person engaged in the recorded music business that, directly or indirectly, in whole or in part, owns and/or controls, or is owned and/or controlled by, or is under common ownership and/or under common control with, Label; and (ii) any Person engaged in the recorded music business that, directly or indirectly, in whole or in part, is owned and/or controlled by Principal.

14.17 "Label Mark" means any trademark, trade name, service mark, logo, emblem, symbol, or visual letters or words owned that is/are owned or controlled by you or Artist that is/are used or furnished by you for use in connection with Distributed Product and/or any related Artwork Materials hereunder.

14.18 "License Territory" means the Territory excluding the Domestic Territory.

14.19 "Limited Download" means a Download of a Recording (whether an audio-only Recording, a Video or other type of Recording) or other work: (i) that is not available to be used by the user on a permanent basis, and which is available to be performed only for a limited number of times, or for a limited time period (e.g., at a time certain or for a time period tied to ongoing subscription payments); or (ii) the use of which by the user is "conditional" (e.g., conditioned on the consumer's continued payment of fees or on some other condition).

14.20. "Master," "Master Recording," or "Recording" means any recording of sound, whether or not coupled with a visual image, including the Video(s) by any method and on any substance or material, whether now or hereafter known, that is or is intended to be embodied on a Record.

14.21 "Master Tone" means an Electronic Transmission (whether in the form of a Download, Stream, or other transmission) of a copy of some or all of a Recording (whether an audio-only Recording, a Video or other type of Recording) to a Personal Playback Device or any other device or media for use as a "master tone," "mobile tone," or "ringtone" (e.g., a Recording that that signals the presence of an incoming telephone call), or a "ringback" (e.g., a Recording that is heard by the caller and signals that the recipient's personal communication device is ringing) or for any use similar to the foregoing in connection with or related to any telecommunications service, and which Electronic Transmission may or may not be accompanied by Mobile Content.

14.22. "Materials" means (i) all Compositions embodied on Masters of Distributed Product; (ii) each item of Distributed Product; (iii) the Label Mark; (iv) all names used by Label as the name of Label in connection with manufacturing, distributing, promoting, marketing, advertising, selling, or otherwise exploiting items of Distributed Product, (v) the names or sobriquets used by all recording artists (including, without limitation, Artist), individually or as a group, whose performances are embodied on any item of Distributed Product, or a producer; (vi) all Artwork Materials, including, without limitation, all Record packaging artwork and all marketing, promotion,

W000038

CONFIDENTIAL

and advertising materials used in connection with Distributed Product; and (vii) all other musical, dramatic, artistic and literary materials, ideas and other intellectual properties embodied in or used in connection with Distributed Product and the packaging, sale, distribution, advertising, publicizing or other exploitation thereof (including, without limitation, all necessary containers (including jackets), all packaging materials graphics, booklets, inserts, tray and inlay cards, stickers, posters and other components). Without limiting the generality of the foregoing, Universal agrees that it will not exploit Materials that you indicate are not intended for exploitation by Universal.

14.23. "Mechanical Royalties" means royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Records.

14.24. "Mobile Content" means artwork, animation, images, photographs, monophonic or polyphonic ringtones or ringbacks, voice messages, voice ringers, audiovisual works, graphics, "wallpaper", logos and/or other materials relating to Artist or Masters, Videos or Records of Distributed Product (it being understood that the Masters, Videos or Records hereunder themselves (including, without limitation Master Tones (e.g., ringtones or ringbacks) hereunder), do not constitute Mobile Content). Any Electronic Transmission that is comprised in whole or in part of Mobile Content will constitute a Record of Distributed Product hereunder, subject to the other provisions set forth herein.

14.25. "Universal Mark" means any trademark, trade name, service mark, logo, emblem, symbol, or visual letters or word(s) that is/are owned or controlled by Universal (or any affiliate of Universal) and that is/are used by Universal to identify Universal.

