# **EXHIBIT 7**

```
 1                    UNITED STATES DISTRICT COURT

 2                   SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5    YASMINA MOHAMMED P/K/A                )
      SOMALIA,                               )
 6                                           )
                          PLAINTIFF,         )
 7                                           )
                                             )
 8           vs.                             ) CASE NO. 1:18-CV-08469-JSR
                                             )
 9                                           )
      ABEL MAKKONEN TESFAYE P/K/A             )
10    THE WEEKND; GUILLAUME EMMANUEL         )
      DE HOMEM-CHRISTO AND THOMAS            )
11    BANGALTER P/K/A DAFT PUNK;             )
      MARTIN MCKINNEY P/K/A DOC;             )
12    HENRY WALTER P/K/A CIRKUT;             )
      JASON QUENNEVILLE P/K/A                )
13    DAHEALA, XO RECORDS, LLC;              )
      REPUBLIC RECORDS; UNIVERSAL            )
14    MUSIC GROUP; WILLIAM USCHOLD           )
      P/K/A WILL U; TYRONE                   )
15    DANGERFIELD P/K/A TABOO!!;             )
      SQUAD MUSIC GROUP; AND DOES            )
16    1-10,                                  )
                                             )
17                        DEFENDANTS.        )
      _____)
18

19                    TELEPHONIC DEPOSITION OF

20              JASON QUENNEVILLE P/K/A DAHEALA

21                 WEDNESDAY, NOVEMBER 28, 2018

22

23

24    REPORTED BY:
      TISHA C. OKUMA
25    CSR NO. 9774
```

## Page 2

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5  YASMINA MOHAMMED P/K/A        )
    SOMALIA,                      )
 6                                )
            PLAINTIFF,            )
 7                                )
                                  )
 8       vs.          ) CASE NO. 1:18-CV-08469-JSR
                                  )
 9                                )
    ABEL MAKKONEN TESFAYE P/K/A   )
10  THE WEEKND; GUILLAUME EMMANUEL)
    DE HOMEM-CHRISTO AND THOMAS   )
11  BANGALTER P/K/A DAFT PUNK;    )
    MARTIN MCKINNEY P/K/A DOC;    )
12  HENRY WALTER P/K/A CIRKUT;    )
    JASON QUENNEVILLE P/K/A       )
13  DAHEALA, XO RECORDS, LLC;     )
    REPUBLIC RECORDS; UNIVERSAL   )
14  MUSIC GROUP; WILLIAM USCHOLD  )
    P/K/A WILL U; TYRONE          )
15  DANGERFIELD P/K/A TABOO!!;    )
    SQUAD MUSIC GROUP; AND DOES   )
16  1-10,                         )
                                  )
17          DEFENDANTS.           )
    _____)
18
19
20    TELEPHONIC DEPOSITION OF JASON QUENNEVILLE P/K/A
21    DAHEALA, TAKEN ON BEHALF OF THE PLAINTIFF AT
22    8383 WILSHIRE BOULEVARD, SUITE 1038, LOS ANGELES,
23    CALIFORNIA, COMMENCING AT 6:00 P.M., WEDNESDAY,
24    NOVEMBER 28, 2018, BEFORE TISHA C. OKUMA, CSR 9774.
25
```

## Page 3

```
 1  APPEARANCES OF COUNSEL:
 2
 3  FOR THE PLAINTIFF:
 4       LOWE & ASSOCIATES, PC
         BY:  STEVEN T. LOWE (PRO HAC VICE)
 5       8383 Wilshire Boulevard
         Suite 1038
 6       Beverly Hills, California  90211
         (310) 477-5811
 7       steven@lowelaw.com
 8
 9  APPEARANCES OF COUNSEL APPEARING TELELPHONICALLY:
10
11  FOR THE DEFENDANTS ABEL MAKKONEN TESFAYE P/K/A
    THE WEEKND, JASON QUENNEVILLE P/K/A DAHEALA, XO RECORDS,
12  LLC, AND UNIVERSAL MUSIC GROUP:
13       DAVIS WRIGHT TREMAINE, LLP
         BY:  PETER ANDERSON, ATTORNEY AT LAW
14       865 South Figueroa Street
         Suite 2400
15       Los Angeles, California  90017-2566
         (213) 633-6800
16       peteranderson@dwt.com
17
    FOR THE DEFENDANTS GUILLAUME EMMANUEL DE HOMEM-CHRISTO
18  AND THOMAS BANGALTER P/K/A DAFT PUNK:
19       PROSKAUER
         BY:  ALEX D. SILAGI, ATTORNEY AT LAW
20       Eleven Times Square
         New York, NY  10036-8299
21       (212) 969-3421
         asilagi@proskauer.com
22
23  TELEPHONICALLY ALSO PRESENT:
24       ABEL TESFAYE, DEFENDANT
25
```

## Page 4

```
 1                      INDEX
 2
 3  DEPONENT:        EXAMINATION BY:        PAGE:
 4  Jason Quenneville   Mr. Lowe              6
 5
 6
 7
 8
 9  MARKED PORTIONS:
10  (None.)
11
12
13
14  QUESTIONS INSTRUCTED NOT TO ANSWER:
15  (None.)