14.26. "Normal Retail Channels" means all primary Record retail distribution channels as commonly understood in the United States recorded music industry, as such channels may exist currently or hereafter develop, and any other distribution channels utilized by the sales forces of Universal's affiliated branch distributors. For the avoidance of doubt, Normal Retail Channels include, without limitation, exploitation by means of Electronic Transmissions.

14.27. "Permanent Download" means a Download of a Recording (whether an audio-only Recording, a Video or other type of Recording) or other work which is available to be used by the user on a permanent basis, and which is not subject to the time or use limitations applicable to Limited Downloads.

14.28. "Person" means any natural person, corporation, partnership, limited liability company, joint stock company, joint venture, association, unincorporated organization, any other organized group of persons, or any legal successors or representatives of the foregoing.

14.29. "Personal Playback Device" means any personal device or media that is capable of receiving and performing Electronic Transmissions, including, without limitation, mobile or land-line telephones, personal digital assistants and other personal communication devices; and hand-held video game players, MP3 players, iPods, and other personal entertainment devices.

14.30. "Principal" means Abel Tesfaye.

14.31. "Record" means all forms of reproduction, transmission or communication, now or hereafter known or devised, manufactured, distributed, transmitted and/or communicated

W000039

CONFIDENTIAL

primarily for personal use (irrespective of the user's location), home use, school use, juke box use or use in means of transportation (regardless of configuration or format), including but not limited to sound-alone Recordings, audiovisual Recordings, interactive media (e.g., enhanced CDs), Records embodying Mobile Content, and Electronic Transmissions.

14.32. "Recording Cost" means all amounts representing direct third party expenses incurred by Universal in connection with the recording of Masters hereunder (including, without limitation, travel, rehearsal, vocal coaching, musical instrument lessons, equipment rental and cartage expenses, costs incurred in connection with sampling, remixing and/or "sweetening", advances to individual producers, transportation costs, hotel and living expenses approved by Universal (other than any costs and expenses not requested by you in writing, of Universal employees attending recording sessions), all studio and engineering charges, in connection with Universal's facilities and personnel or otherwise, and all costs necessary to prepare Masters for release on all applicable media including those costs necessary to prepare final, equalized tapes therefor). For the avoidance of doubt, costs in connection with Universal's personnel will not be charged as a recording cost unless such person is a Staff Producer performing services in connection with the project concerned..

14.33. "Royalty Base Price" means the Suggested Retail List Price less all excise, sales and similar taxes and less the applicable Container Charge.

14.34. "Sales Reporting System" means Nielsen SoundScan, a division of Nielsen Entertainment, LLC (or any successor thereto) ("SoundScan"), or, if SoundScan becomes unavailable for such purposes, any other Record retail sales reporting system or provider of Record retail sales data then used by Universal or the Universal Parent, including, without limitation, any internal or proprietary system or any system used by Universal or the Universal Parent and/or Universal's distributor.

14.35. "Sample" or "sample" means the embodiment of pre-existing Recording(s) and/or Composition(s) on a Master or Masters hereunder; provided, however, if all rights required for the purpose of manufacturing and distributing Records hereunder may be obtained by Universal pursuant to a compulsory mechanical license such embodiment is not a Sample.

14.36. "Stream" means an Electronic Transmission of a Recording (whether an audio-only Recording, a Video or other type of Recording) or other work that is (i) substantially contemporaneous with the rendering of the work on an end user's local storage device (e.g., the hard drive of the user's computer, a Personal Playback Device or other device or media, etc.); and (ii) transmitted by means of a technology that is not designed to enable the end user to create a reproduction of the work (other than a transitory reproduction required to render such substantially contemporaneous performance, as in a data buffer).