16
17
```

## Page 5

```
 1  EXHIBITS FOR IDENTIFICATION:              PAGE:
 2  PLAINTIFF
 3
 4  Exhibit 18   Agreement, marked            29
                 Confidential, Bates stamped
 5               W000118 through W000122, 5
                 pages
```

Page 6

1  BEVERLY HILLS, CALIFORNIA
2  WEDNESDAY, NOVEMBER 28, 2018, 6:00 P.M.
3       -OOO-
4
5       JASON QUENNEVILLE P/K/A DAHEALA,
6       having been first duly sworn, was
7       examined and testified as follows:
8
9       EXAMINATION
10 BY MR. LOWE:
11 Q.    Well, good morning Mr. Quenneville. I believe
12 it's morning there. It's evening here.
13       Can you please state your address for the
14 record, please?
15 A.    Yes. I don't know --
16       MR. ANDERSON: Well, his home address is care
17 of me. So I don't think you need his home address, do
18 you?
19       MR. LOWE: Well, normally, I wouldn't, Peter,
20 but since he's taking the position he resides in
21 Los Angeles, I believe for that reason I thought it
22 would be relevant in this case.
23       MR. ANDERSON: Well, do you want to ask him,
24 like, where in L.A. generally? I hate to give out a
25 personal -- especially for someone, like, who's a

Page 7

1  celebrity, I hate to give out a personal actual home
2  address.
3  Q.    BY MR. LOWE: Well, how about a business
4  address? Can you state a business address for the
5  record?
6  A.    Yep. One second.
7        MR. ANDERSON: While he's doing that, Steven,
8  Mr. Tesfaye just came into the room as well.
9        MR. LOWE: Okay.
10       MR. ANDERSON: Now it's the three of us.
11       MR. LOWE: For the record, Mr. Tesfaye just
12 entered the room.
13       THE WITNESS: So the address is 1880 Century
14 Park East, Unit 1600, Los Angeles, California 90067.
15 Q.    BY MR. ANDERSON: And that is your business
16 address, Mr. Quenneville?
17 A.    Yep.
18 Q.    Okay. Do you actually have a physical office
19 there, or is that just a post office box?
20 A.    No. I don't have a physical office there.
21 Q.    Okay. All right.
22       MR. ANDERSON: Steven, can I just interrupt?
23 I want to say one thing.
24       MR. LOWE: Okay.
25       MR. ANDERSON: You may know this, but in the

Page 8

1  Southern District of New York, we're not allowed to
2  state objections the same way we do in L.A. You're
3  supposed to just say, "Objection as to form." You can't
4  talk about argumentative, lacks foundation, that kind of
5  stuff.
6        I just want to say that I'll, of course,
7  comply with that and just state "objection as to form"
8  if I have an objection.
9        But that's, you know, with the understanding
10 that the case is in the Southern District of New York,
11 and that's without waiving the actual grounds for the
12 objections, specific grounds, if it is transferred to
13 California.
14       MR. LOWE: Okay. Fair enough.
15 Q.    BY MR. ANDERSON: Mr. Quenneville, have you
16 ever had your deposition taken before?
17 A.    No. I have not.
18 Q.    All right. Let me go through the ground rules
19 with you real quickly.
20       First of all, you've just been given the oath.
21 That's the same oath that you would be given in a court
22 of law, and it carries with it the same force and effect
23 as if you were in a court of law, including the fact
24 that your testimony is under penalty of perjury, and you
25 are required to tell the truth to the best of your

Page 9

1  ability today.
2        Do you understand that?
3  A.    I understand. Yes.
4  Q.    Okay. The court reporter is going to be
5  preparing a transcript on an expedited basis of
6  everything that is said today on the record. You will
7  have the opportunity to review that transcript and make
8  corrections to it.
9        However, if you make any corrections to the
10 transcript, I'll be able to call the Court's attention
11 to that. So I would ask that you give your best
12 testimony today, and what that essentially means is, if
13 you do not understand a question, or you're unable to
14 respond to it, that you let me know that rather than
15 just trying to respond.
16       Is that acceptable to you?
17 A.    Understood. Yes.
18 Q.    Okay. Also, the court reporter can only take
19 down one person speaking at a time. So I would ask that
20 you wait for me to finish my question, and I'll wait for
21 you to finish your answer, so we don't talk over each
22 other.
23       Okay?
24 A.    Duly noted.
25 Q.    All right. Also, I will be asking questions

Page 10

1  today about things that you might not have a precise
2  recollection of, but I am entitled to your best
3  estimate. However, we do not want you to guess.
4      Do you think you understand the difference
5  between an estimate and a guess?
6  A.    I absolutely do.
7  Q.    Okay. So just to sort of clarify it, if you
8  have some recollection of something or a faint
9  recollection of it, I am entitled to know that. But if
10 you just have no recollection whatsoever, then I don't
11 want you to offer a response.
12     Are you using any medication or drugs today
13 that would impair your ability to testify?
14 A.    No. I have not.
15 Q.    Okay. Terrific.
16     All right. So is it your testimony that you
17 reside in Los Angeles, California?
18 A.    Yes.
19 Q.    And that's been since 2017?
20 A.    Yes.
21 Q.    Where did you reside before that?
22 A.    In Canada.
23 Q.    Okay. And what were the circumstances under
24 which you first met Mr. Tesfaye?
25 A.    For music.

Page 11

1  Q.    Right.
2  A.    I'm a music producer. It was bound to happen,
3  with music.