14.37. "Suggested Retail List Price" means, with respect to Records sold for distribution outside of the United States, the retail equivalent price utilized by Universal's licensee in computing monies to be paid to Universal for the Record concerned, provided that in any country where there is no actual suggested or applicable retail list price and where Universal's licensee is wholly-owned by Universal or Universal's parent, the Suggested Retail List Price will be deemed to be the price established by Universal or its licensee(s) in conformity with the general practice of the recording industry in such country. Notwithstanding the foregoing, (i) the Suggested Retail List Price for premium Records will be Universal's or its licensee's actual sales

W000040

CONFIDENTIAL

price of such Records; (ii) the Suggested Retail List Price with respect to home video devices and other videograms will be Universal's published wholesale price for the device concerned; and (iii) the Suggested Retail List Price with respect to Records (other than Electronic Transmissions) sold by Universal directly to a consumer through direct response, or otherwise will be Universal's actual sales price of such Records.

14.38. "Video" means a sight and sound Recording that reproduces the audio performances of Artist together with a visual image.

15.    Notices and Payments.

15.1.    All notices required to be given to a party under this Agreement and all Domestic Net Proceeds and Foreign Royalties and related accounting statements to Label must be sent to the applicable address indicated below, or to such new address if changed as described below:

> If to Label:
>
> XO&co Inc.
> c/o Shalinsky & Company
> 40 Holly Street, Suite 302
> Toronto, Ontario M4S 3C3
>
> If to Universal:
>
> Universal Republic Records, a division of UMG Recordings, Inc.
> 1755 Broadway
> New York, New York 10019
> Attention:  Executive Vice President, Business & Legal Affairs

15.2.    All notices sent under this Agreement must be in writing and sent to the appropriate address set forth above to be effective and, except for statements of Distribution Proceeds, may be sent only by personal delivery, registered or certified mail (return receipt requested), or by overnight air express (or courier shipment if outside the United States) if such service actually provides proof of mailing. The day of mailing of any such notice will be deemed the date of the giving thereof (except notices of change of address, the date of which will be the date of receipt by the receiving party). Facsimile and email transmissions will not constitute valid notices hereunder, whether or not actually received. Each party may change its respective address hereunder only by notice in writing to the other party.  All notices to Universal must be sent to the attention of the Executive Vice President, Business & Legal Affairs. A courtesy copy of each notice sent to you pursuant to his agreement will be sent to Shalinsky & Company, 40 Holly Street, Suite 302, Toronto, Ontario M4S 3C3 Attn: Sander Shalinsky, provided, that any failure to do so will not constitute a breach of this agreement nor impair the effectiveness of the notice concerned.

16.    Intentionally omitted

17.    Miscellaneous.

17.1.    Entire Agreement; Amendment; Binding Effect; Incorporation by Reference.  This Agreement contains the entire understanding of the parties hereto relating to its subject matter

W000041

CONFIDENTIAL

and cancels, terminates, supersedes, and replaces any and all prior or contemporaneous correspondence, negotiations, Contracts, and understandings, whether written or oral, between the parties with respect to the subject matter hereof. This Agreement cannot be amended, supplemented, or modified in any manner except by an agreement in writing that makes specific reference to this Agreement and that is executed by authorized signatories of both parties. This Agreement, when executed by Label and Universal, will constitute a fully enforceable agreement. This Agreement will inure to the benefit of and will be binding upon each of the parties and their respective successors and permitted assigns.

17.2. <u>Breach; Notice and Opportunity to Remedy.</u> Neither party will be entitled to recover damages or to terminate the Term of this Agreement by reason of any breach by the other party of the breaching party's material obligations hereunder unless the breaching party fails to remedy such breach within thirty (30) days following receipt of the non-breaching party's written notice thereof. The foregoing cure period will not apply to the warranties and representations of Label hereunder or to breaches incapable of being cured.

17.3. <u>Choice of Law; Venue.</u> This Agreement has been entered into in the State of New York. The validity, interpretation and legal effect of this Agreement is governed by the laws of the State of New York applicable to contracts entered into and performed entirely within such State (without giving effect to any conflict of laws principles under the laws of the State of New York and regardless of the place or places of the actual execution of this Agreement or the place or places of the actual performance of this Agreement). The New York courts (State and Federal), only, will have jurisdiction over any controversies regarding this Agreement, and the parties hereto consent to and irrevocably and unconditionally agree to be subject to the exclusive jurisdiction of said courts located in New York County (and of the appropriate appellate courts therefrom). Any process in any action, suit, or proceeding arising out of or relating to this Agreement may, among other methods, be served upon Label by delivering it or mailing it in accordance with Article 15 hereinabove. Any such delivery or mail service will have the same force and effect as personal service.