4  Q.    Right.
5      So you're a music producer, correct?
6  A.    Yes. Correct.
7  Q.    Okay. And can you tell me when you first met
8  Mr. Tesfaye?
9  A.    It was around 2013.
10 Q.    And where did you meet?
11 A.    In Canada.
12 Q.    Okay. Have you and Mr. Tesfaye ever been in
13 New York together?
14 A.    Yes. We have.
15 Q.    On how many occasions?
16 A.    About -- I could not say. I don't have an
17 exact number, and I cannot approximate. Quite a few
18 times.
19 Q.    Okay. Well, let's try to nail it down just a
20 little bit.
21     "Quite a few times," would you say it's more
22 than ten?
23 A.    No. I would say about ten.
24 Q.    Okay.
25 A.    I am not 100 percent sure.

Page 12

1  Q.    Right.
2      So approximately ten times?
3  A.    Approximately ten.
4  Q.    Okay. And those times that you were in
5  New York with Mr. Tesfaye, were those in connection with
6  some business that you were doing together or pleasure
7  or neither?
8  A.    It was all business.
9  Q.    Music business?
10 A.    Yes.
11 Q.    All right. And over what period of time did
12 that take place? Those approximately ten times in
13 New York with Mr. Tesfaye, what years did those take
14 place?
15 A.    Between 2014 until the current time, right
16 now.
17 Q.    Okay. Of those times that you were in
18 New York with Mr. Tesfaye, were any of those times in
19 connection with a live performance by Mr. Tesfaye that
20 you either participated in or attended?
21 A.    Yes. I've attended multiple of his shows.
22 Q.    Right.
23 A.    Worldwide, including New York.
24 Q.    All right. And the ones that were in
25 New York, do you recall where they were?

Page 13

1  A.    There was one that was in Victoria's Secret
2  performance with live television. Another one was
3  Radio City Music Hall. Another one -- I can't remember.
4  We've traveled the whole world, so I have a difficulty
5  keeping track from the time changes.
6  Q.    Right. Understood.
7      Well, do you recall if you were with
8  Mr. Tesfaye this past summer in New York when he did a
9  performance?
10 A.    Do you have a month approximately?
11 Q.    Yeah. July of 2018.
12 A.    No.
13 Q.    You were not?
14 A.    No.
15 Q.    Okay. What about the concerts that he did in
16 Brooklyn, New York, in 2017?
17 A.    No. I was not there.
18 Q.    All right.
19 A.    To the best of my recollection.
20 Q.    All right. So the ones that you remember are
21 Victoria's Secret and a Radio City Music Hall
22 performance?
23 A.    Yes. And that was between 2014 and 2016-ish.
24 There was another one, I believe, Madison Square Garden.
25 Q.    And do you recall when the Madison Square

Page 14

1  Garden concert was?
2  A.    I do not.
3  Q.    All right. Now, when you were attending, with
4  Mr. Tesfaye, these live performances, were you actually
5  back stage? Were you on stage? Were you in the
6  audience?
7  A.    I have usually an all access pass, and I move
8  around. So I could be in the dressing room having
9  coffee. I could be next to the stage watching his
10 performance, or going in the audience in front of the
11 house sound control to see how everything sounds, and
12 then afterwards just go back to backstage. I walk
13 around.
14 Q.    Got it.
15       Are you compensated by The Weeknd XO, Inc., or
16 The Weeknd XO, LLC?
17 A.    For --
18 Q.    I'm sorry?
19 A.    Compensated? What was that?
20 Q.    For your services, other than your, you know,
21 producing or songwriting services?
22       MR. ANDERSON: Objection as to form.
23       Do you understand the question?
24       THE WITNESS: As occurred early in, like,
25 2014, '15-ish, but afterwards things changed, and it

Page 15

1  wasn't the case anymore.
2  Q.    BY MR. LOWE: Okay. All right. Now, do you
3  remember any other occasions that you were in New York
4  in 2017 or 2018 with Mr. Tesfaye, other than the ones
5  that you just mentioned?
6  A.    Yes.
7  Q.    Okay. Can you tell me what they are, please?
8  A.    The last one was in October -- from
9  October 22nd till November -- from October 22nd, I was
10 there for 18 days, and then I returned back to
11 Los Angeles.
12 Q.    Okay. October 22nd of 2018?
13 A.    Yes.
14 Q.    Okay.
15 A.    Correct.
16 Q.    And were you staying at a hotel in New York,
17 or were you staying with Mr. Tesfaye?
18 A.    At the hotel.
19 Q.    And what was your purpose of being there
20 during those 18 days?
21 A.    To make music.
22 Q.    Once again, business related to make music
23 with Mr. Tesfaye?
24 A.    Yes.
25 Q.    Okay.

Page 16

1  A.    Yes. Correct.
2  Q.    And prior to that occasion when you were there
3  for 18 days recently, do you remember when the previous
4  time that you were in New York with Mr. Tesfaye was?
5  A.    Yes. Vaguely. But it was also in this year.
6  Q.    When, this year?
7  A.    I do not know specifically, because we travel
8  the whole world. Everything is usually, you know, find
9  out last minute, pack my bags, go to work, type of.
10 Q.    Well, do you know that it was prior to
11 September of 2018?
12 A.    Well, I was just -- I believe, yes, it was.
13 Q.    Okay. And what were the circumstances?
14 A.    I can look on my calendar and be a little bit
15 more specific, but I don't recollect offhand.