17.4. <u>Headings.</u> The name of this Agreement and the headings of the Articles, paragraphs, and other parts of this Agreement are intended for convenience only and will not be of any effect in construing the contents of this Agreement.

17.5. <u>Intentionally omitted.</u>

17.6. <u>Intentionally omitted.</u>

17.7. <u>Sales Speculative.</u> Label recognizes that the sale of Records is speculative and agrees that the reasonable judgment of Universal with respect to matters affecting the sale, distribution and exploitation of such Records is binding upon Label unless otherwise expressly provided herein. Nothing contained in this Agreement obligates Universal to make, sell, license or distribute Records manufactured from Masters of Distributed Product except as specified herein.

17.8. <u>Assignment.</u> Universal has the right to assign this Agreement in whole or in part to any Person. Label does not have the right to assign this Agreement or any of Label's rights or to delegate any of its obligations hereunder without the prior written consent of Universal, which consent Universal may withhold in its sole discretion. Any purported assignment of this Agreement by Label in violation of this paragraph will be null and void <u>ab initio</u> and of no force and

W000042

CONFIDENTIAL

effect. Notwithstanding the foregoing, Universal will not withhold its consent to an assignment by you of your rights hereunder to another entity wholly owned and controlled by Artist subject to both entities and Artist entering into an assignment and assumption agreement in a form acceptable to Universal in its sole discretion.

17.9. <u>Relationship of the Parties; Third Party Beneficiaries</u>.   The parties to this Agreement are independent contractors. Nothing contained in this Agreement contemplates or constitutes Label or Principal as Universal's employees. Neither Label nor Principal is an agent, representative or partner of Universal.   Neither Label nor Principal has any right, power, or authority to enter into any Contract for or on behalf of, or incur any obligation or liability of, or to otherwise bind, Universal. This Agreement will not be interpreted or construed to create an association, agency, joint venture or partnership between the parties or to impose any liability attributable to such a relationship upon the parties.   No other Persons will be deemed a third party beneficiary of this Agreement.   Nothing in this Agreement, express or implied, is intended to confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

17.10. <u>No Waiver; Rights and Remedies Cumulative; Severability</u>.   A waiver by either party of any provision of this Agreement in any instance will not be deemed to be a waiver of such provision by that party for the future.   All rights and remedies of each party under this Agreement are cumulative to, and not exclusive of, any other rights or remedies available to each party under this Agreement or applicable Law.   The invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of any other provision hereof. Nothing contained in this Agreement will be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future or law, the latter will prevail; but the provision of this Agreement that is affected will be curtailed and limited only to the extent necessary to bring it within the requirements of such law.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000043

CONFIDENTIAL

17.11. No Inference Against The Author. This Agreement has been negotiated by the parties and their respective counsel and other representatives sophisticated and knowledgeable with the subject matter hereof, and the language hereof will not be construed for or against either party. Accordingly, any statute, regulation, or rule of law, or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the party that drafted it has no application and is expressly waived by the parties. The provisions of this Agreement will be interpreted in a reasonable manner to effect the intent of the parties and of this Agreement.

IN WITNESS WHEREOF, Universal and Label have executed this Agreement as of the Effective Date.

UNIVERSAL RECORDS
A DIVISION OF UMG RECORDINGS, INC.

By: _____
    Steve Gawley, Esq.
    Executive Vice President
    Business & Legal Affairs

XO&CO INC.

By: _____
    An Authorized Signatory

(Universal Republic) Weeknd8EX.8.17.12 (DBG)

W000044