16 Q.    Okay. Do you have your calendar handy that
17 you could look at?
18 A.    No. Not currently.
19 Q.    Okay. So in terms of the circumstances, do
20 you recall how long you were in New York for?
21 A.    I believe it must have been more than ten
22 days.
23 Q.    Approximately ten days?
24 A.    Approximately. Yes.
25 Q.    All right.

Page 17

1  A.    Best of my recollection.
2  Q.    Okay. And do you recall what the purpose was?
3  A.    Same as usual. To conduct business and make
4  music.
5  Q.    Okay. So when you say --
6        I'm sorry?
7  A.    Go ahead.
8  Q.    Would you say one way to characterize it is
9  that to work on music together with Mr. Tesfaye?
10 A.    Well, pretty much. Yes.
11 Q.    Now, you mentioned a couple times that you
12 have toured the world with him.
13       Are you basically on tour with -- well, let me
14 restate the question.
15       There's a tour that's called the "Starboy
16 Tour," right -- or, actually, the official name for it
17 is "Starboy Legend of the Fall 2017 World Tour."
18       Do you recall that tour?
19 A.    I do. Yes.
20 Q.    Okay. Were you on that tour with Mr. Tesfaye?
21 A.    On the European leg of the tour.
22 Q.    Okay. And that tour, the Legend of the Fall,
23 the Starboy Legend of the Fall Tour, is that still going
24 on?
25 A.    To the best of my recollection, no.

Page 18

1  Q.    When did that tour end, to your knowledge?
2  A.    I don't have the specific date; however, it
3  has ended quite a while ago.
4  Q.    And so now there's another tour.
5        What's the current tour called; do you know?
6  A.    There's no current tour, to the best of my
7  knowledge.
8  Q.    Oh, okay.
9  A.    Oh, yeah. There is. There is a tour. I'm
10 sorry. I'm completely -- okay. Currently, I don't know
11 what the name of this tour is, because I am only
12 familiar with the fact that there is touring.
13       I only pay attention to whatever I'm here for.
14 But, usually, a lot of information is conveyed to me on
15 the day of or from another person that does work also
16 with him. So current tour could be potentially
17 something else. I don't know.
18 Q.    Okay.
19 A.    I'm in Hong Kong, and I'm jet lagged.
20 Q.    Okay. Well, let me ask you this.
21       There was a tour in 2017, that was the Starboy
22 Tour, correct?
23 A.    I believe so.
24 Q.    All right. Now, then there appear to be quite
25 a few dates in 2018 that Mr. Tesfaye also appeared at

Page 19

1  various, you know, locations, including Coachella in
2  California, and, you know, Central Park in New York.
3  That kind of thing.
4        Is that an extension of the Starboy Tour, or
5  is that a new tour, or do you not know?
6  A.    I have no idea.
7  Q.    Okay. All right. Fair enough.
8        Now, during the times that you were with
9  Mr. Tesfaye at performances in New York, did you witness
10 him perform the song Starboy?
11 A.    Yes. I have.
12 Q.    On approximately how many occasions?
13 A.    More than ten.
14 Q.    Okay. And those were performances in
15 New York?
16 A.    Not all ten.
17 Q.    Okay. How many --
18 A.    It's the world --
19 Q.    Okay. How many performances have you
20 witnessed of Starboy in New York, to your best
21 recollection?
22 A.    Potentially one.
23 Q.    Just one?
24 A.    I believe so, because I did not attend the
25 whole show, because it was after a while; therefore, I

Page 20

1  keep myself occupied with other things and continuing
2  the music that we are working on, if any.
3  Q.    Right.
4        So what was the one that you remember?
5  A.    The last one I remember, Toronto, because of
6  the way -- because of the track listing and the play
7  list of which song comes up, what time and what period
8  of the show, and there's oftentimes where I am just not
9  actually there to witness it.
10 Q.    I understand.
11       MR. ANDERSON: He's specifically asking you
12 about the last performance in New York of Starboy.
13       THE WITNESS: Did not see it.
14 Q.    BY MR. LOWE: Well, I'm asking you what -- I'm
15 asking you what you remember the last time -- okay.
16       You said that you saw him perform Starboy in
17 New York at least one time.
18       Where was that?
19       MR. ANDERSON: Wait a second. That's not what
20 he testified to.
21       But objection as to form.
22       MR. LOWE: Okay. Well --
23       MR. ANDERSON: He said "potentially," and
24 that's a guess.
25 Q.    BY MR. LOWE: All right. Where do you recall

Page 21

1  seeing Mr. Tesfaye perform Starboy in New York?
2  A.    I could not tell you.
3  Q.    Okay. You just don't recall?
4  A.    It's ongoing. Well, yeah. I don't recall.
5  Q.    All right. Now, you are a co-writer on
6  Starboy, correct?
7  A.    Correct.
8  Q.    What did you contribute?
9  A.    It was from another idea that we had started
10 many years ago, a few years ago.
11 Q.    Well, okay. My question is, what did you
12 contribute to the song?
13       MR. ANDERSON: Objection as to form.
14 Q.    BY MR. LOWE: You can attempt to answer unless
15 you don't understand the question.
16 A.    My contribution to the song was done
17 externally from the current final song, to a certain
18 extent. Not fully, but it was an idea that we had
19 started and that was elaborated on.
20 Q.    Well, let me see if I can -- that's a little
21 vague, so let me see if I can be more specific.
22       Did you contribute any lyrics?
23 A.    No.
24 Q.    Okay. Did you contribute any music?
25 A.    To this version, not quite, because it's a bit

Page 22

1  tricky. Music is not as straightforward as an A/B
2  answer.
3  **Q.** Okay. Well --
4  **A.** Are you familiar with music?
5  **Q.** I am, actually, but that's kind of besides the
6  point, because, you know, I have to get on the record,
7  you know, what it is that you actually did in connection
8  with the song.
9      So can you --
10 **A.** I want to give you a proper answer, so I could
11 not assume or just answer anything.
12 **Q.** Well, do your best.
13 **A.** Okay. Well, like I said, we had an idea that
14 we had kind of tinkered around, and then that idea
15 eventually became part of the prechorus, and that is my
16 contribution.
17 **Q.** Ah. So you contributed some music to the
18 prechorus on Starboy?
19 **A.** Incorrect. I did not provide no music. We
20 started at the musical location. There's a composition
21 of things. It takes many forms and shapes prior to
22 actually becoming a final result.
23      And, however, that creativity is channeled
24 sometimes different ways; therefore, whatever we had
25 tinkered around with, essentially, became part of the

Page 23

1  prechorus.
2  **Q.** Whatever you tinkered around with became part
3  of the prechorus.
4      I mean, correct me if I'm wrong, but at least
5  as to a song it's comprised of music and lyrics. We
6  know you didn't contribute any lyrics.
7      Did you contribute any music?
8      MR. ANDERSON: Objection as to form.
9      THE WITNESS: So I played some chords to which
10 he started with an idea that he developed, and it's a
11 process. It's a long process.
12 **Q.** BY MR. LOWE: Okay.
13 **A.** Making music is not like a recipe. It's not
14 like that.
15 **Q.** Okay. What's your percentage on the song?
16 **A.** Five percent, I believe.
17 **Q.** Okay.
18 **A.** Or less.
19 **Q.** All right.
20 **A.** I'm not exactly --
21 **Q.** I'm sorry?
22 **A.** My management handles that stuff. They have a
23 more accurate response.
24 **Q.** Well, we'll get to that in a second. Okay.
25      So can we say that your contribution to

Page 24

1  Starboy is some chords for the prechorus?
2  **A.** No, because the chords changed, eventually.
3  **Q.** Ah.
4  **A.** The chords is not bound to a specific thing.
5  **Q.** So here's what I'm hearing, and correct me if
6  I'm wrong.
7      I'm hearing that you were working on some
8  ideas for the prechorus on Starboy, but that your ideas
9  weren't actually ended being used, but that you still
10 got five percent because of the work that you did?
11 **A.** That's incorrect. I was not working towards
12 or geared towards Starboy, the song that we're currently
13 referring to.
14 **Q.** Oh, so you didn't do any work on Starboy, per
15 se?
16      MR. ANDERSON: Objection as to form.
17      THE WITNESS: That's also incorrect.
18 **Q.** BY MR. LOWE: Is that correct or incorrect?
19 **A.** Incorrect.
20 **Q.** Okay. Well, let me try again, then.
21      What, if anything, did you do with respect to
22 the song Starboy?
23 **A.** Like I have mentioned before, when you try to
24 compose an idea, a fresh concept from nothing, you take
25 different approaches. Sometimes it could be chords.

Page 25

1  Sometimes it could be rhythm. Sometimes it could be --
2  I don't know. It could be anything.
3      But in that specific moment where me and him,
4  with whatever became a part of, like, not because that
5  was the intention, but what became a part of, I was
6  playing some chords, and then afterwards something came
7  out of it, and then afterwards we made the version of a
8  song called "Ebony," and then afterwards, that was it.
9      And we did not go back to that song. And I am
10 not in a position to speak of Mr. Tesfaye's creative
11 process; therefore, I do not believe we fully know how
12 that became a part of Starboy. However, it did.
13 **Q.** So do you recognize anything that you did in
14 Starboy?
15 **A.** In comparison to the idea that we had started,
16 not as a -- you know, it was not -- it's in comparison.
17 **Q.** So --
18 **A.** It wasn't -- it's not --
19 **Q.** So in answer to my question whether you
20 recognize anything that you did in the final version of
21 Starboy that was released to the public, is it correct
22 that your answer is "no"?
23      MR. ANDERSON: Objection as to form.
24      THE WITNESS: I recognize from this idea that
25 we started, that it was similar, to a certain extent.

Page 26

1  That is how I acquired my five percent.
2       It's not as black and white as you are
3  currently making it out to be, but that is -- that's
4  what I recognize from a past idea that we had started.
5  Q.    BY MR. LOWE: "A past idea."
6       So it was a musical idea?
7  A.    Yes.
8  Q.    Okay. So you recognize some of that musical
9  idea in the final version of Starboy?
10 A.    It is not -- it is a musical idea by default,
11 because we are in -- we make music. With any other type
12 of domains, it would be labeled as such.
13      Currently, yes, in the musical form, but not
14 accurately from the idea from which it stemmed from
15 between me and him with regards to my involvement to
16 this song.
17 Q.    All right. I'm sorry, Mr. Quenneville, I'm
18 having a hard time understanding what you're saying. So
19 let me try again.
20      When you listen to the final version of
21 Starboy that was released to the public, do you
22 recognize anything that you contributed in that version
23 at all in the prechorus anywhere?
24 A.    Yes. In the prechorus, yes.
25 Q.    And what do you recognize in the prechorus?

Page 27

1  Is it a chord progression? Is it a melody? Is it a
2  bass drum? What is it?
3  A.    It's the lyrical reference.
4  Q.    It's a "lyrical reference"?
5  A.    Yes.
6  Q.    Okay. And what lyrical reference is it?
7  A.    "Table cut from Ebony" -- "twenty racks a
8  table cut from Ebony" part. I don't remember the lyrics
9  very well.
10 Q.    Okay. So it's lyrics?
11 A.    It is the lyrics that I recognize. Yes.
12 Q.    And you recognize them, because that's what
13 you contributed for your five percent?
14 A.    It is how I identify that I was a part of it.
15      MR. ANDERSON: I think he's asking if you
16 created those lyrics that you just phrased.
17      THE WITNESS: I did not. I did not. That is
18 how I recognize it.
19 Q.    BY MR. LOWE: All right. So is it correct,
20 then -- and we'll move on, because I want to try to get
21 past this -- as Starboy is currently, the version that,
22 you know, was released to the public, originally
23 released to the public, there's actually nothing in
24 there that you actually performed or created; am I
25 right?

Page 28

1       MR. ANDERSON: Objection as to form.
2       THE WITNESS: Yes. Exactly correct.
3  Q.    BY MR. LOWE: All right. Okay.
4       Now, were you in the studio when Mr. Tesfaye
5  was working on this song?
6  A.    On the property at the studio, we bounce
7  around. There's multiple rooms in the studio where we
8  work.
9  Q.    Okay. So you weren't actually in the room?
10 A.    Not in the same room. I don't believe so.
11 No.
12 Q.    Okay. And what studio is that?
13 A.    Conway, I believe -- or, well, actually, you
14 know what, I was not in the room, so I don't know for a
15 fact.
16 Q.    Okay.
17 A.    I remember hearing it at Conway, you know.
18 Q.    You remember hearing it at Conway Studio?
19 A.    Yes.
20 Q.    Okay. And Conway Studio, do you believe
21 that's located in Los Angeles?
22 A.    Yes.
23 Q.    Okay.
24 A.    On Melrose.
25 Q.    But do you know if it was first created at

Page 29

1  Conway Studio or not?
2       MR. ANDERSON: Objection as to form.
3       THE WITNESS: I do not know.
4  Q.    BY MR. LOWE: Okay. Now, other than the time
5  that you heard it at Conway Studio in New York (sic),
6  did you ever have occasion to actually collaborate on
7  Starboy at any time after that?
8       MR. ANDERSON: I'm sorry. You referred to
9  "Conway Studio in New York."
10      MR. LOWE: I'm sorry.
11 Q.    BY MR. LOWE: Conway Studio in Los Angeles.
12      MR. ANDERSON: Could you please repeat the
13 question?
14      MR. LOWE: Yes. I absolutely will.
15 Q.    BY MR. LOWE: After the time that you heard
16 the song Starboy at Conway Studio in Los Angeles, was
17 there any subsequent occasion, that you recall, where
18 you worked on the song with Mr. Tesfaye?
19 A.    I do not recall.
20 Q.    Okay. All right. Now, I want you to turn to
21 Exhibit No. 18.
22      (Plaintiff's Exhibit No. 18 was marked
23       for identification and is attached hereto.)
24      MR. LOWE: And you can go ahead and mark it
25 after he identifies it?

Page 30

1  THE COURT REPORTER: (Nodding head.)
2  Q. BY MR. LOWE: Let me know when you have it in
3  front of you.
4  A. I have it in front of me.
5  Q. Okay. This is an agreement that you entered
6  into with respect to, among other songs, Starboy,
7  correct?
8  A. It would appear so.
9  Q. All right. And is that your signature on the
10 next to last page of the agreement?
11 A. That is my signature there.
12 Q. Okay. And where were you when you signed it?
13 A. I cannot recollect.
14 Q. Okay.
15 A. I can't remember the office.
16 Q. All right. And do you believe that signature
17 right above your signature is Mr. Tesfaye's signature?
18 A. There's no is signature above mine.
19 Q. Well, next to yours.
20 A. There's one to the right.
21 Q. To the right. Correct.
22 A. Well, there's a signature, but I wouldn't know
23 if it is his or not. I don't really know his signature.
24 Q. Well, did he sign this in front of you?
25 A. I think it was signed separate, with a

Page 31

1  witness, I believe.
2  Q. Okay.
3  A. I cannot recollect. My management would know
4  better.
5  Q. All right. Now, if you look up at
6  paragraph 8, in all capital letters, it says, "This
7  agreement shall be governed by and construed under the
8  laws and judicial decisions of the State of New York
9  without giving effect to the conflict of laws principles
10 of New York."
11    Do you see that?
12 A. I do.
13 Q. All right. Do you know why that you and
14 Mr. Tesfaye agreed to be governed by the laws and
15 judicial decisions of the State of New York?
16    MR. ANDERSON: Objection as to form.
17    Go ahead.
18    THE WITNESS: I do not.
19 Q. BY MR. LOWE: Okay. Do you recall if there
20 was any discussion as to why you were going to be
21 governed by the laws of New York?
22 A. I do not.
23 Q. Okay. All right.
24    Now, and this, by the way, the exhibit,
25 confirms the fact that you are a five percent co-writer

Page 32

1  on Starboy, correct?
2  A. On the final page, it does say, "5 percent."
3  Q. Right.
4    And that's accurate, as far as you know,
5  right?
6  A. Yes.
7  Q. Okay. Have you derived any money from the
8  sales or other exploitations of Starboy yet?
9    MR. ANDERSON: Objection. Outside the scope
10 of jurisdiction of discovery.
11    MR. LOWE: Well, I'm coming around to that.
12    You're not instructing him not to answer,
13 right?
14    MR. ANDERSON: I'm not. I mean, I'll give you
15 some leeway, but I don't see it's relevant through
16 jurisdictional discovery.
17    But it's asking for a "yes" or "no" answer.
18 Q. BY MR. LOWE: Yes.
19 A. My business management would have a better
20 answer to -- I do not know for sure.
21 Q. All right.
22 A. This is 2016. I don't know.
23 Q. So you've never seen a statement where you saw
24 that you got some money from Starboy?
25 A. My business management would know that.

Page 33

1  Q. But I'm asking you, have you seen that?
2  A. I understand. But not to the best of my
3  recollection. No.
4  Q. All right. Do you know if you have derived
5  any revenue from sales or exploitations of Starboy in
6  New York?
7  A. I do not.
8  Q. All right. Other than the instances that you
9  have identified of the approximately ten times or quite
10 a few times that you've been with Mr. Tesfaye in
11 New York, do you have any other contacts with New York?
12 Have you been to New York yourself before?
13    MR. ANDERSON: Objection as to form.
14    Go ahead.
15    THE WITNESS: Been to New York. Yes. I have.
16 Q. BY MR. LOWE: All right. Approximately how
17 many times have you been to New York in the last five
18 years?
19 A. I have no idea.
20 Q. Well, I'm entitled to your best estimate.
21 A. I know you are. I still don't have no idea.
22 Q. Well, is it --
23 A. I just go along with it. I'm not here to keep
24 track of how many trips I take.
25 Q. Well, I understand. You know, I understand

Page 34

1  that you have not kept some sort of diary of each of
2  your trips to New York in the last five years. But I am
3  entitled to your best estimate.
4      And so can you tell me approximately how many
5  times that you've been in New York in the last five
6  years?
7      MR. ANDERSON: Can I ask for a classification?
8  You're asking him, setting aside instances where he went
9  to New York and Mr. Tesfaye was there, how many times he
10 recalls going to New York without Mr. Tesfaye?
11     MR. LOWE: That's correct.
12     MR. ANDERSON: Is that right?
13     MR. LOWE: Yes.
14     MR. ANDERSON: Thank you.
15     THE WITNESS: Three times.
16 **Q.** BY MR. LOWE: Okay. And what were the purpose
17 of those three times?
18 **A.** To see a friend of mine.
19 **Q.** So the other three times were not business
20 related? It had nothing to do with music?
21 **A.** Correct.
22 **Q.** Did you ever go to the offices of Republic
23 Records located at -- one second. I'll tell you the
24 address.
25 **A.** No. I have not.

Page 35

1  **Q.** Okay. So you've never been to Republic at
2  1755 Broadway?
3  **A.** No. I have not.
4  **Q.** All right. Are you currently signed -- well,
5  strike that.
6      You mentioned your "management." Who is your
7  management?
8  **A.** (Unintelligible.)
9  **Q.** I'm sorry. Could you say that again?
10 **A.** Sal & Co.
11     MR. ANDERSON: I'm sorry. I just want to
12 object as to form. I know I'm late, but I think you
13 have to be more specific.
14     Go ahead.
15 **Q.** BY MR. LOWE: Well, this is your management
16 company in the entertainment industry, correct?
17     MR. ANDERSON: Objection as to form.
18     But I'm happy to tell you what my concern is,
19 Mr. Lowe, but go ahead.
20     MR. LOWE: Go ahead and tell me what your
21 concern is.
22     MR. ANDERSON: People in this business have
23 personal managers and business managers, and you're not
24 distinguishing between the two.
25     MR. LOWE: Okay. Sorry.

Page 36

1  **Q.** BY MR. LOWE: I'm referring to your personal
2  managers.
3  **A.** Okay. What about them? What's the question?
4  **Q.** Who are they?
5  **A.** I am in business, personal business, but not
6  business, personal management deal with Sal & Co.
7  **Q.** Can you spell it, please?
8  **A.** S-A-L, the character for "and," C-O.
9  **Q.** Sal & Co.?
10 **A.** Yes.
11 **Q.** Where is Sal & Co. located?
12 **A.** I would not know.
13 **Q.** Have you ever met with anybody of your
14 personal managers in person?
15 **A.** Yes.
16 **Q.** Where did you meet with them?
17 **A.** In Los Angeles, but it stems from Canada to
18 begin with.
19 **Q.** Okay.
20 **A.** Specifically, in Ottawa.
21 **Q.** Oh, okay. All right. Let's see. Question
22 for you.
23     Were you aware that Mr. Tesfaye's entered into
24 a settlement agreement with Squad Music concerning the
25 song Starboy?

Page 37

1      MR. ANDERSON: Objection. Again, outside the
2  scope of jurisdictional discovery.
3      It's a "yes" or "no" question.
4      THE WITNESS: No.
5  **Q.** BY MR. LOWE: All right. Have we now
6  identified all contacts that you've had with New York
7  over the last five years, or are there any others that
8  you have not testified to?
9      MR. ANDERSON: Objection as to form.
10     THE WITNESS: Yes. We have pretty much laid
11 out most of what I can remember, to the best of my
12 recollection.
13 **Q.** BY MR. LOWE: Okay. Is there anything else
14 that you remember?
15 **A.** No.
16 **Q.** All right. Do you know why you were not
17 originally on the split agreement concerning Starboy?
18 **A.** I do not.
19 **Q.** All right. Was there any discussions or
20 negotiations that you recall having with Mr. Tesfaye or
21 others about getting your five percent?
22 **A.** No.
23 **Q.** Okay.
24 **A.** Not with Mr. Tesfaye.
25     THE COURT REPORTER: I didn't hear him.

Page 38

1  MR. LOWE: I think he said, "not with
2 Mr. Tesfaye."
3  Q. BY MR. LOWE: Is that what you said?
4  A. Yes. Correct.
5  Q. Did you have discussions with anybody else?
6  A. My management, Sal & Co.
7  Q. Okay. Anybody else that you recall?
8  A. Nobody else.
9  Q. All right.
10 A. Not that I recall.
11     MR. LOWE: Let's take a five-minute break, but
12 I may be done with you. So let me just make sure that I
13 haven't forgotten to ask you anything.
14     I guess, Peter, do you think it's okay if I
15 put it on hold? You guys are going to get music, or I
16 could just leave the line open. But let's go ahead and
17 take a five-minute break.
18     Is that okay with everybody?
19     MR. ANDERSON: Yeah. That's fine. We'll just
20 wait for you to come back.
21     MR. LOWE: Okay. All right.
22     (Brief recess was taken from 6:45 p.m. to
23 6:46 p.m.)
24     MR. LOWE: All right. Well, I don't have
25 anything else.

Page 39

1     Anybody else have any questions for
2 Mr. Quenneville? Okay. Are you guys there still?
3     THE WITNESS: Yep.
4     MR. ANDERSON: Yes. We're waiting for Alex.
5     MR. LOWE: I was waiting for Alex, too.
6     MR. SILAGI: Still here. No questions.
7     MR. LOWE: Okay. All right.
8     Well, with that in mind, I guess let's enter
9 into a stipulation, that the court reporter can be
10 relieved of her duties under the code.
11    We're going to expedite this transcript to get
12 it, actually, on Friday, given the sort of tight time
13 frame that we're on.
14    So, you know, if possible, can we have him
15 review and make any corrections to the transcript --
16    It's going to be short, right? It's only
17 going to be, how many pages do you think, Court
18 Reporter?
19    THE COURT REPORTER: About 40.
20    MR. LOWE: It's going to be about 40 pages.
21    So do you think we can get him to review it
22 and make any changes by a week from Friday?
23    MR. ANDERSON: Which Friday, though? Are you
24 talking about two days from now?
25    MR. LOWE: Well, we're --

Page 40

1    MR. ANDERSON: Or next Friday?
2    MR. LOWE: The transcript will be circulated
3 by e-mail, probably just by e-mail, for the most part,
4 this Friday, the 30th, and then what I'm asking him is
5 if he could read it and make any changes by the
6 following Friday.
7    MR. ANDERSON: We will try that. I mean,
8 they're leaving Hong Kong and moving on to the next
9 venue, and so it may be difficult. But I will endeavor
10 to get that done for you.
11    MR. LOWE: Okay. And the original transcript
12 will be maintained by you, Peter, and that will be
13 signed by the deponent. And a certified copy can be
14 used in lieu of the original for all purposes.
15    MR. ANDERSON: So stipulated.
16    MR. LOWE: Okay. So stipulated.
17    (The deposition was concluded at 6:48 p.m.)
18                    -oOo-

Page 41

1          DEPONENT'S DECLARATION
2
3    I, JASON QUENNEVILLE, hereby declare:
4    I have read the foregoing deposition
5 transcript, I identify it as my own, and I have made any
6 corrections, additions, or deletions that I was desirous
7 of making in order to render the within transcript true
8 and correct.
9    I declare under penalty of perjury, under
10 the laws of the State of California, that the foregoing
11 is true and correct.
12
13 _____;_____
         (Date)              (City and State)
14
15
16         _____
                (Signature)

Page 42

```
 1  STATE OF CALIFORNIA   )
                         ) SS.
 2  COUNTY OF LOS ANGELES )
 3
 4         I, Tisha C. Okuma, Certified Shorthand
 5  Reporter, Certificate No. 9774 in the State of
 6  California, duly empowered to administer oaths, do
 7  hereby certify:
 8         I am the deposition officer that
 9  stenographically recorded the testimony in the foregoing
10  deposition;
11         Prior to being examined, the deponent was by
12  me first duly sworn;
13         The foregoing transcript is a true record of
14  the testimony given;
15         I was relieved of my duty pursuant to Code
16  of Civil Procedure, Section 2025 (Q)(1), and therefore
17  any changes made by the deponent or whether or not the
18  deponent signed the transcript are not set forth.
19
20  Dated_____, Los Angeles, California.
21
22
23         _____
24
25
```