# EXHIBIT 8

```
 1                   UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5   YASMINA MOHAMMED P/K/A                )
     SOMALIA,                               )
 6                                          )
                    PLAINTIFF,              )
 7                                          )
                                            )
 8        vs.                               ) CASE NO. 1:18-CV-08469-JSR
                                            )
 9                                          )
     ABEL MAKKONEN TESFAYE P/K/A            )
10   THE WEEKND; GUILLAUME EMMANUEL         )
     DE HOMEM-CHRISTO AND THOMAS            )
11   BANGALTER P/K/A DAFT PUNK;             )
     MARTIN MCKINNEY P/K/A DOC;             )
12   HENRY WALTER P/K/A CIRKUT;             )
     JASON QUENNEVILLE P/K/A                )
13   DAHEALA, XO RECORDS, LLC;              )
     REPUBLIC RECORDS; UNIVERSAL            )
14   MUSIC GROUP; WILLIAM USCHOLD           )
     P/K/A WILL U; TYRONE                   )
15   DANGERFIELD P/K/A TABOO!!;             )
     SQUAD MUSIC GROUP; AND DOES            )
16   1-10,                                  )
                                            )
17                  DEFENDANTS.             )
     _____)
18

19                  TELEPHONIC DEPOSITION OF

20        ABEL MAKKONEN TESFAYE P/K/A THE WEEKND

21                WEDNESDAY, NOVEMBER 28, 2018

22

23

24   REPORTED BY:
     TISHA C. OKUMA
25   CSR NO. 9774
```

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5   YASMINA MOHAMMED P/K/A           )
     SOMALIA,                         )
 6                                    )
           PLAINTIFF,                 )
 7                                    )
                                      )
 8        vs.          ) CASE NO. 1:18-CV-08469-JSR
                                      )
 9   ABEL MAKKONEN TESFAYE P/K/A      )
10   THE WEEKND; GUILLAUME EMMANUEL   )
     DE HOMEM-CHRISTO AND THOMAS      )
11   BANGALTER P/K/A DAFT PUNK;       )
     MARTIN MCKINNEY P/K/A DOC;       )
12   HENRY WALTER P/K/A CIRKUT;       )
     JASON QUENNEVILLE P/K/A          )
13   DAHEALA, XO RECORDS, LLC;        )
     REPUBLIC RECORDS; UNIVERSAL      )
14   MUSIC GROUP; WILLIAM USCHOLD     )
     P/K/A WILL U; TYRONE             )
15   DANGERFIELD P/K/A TABOO!!;       )
     SQUAD MUSIC GROUP; AND DOES      )
16   1-10,                            )
                                      )
17         DEFENDANTS.                )
     _____)
18
19
20      TELEPHONIC DEPOSITION OF ABEL MAKKONEN TESFAYE
21      P/K/A THE WEEKND, TAKEN ON BEHALF OF THE PLAINTIFF
22      AT 8383 WILSHIRE BOULEVARD, SUITE 1038,
23      LOS ANGELES, CALIFORNIA, COMMENCING AT 7:01 P.M.,
24      WEDNESDAY, NOVEMBER 28, 2018, BEFORE TISHA C.
25      OKUMA, CSR 9774.
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2
 3   FOR THE PLAINTIFF:
 4      LOWE & ASSOCIATES, PC
        BY: STEVEN T. LOWE (PRO HAC VICE)
 5      8383 Wilshire Boulevard
        Suite 1038
 6      Beverly Hills, California 90211
        (310) 477-5811
 7      steven@lowelaw.com
 8
 9   APPEARANCES OF COUNSEL APPEARING TELEPHONICALLY:
10
11   FOR THE DEFENDANTS ABEL MAKKONEN TESFAYE P/K/A
     THE WEEKND, JASON QUENNEVILLE P/K/A DAHEALA, XO RECORDS,
12   LLC, AND UNIVERSAL MUSIC GROUP:
13      DAVIS WRIGHT TREMAINE, LLP
        BY: PETER ANDERSON, ATTORNEY AT LAW
14      865 South Figueroa Street
        Suite 2400
15      Los Angeles, California 90017-2566
        (213) 633-6800
16      peteranderson@dwt.com
17
     FOR THE DEFENDANTS GUILLAUME EMMANUEL DE HOMEM-CHRISTO
18   AND THOMAS BANGALTER P/K/A DAFT PUNK:
19      PROSKAUER
        BY: ALEX D. SILAGI, ATTORNEY AT LAW
20      Eleven Times Square
        New York, NY 10036-8299
21      (212) 969-3421
        asilagi@proskauer.com
22
23
24
25
```

Page 4

```
 1                         INDEX
 2
 3   DEPONENT:        EXAMINATION BY:        PAGE:
 4   Abel Tesfaye     Mr. Lowe                 7
 5                    Mr. Anderson            63
 6
 7
 8
 9   MARKED PORTIONS:
10   (None.)
11
12
13
14   QUESTIONS INSTRUCTED NOT TO ANSWER:
15   (None.)
```

Page 5

```
 1   EXHIBITS FOR IDENTIFICATION:              PAGE:
 2   PLAINTIFF
 3
 4   Exhibit 3   Declaration of Defendant        57
              Abel Makkonen Tesfaye in
 5            Support of Motion to
              Dismiss or Transfer, 10
 6            pages
 7   Exhibit 5   Exclusive Manufacturing,        12
              Distribution, and License
 8            Agreement, marked
              Confidential, Bates stamped
 9            W000004 through W000053, 51
              pages
10
11   Exhibit 7   Weeknd Exclusive                20
              Manufacturing Distribution
12            and License Agreement -
              Distribution and Services
13            Fee and Foreign License
              Royalty Amendment, marked
14            Confidential, Bates stamped
              W000054 through W000055, 3
15            pages
16   Exhibit 8   Weeknd Exclusive                22
              Manufacturing Distribution
17            and License Agreement -
              Album Three Distribution
18            and Services Fee and
              Foreign License Royalty
19            Amendment, marked
              Confidential, Bates stamped
20            W000056 through W000059, 5
              pages
21   Exhibit 11  NY E-File Payment Record -      24
              Balance Due, Bates stamped
22            W000099, 2 pages
23   Exhibit 12  The Weeknd brings 'Madness'     26
              to Madison Square Garden
24            article, 3 pages
25
```

Page 6

1  EXHIBITS FOR IDENTIFICATION:                    PAGE:
2  PLAINTIFF
3
4  Exhibit 14   The Weeknd/Barclays Center          31
               Event Information, 2 pages
5  Exhibit 15   Standard Form of                    34
               Condominium Apartment
6              Lease, marked Confidential,
               Bates stamped W000087
7              through W000098, 13 pages
8  Exhibit 17   Elle Magazine article Bella         40
               Hadid reportedly Agreed to
9              Move In With The Weeknd and
               Share His Luxury NYC Condo,
10             4 pages
11 Exhibit 18   Agreement, marked                   10
               Confidential, Bates stamped
12             W000118 through W000122, 6
               pages
13
14 Exhibit 19   Agreement, 10 pages                 44
15 Exhibit 20   The Weeknd x Footaction             53
               Bring Puma 'XO' Pop-Up Shop
16             to NYC for One Weekend Only
               article, 3 pages
17 Exhibit 21   On the Scene at Victoria's          56
               Secret Fashion Show 2018:
18             Halsey's Near Wipeout, The
               Weeknd's Chats With Yolanda
19             Hadid & More article, 3
               pages
20
21 (Plaintiff's Exhibit Nos. 1, 2, 4, 6, 9, 10, 13, 16,
22 and 22 were all together in an Exhibit packet and were
23 not marked nor attached to this transcript.)
24
25

Page 7

1              BEVERLY HILLS, CALIFORNIA
2         WEDNESDAY, NOVEMBER 28, 2018, 7:01 P.M.
3                        -OOO-
4
5         ABEL MAKKONEN TESFAYE P/K/A THE WEEKND,
6            having been first duly sworn, was
7            examined and testified as follows:
8
9                      EXAMINATION
10 BY MR. LOWE:
11 **Q.**    Okay.  Good morning, Mr. Tesfaye.
12          Am I pronouncing your last name correctly?
13 **A.**    Yes.  You are.
14 **Q.**    Okay.  Have you ever had your deposition taken
15 before?
16 **A.**    No.  This is my first time.
17 **Q.**    All right.  Well, let me just go through some
18 of the ground rules with you.
19          First of all, you've just been given the oath.
20 That's the same oath that you would be given in a court
21 of law.  It carries with it the same force and effect as
22 if you were in a court of law, including your testimony
23 is under penalty of perjury.  You've been sworn to tell
24 the truth today.
25          Do you understand that?

Page 8

1  **A.**    I understand that.
2  **Q.**    Okay.  I'm going to be asking you questions
3  today about things that you may not have a precise
4  recollection of; however, I'm entitled to your best
5  recollection, meaning that, if you can estimate
6  something, I'm entitled to that testimony.  If you have
7  a faint recollection of something, I'm entitled to that.
8  But I don't want you to guess.
9           Do you understand the difference between a
10 faint recollection or an estimate versus a guess?
11 **A.**    Absolutely.
12 **Q.**    Okay.  And you have, I assume, no problem with
13 distinguishing those two and providing me with your best
14 recollection if the question calls for it?
15 **A.**    Yes, sir.
16 **Q.**    All right.  So, also, today the court reporter
17 is going to be preparing a transcript.  That transcript
18 of the proceedings today is going to be circulated to
19 everybody probably this Friday, as early as this Friday,
20 in about 48 hours.
21          You will have the opportunity to review that
22 transcript, and you'll have the opportunity to make any
23 corrections to it.
24          But if you make any corrections, I have the
25 opportunity to comment on that and point out the fact

Page 9

1  that you testified one way on November 28th, and then
2  you changed your testimony.
3           So, for that reason, I would ask that you give
4  your best testimony today.  What that means is, if you
5  are unable to answer a question for some reason, or if
6  you don't understand it, it is better that you tell me
7  that rather than just try to go ahead and answer it.
8           Is that acceptable?
9  **A.**    Yes, sir.
10 **Q.**    All right.  And the court reporter cannot take
11 down two people talking at the same time.  So especially
12 given the fact that this is a telephonic deposition, I
13 will wait for you to finish your answer and, likewise,
14 please wait for me to finish my question.  Those are the
15 basic ground rules.  There's some more, but that's good
16 enough for now.
17          Are you currently under the influence of any
18 drugs or alcohol or medication which would impair your
19 ability to testify?
20 **A.**    No.
21 **Q.**    All right.  I'm sorry?
22 **A.**    No.  I am not.  Sorry.
23 **Q.**    Now, I know you were in the room during at
24 least some portion of Mr. Quenneville's deposition.
25          Do you recall that I referred him to

Page 10

1  Exhibit 18, which is your agreement with
2  Mr. Quenneville?
3         MR. ANDERSON:  Objection as to form.
4         Do you want me to put it in front of him?
5         MR. LOWE:  Yes, please.
6         MR. ANDERSON:  Done.
7         MR. LOWE:  All right.
8         THE WITNESS:  Yes.  I remember.
9         (Plaintiff's Exhibit No. 18 was previously
10     marked for identification and is attached hereto.)
11  Q.    BY MR. LOWE:  All right.  And turning to the
12  second to last page of that, that is your signature,
13  correct?
14  A.    Yes.  It is.
15  Q.    All right.  Do you know who prepared this
16  agreement?
17  A.    I don't know.  I would assume it was my
18  lawyers.
19        MR. ANDERSON:  He wants to know if you know.
20        THE WITNESS:  Oh, no.  I do not know.
21        MR. ANDERSON:  It doesn't help him if you
22  guess.
23        THE WITNESS:  No.  I don't.
24  Q.    BY MR. LOWE:  Now, do you have lawyers in both
25  New York and California?

Page 11

1  A.    I'm sorry?
2         MR. ANDERSON:  Can you distinguish between
3  litigation counsel and general counsel?
4         MR. LOWE:  Oh, I'm sorry.  Yes.
5  Q.    BY MR. LOWE:  Let's exclude litigation
6  counsel.
7         For negotiating your contracts and things like
8  that, do you have lawyers in both New York and
9  California?
10 A.    I don't know.
11 Q.    All right.  Are you familiar with a gentleman
12 named Stuart Prager?
13 A.    No.
14 Q.    Okay.  At this moment, you don't know who
15 Stuart Prager is?
16 A.    Is it a lawyer?
17 Q.    It is.
18 A.    I know Kenny Meiselas.
19 Q.    Okay.
20        MR. ANDERSON:  The question is whether you
21 know who Stuart Prager is.
22        THE WITNESS:  No.  No.  No.
23 Q.    BY MR. LOWE:  All right.
24 A.    Sorry.
25 Q.    Do you know if, within the last five years,

Page 12

1  you've used any lawyers in New York other than
2  litigation counsel?
3         MR. ANDERSON:  Objection as to form.
4         THE WITNESS:  I don't know.
5  Q.    BY MR. LOWE:  Okay.  Now, going to your
6  signature on Exhibit 18, you see that it says, in all
7  capital letters, "This agreement shall be governed by
8  and construed under the laws and judicial decisions of
9  the State of New York."
10        Were you the one that wanted to include that
11 language?
12 A.    No.  I am not.
13 Q.    Okay.  Do you know why that language is in
14 this contract?
15 A.    I do not know.
16 Q.    Okay.
17        All right.  We've got a fair amount of ground
18 to cover, so let's go to Exhibit 5.
19        (Plaintiff's Exhibit No. 5 was marked
20     for identification and is attached hereto.)
21 Q.    BY MR. LOWE:  Is Exhibit 5 an agreement that
22 you entered into in or about August of 2012?
23 A.    Can you rephrase the question, please?
24 Q.    Is this an agreement, Exhibit 5, that you
25 entered into in August of 2012?

Page 13

1         MR. ANDERSON:  I think he just needs to
2  know -- I mean, the thing is, it's over a quarter-inch
3  thick, but --
4  Q.    BY MR. LOWE:  Well, let's go to the various
5  different pages.  They're Bates stamped pages.
6  A.    Okay.
7  Q.    And so let's first go to Bates stamped page
8  -44.
9         MR. ANDERSON:  Do you know what "Bates stamped
10 page" means?
11        THE WITNESS:  No.
12        MR. ANDERSON:  You see the bold numbers that
13 begin with "W"?  He's talking about that number.
14        THE WITNESS:  Oh.  So -44?
15        MR. ANDERSON:  Yes.
16 Q.    BY MR. LOWE:  So XO & Co., Inc., is that a
17 company that you owned?
18 A.    Yes, sir.
19 Q.    Okay.  And is that your signature?
20 A.    Yes.  It is.
21 Q.    All right.  Now, two pages before that,
22 Bates stamped -42, under the "Choice of Law" provision,
23 were you the one that requested New York law, or was
24 that Republic Records, or do you know?
25 A.    I don't know.

Page 14

1  Q. All right. Now, going to page Bates stamped
2  page -31, it says on paragraph 12.1.3, "Artist is not a
3  resident of the state of California."
4      Do you see that?
5  A. Where is that?
6  Q. On Bates stamped page -31, paragraph 12.1.3.
7  A. Yes. I do see that.
8  Q. Okay. And is it your understanding that you
9  are "artist"?
10 A. Yes.
11 Q. Okay. And so at least as of that time, at
12 least as of August 2012, you were not a resident of the
13 state of California, correct?
14 A. Yes. I wasn't.
15 Q. Okay. And this contract was signed by you in
16 or about August of 2012?
17 A. Yes, sir.
18 Q. Now, continuing on to Bates stamped page -48,
19 is that your signature again?
20 A. Yes, sir.
21 Q. All right. And then continuing on to page
22 -51, is that your signature again?
23 A. Yes. It is.
24 Q. And you've signed in two places on page -51,
25 correct?

Page 15

1  A. Yep. Yes. I did.
2  Q. All right. And do you recall where you signed
3  this? It says at the very first paragraph of this
4  agreement that this was with Universal Republic Records
5  located at 1755 Broadway in New York, New York.
6      Is that where you were when you signed this?
7  A. No. I was in Toronto.
8  Q. Okay.
9  A. Canada.
10 Q. Ah.
11     Have you ever been to Republic Records at 1755
12 Broadway?
13 A. Yes. I have.
14 Q. Can you recall how many occasions you've been
15 there in the last five years?
16 A. I was there once in 2012.
17 Q. That's the only time?
18 A. Yes.
19 Q. And were you there to meet with the people
20 from the record company, from Republic Records?
21 A. Yes. I was.
22 Q. Okay. And do you know if it was before or
23 after you signed Exhibit 5?
24 A. I don't remember.
25 Q. And were all the people from the record

Page 16

1  company, Republic Records, that you met with, were they
2  all from the New York division; do you know?
3      MR. ANDERSON: Objection as to form.
4      THE WITNESS: No. They were not.
5  Q. BY MR. LOWE: Well, who did you meet with; do
6  you recall?
7  A. Yes. I met with the office, Monte Lipman,
8  Avery Lipman. There were most of the staff, most of the
9  people from the office were from New York, that they
10 were also Los Angeles -- people from Los Angeles as
11 well.
12 Q. Okay.
13 A. Wendy Goldstein, in A&R, from L.A.
14 Q. Monte Lipman is in the New York office?
15 A. Yes, sir.
16 Q. Okay. Are you in regular communication with
17 Monte Lipman?
18 A. Yes. I am.
19 Q. And you have been over the last five years?
20 A. Yes. I have.
21 Q. All right. And have you met with him in
22 person at all, or is it always by phone?
23 A. No. It's in person.
24 Q. And where were the meetings, in the last five
25 years, that you met with Monte Lipman from Republic

Page 17

1  Records?
2  A. An estimate, I have met him around the world
3  in London, Toronto, New York, Los Angeles. If you want
4  to add it all up, I would estimate, maybe, six times,
5  seven times.
6  Q. All right. Of those six or seven times that
7  you've met him in person, how many of those times were
8  in New York?
9      MR. ANDERSON: Within the last five years.
10     THE WITNESS: Within the last five years,
11 every New York show, every major New York show, he has
12 shown up. So I would estimate, maybe, four times
13 New York.
14 Q. BY MR. LOWE: All right. And do you also
15 speak to him by phone regularly?
16     MR. ANDERSON: Objection as to form.
17     THE WITNESS: Sorry. What was that?
18     MR. ANDERSON: For me, for the record, I'm
19 just saying that I think there is a problem with the
20 form of the question --
21     THE WITNESS: I can still answer?
22     MR. ANDERSON: You can still answer.
23     THE WITNESS: Can you repeat the question?
24 Q. BY MR. LOWE: Do you also speak to him by
25 phone regularly?

Page 18

1  A.    Yes. I do.
2  Q.    Is there anybody else at Republic Records that
3  you communicate with as much as you communicate with
4  Monte Lipman?
5  A.    As much, no.
6  Q.    All right.
7  A.    Sorry. Can I repeat -- can I re-answer?
8        MR. ANDERSON: Objection as to form. You mean
9  as much or more, or just exactly the same amount?
10       MR. LOWE: No.
11 Q.    BY MR. LOWE: In other words, is he the main
12 person at -- well, let me rephrase that. Strike that.
13       Do you communicate with Monte Lipman the most
14 frequently of anybody at Republic Records?
15 A.    No.
16 Q.    Okay. Who do you communicate with more
17 frequently?
18 A.    Wendy Goldstein.
19 Q.    Anybody else?
20 A.    In around that ballpark, his brother,
21 Avery Lipman, but not really. I would say Wendy,
22 Wendy Goldstein.
23 Q.    Okay. What is her position?
24 A.    She's an A&R for Republic.
25 Q.    Okay. And where is she located?

Page 19

1  A.    In Los Angeles.
2  Q.    What about Avery Lipman?
3  A.    Avery is in New York with Monte. But usually
4  when I talk to Monte, Avery is there. But I have -- I
5  call Monte, but they're usually together.
6  Q.    Got it.
7  A.    They're, like, brothers.
8  Q.    And how often would you say that you
9  communicate with Avery and/or Monte Lipman, over the
10 last five years, if you had to give us your best
11 estimate? You talk to him once a week? Once a month?
12 Once a --
13 A.    Oh, no. It would be, like, twice, every time
14 I'm about to drop an album, when I'm in an album cycle.
15 Q.    Okay. How many times would that be?
16 A.    Over the phone, I'd say, maybe, 12 times.
17 Estimate.
18 Q.    Over the last five years?
19 A.    Yeah.
20 Q.    Okay. All right.
21       Now, the last signature on page Bates stamped
22 -51, you see that it says in all capital records -- all
23 capital letters that, "This agreement has been entered
24 into in the state of New York," do you see that first
25 sentence?

Page 20

1  A.    Yes, sir.
2  Q.    Okay.
3  A.    Yes, sir.
4  Q.    Was there any discussion about that clause
5  with you, to your knowledge?
6  A.    No.
7  Q.    What about Steve Gawley, Esquire, do you see
8  his signature right above yours?
9  A.    Yes, sir.
10 Q.    Do you have any idea where he is located?
11 A.    No.
12       MR. LOWE: All right. Now let's go to
13 Exhibit 7.
14       (Plaintiff's Exhibit No. 7 was marked
15       for identification and is attached hereto.)
16 Q.    BY MR. LOWE: Now, my first question about
17 Exhibit 7 is, did you sign this agreement in or about
18 April of 2015?
19 A.    Yes. I did.
20 Q.    All right. Do you recall where you were when
21 you signed it?
22       MR. LOWE: Hold on one second.
23       (Pause in the proceedings from 7:20 p.m. to
24       7:21 p.m.)
25 Q.    BY MR. LOWE: I think my question was, do you

Page 21

1  recall where you were when you signed this?
2  A.    I don't recall.
3  Q.    All right. And I notice on the first page, it
4  says, "Universal Republic Records, 1755 Broadway,
5  New York, New York."
6        Was it your understanding that
7  Republic Records was located in New York in or about
8  April of 2015?
9        MR. ANDERSON: Objection as to form.
10       THE WITNESS: Can you repeat the question?
11 Sorry.
12 Q.    BY MR. LOWE: Well, I'm noticing on the first
13 page of Exhibit 7, it says --
14 A.    Yes.
15 Q.    -- "Universal Republic Records, 1755 Broadway
16 New York, New York."
17       Was it your understanding that Republic was
18 located in New York in or about April of 2015?
19 A.    Yes.
20       MR. ANDERSON: Same objection.
21       THE WITNESS: Yes. It was.
22 Q.    BY MR. LOWE: And this is signed by you on
23 behalf of The Weeknd XO, Inc.
24       Is that a company that you were the sole owner
25 of?

Page 22

1  A.    No. I'm not the sole owner of it.
2  Q.    Who else owns The Weeknd XO, Inc.?
3        (Pause in the proceedings from 7:21 p.m. to
4    7:22 p.m.)
5  Q.    BY MR. LOWE: So who else owns The Weeknd XO,
6  Inc., besides you?
7  A.    Yes. So can I re-answer that question?
8  Sorry.
9  Q.    Yes.
10 A.    I got mixed up between XO, which is another
11 company I own, and The Weeknd XO, Inc.
12       Yes. I'm the sole owner of The Weeknd XO,
13 Inc.
14 Q.    All right. Now, is there also an entity
15 called "The Weeknd XO USA, Inc."?
16 A.    I don't -- I don't know.
17 Q.    All right. And then you also signed
18 individually at the very bottom of Exhibit 7 as well,
19 correct?
20 A.    That's Exhibit 7?
21       MR. ANDERSON: That's Exhibit 7.
22       THE WITNESS: Yes. I did.
23       (Plaintiff's Exhibit No. 7 was marked
24    for identification and is attached hereto.)
25 Q.    BY MR. LOWE: All right. Let's go on to

Page 23

1  Exhibit 8.
2        And my question is on Exhibit 8, is this an
3  agreement that you signed in or about March of 2016?
4  A.    Can you explain what Exhibit 8 is? Sorry. I
5  have to read a lot.
6  Q.    Well, Exhibit 8 appears to be an agreement
7  between Universal Republic Records and The Weeknd XO,
8  Inc., with you signing off individually as well?
9  A.    Yes. But what is it?
10       I'm just going to read what this is.
11 (Examining document.)
12       Oh, yes.
13 Q.    All right.
14 A.    This is my signature. Yes.
15 Q.    All right. So you signed this agreement,
16 Exhibit 8, on behalf of The Weeknd XO, Inc., and also
17 signed it individually, correct?
18 A.    Yes, sir.
19 Q.    Do you remember where you were when you signed
20 it?
21 A.    I do not.
22 Q.    Okay. Do you know who the signature, the
23 authorized signatory is, for Universal Republic Records?
24 A.    I cannot make out the signature, so I do not
25 know.

Page 24

1  Q.    All right. And is it your understanding,
2  based on the first page of this document, that
3  Universal Republic Records was located in New York in or
4  about March of 2016?
5        MR. ANDERSON: Objection as to form.
6        THE WITNESS: Repeat the question. Sorry.
7        MR. LOWE: Can the court reporter read it
8  back, please?
9        The court reporter's going to read it back.
10       (Record read by the reporter as follows:
11       "Q. And is it your understanding, based
12       on the first page of this document, that
13       Universal Republic Records was located in
14       New York in or about March of 2016?")
15       THE WITNESS: Yes. It is.
16       MR. LOWE: Okay. All right.
17       (Plaintiff's Exhibit No. 11 was marked
18    for identification and is attached hereto.)
19 Q.    BY MR. LOWE: Now, let's go to Exhibit 11.
20 And this is a document that was produced that appears to
21 reflect that you paid some taxes to New York; is that
22 correct?
23       MR. ANDERSON: Objection as to form.
24       Don't you need to ask him if he's ever seen it
25 before?

Page 25

1        MR. LOWE: Okay. You're right.
2        MR. ANDERSON: I'm sorry, Steven. You're
3  asking him to interpret the document or what?
4        MR. LOWE: Well, you're absolutely right, so
5  let me ask him.
6  Q.    BY MR. LOWE: Have you ever seen this document
7  before?
8  A.    I have not.
9  Q.    Do you believe, based upon this document, that
10 you made a payment of taxes for 2017 to New York?
11 A.    No.
12 Q.    Okay. So you have no idea one way or the
13 other whether or not you've ever paid taxes to New York?
14 A.    No. I'm saying I don't remember paying this
15 one.
16 Q.    Okay. Do you remember paying other taxes to
17 New York?
18 A.    No. I have never paid taxes to New York.
19 Q.    Well --
20 A.    That I know of.
21 Q.    Okay. Well, this document seems to reflect
22 that there was a payment.
23       It says at the top, "New York E-File Payment
24 Record," and then it has your name immediately
25 underneath it.

Page 26

1    Do you see that?
2  **A.**   Yes. I do.
3  **Q.**   All right. So do you have any reason to
4  believe that this document is inaccurate -- I will tell
5  you that it was produced by your attorneys -- that it's
6  inaccurate that you paid taxes to New York for 2017?
7  **A.**   Most trust in my attorneys, that anything that
8  I've done is with them is accurate. But I do not
9  remember this sheet of paper, and I don't remember
10 paying taxes from City National Bank.
11 **Q.**   Well, let's see. Let's just read what it
12 says. "The taxpayer's balance due will be paid
13 electronically using the following information. Modify
14 the bank and account information using the New York
15 electronic payment input fields in screen 3."
16    Do you have an account at City National Bank?
17 **A.**   I don't know.
18 **Q.**   Okay. So bottom line is, notwithstanding
19 Exhibit 11, you just have no recollection one way or the
20 other whether or not you have ever individually paid any
21 taxes to the state of New York; is that correct?
22 **A.**   That I recall, yes.
23 **Q.**   All right.
24    (Plaintiff's Exhibit No. 12 was marked
25    for identification and is attached hereto.)

Page 27

1  **Q.**   BY MR. LOWE: Let's go to Exhibit 12.
2     Have you had an opportunity to look at Exhibit
3  12 before now?
4  **A.**   No. I'm looking at it right now.
5  **Q.**   Okay. Well, Exhibit 12 is an article that
6  appeared in USA Today on or about November 17th, 2015,
7  and in the second paragraph, it says that, "The Weeknd
8  took a moment to reminisce on his 'long-term
9  relationship with New York,'" during your sold out show
10 at Madison Square Garden.
11    First of all, do you recall performing at
12 Madison Square Garden in New York City?
13 **A.**   Yes. I do.
14 **Q.**   All right. And how many times have you
15 performed at Madison Square Garden?
16 **A.**   I think twice.
17 **Q.**   All right.
18 **A.**   No. I think four times.
19 **Q.**   Four times. Got it.
20    And did you do two shows in 2015?
21 **A.**   I believe I did one show in Madison Square
22 Garden in 2015, and two shows at the Barclays in
23 Brooklyn.
24 **Q.**   Right. But I'm not asking about Barclays yet.
25 I'm just asking about Madison Square Garden.

Page 28

1  **A.**   In 2015, yes. Just one show in Madison Square
2  Garden.
3  **Q.**   Since 2015, have you done more shows at
4  Madison Square Garden?
5  **A.**   I performed at the Starboy Tour in 2016, I
6  believe.
7  **Q.**   At Madison Square Garden?
8  **A.**   Yes, sir.
9  **Q.**   Okay. Now, it says that you took a moment to
10 reminisce on your, quote, "long-term relationship with
11 New York."
12    Did you say that?
13 **A.**   Uh-huh.
14 **Q.**   I'm sorry?
15    MR. ANDERSON: Objection as to form.
16    He's asking you if you said those words.
17    THE WITNESS: Yeah. I said it.
18 **Q.**   BY MR. LOWE: Okay.
19 **A.**   That's right.
20 **Q.**   Now, did you believe in or about November of
21 2015, when you were performing at Madison Square Garden,
22 that you did have a long-term relationship with
23 New York?
24    MR. ANDERSON: Objection as to form.
25    THE WITNESS: A long-term relationship with my

Page 29

1  New York fans. Yes.
2  **Q.**   BY MR. LOWE: Okay. But what about a
3  long-term relationship with New York?
4     Did you, for example, mention that you had
5  played the city's Bowery Ballroom and Paradise Theatre?
6  **A.**   Yes. I did.
7  **Q.**   All right. And what about the Williamsburg
8  Music Hall?
9  **A.**   Yes. I did.
10 **Q.**   All right. Do you recall when you performed
11 at the Bowery Ballroom or the Paradise Theatre or the
12 Williamsburg Music Hall?
13 **A.**   If my memory is correct, I would say 2012.
14 **Q.**   All right. Can you estimate about how many
15 times you performed at each one of those venues?
16 **A.**   I did Williamsburg -- I don't know how many
17 times I did it that year. But I performed for the first
18 time, once in 2012, and Paradise once as well. And I
19 never returned. Went to bigger venues.
20 **Q.**   Right.
21    Where is the Williamsburg Music Hall?
22 **A.**   I would say Brooklyn.
23 **Q.**   Okay. Same question for Paradise Theatre?
24 **A.**   Paradise Theatre, I would think, is in the
25 Bronx.

Page 30

1  Q.  Okay. What about the Bowery Ballroom?
2  A.  That is in NYC.
3  Q.  Okay. So did you mention those venues to the
4  audience at Madison Square Garden?
5  A.  I don't remember.
6  Q.  Okay. And then it says, "He plays Brooklyn's
7  Barclays Center on Wednesday and Thursday."
8      Did you, thereafter, play the Brooklyn's
9  Barclays Center on Wednesday and Thursday of that week
10 in November of 2015?
11 A.  Yes, sir.
12 Q.  Okay. All right. It appears at the very
13 first line, you say, "I think it's safe to say we're
14 here to stay, right?"
15     What did you mean by that?
16     Well, first of all, did you say that?
17 A.  Yes. I did.
18 Q.  And what did you mean by that?
19 A.  As in my -- I would assume, my relevancy in
20 New York. Every year I perform in New York, the venues
21 got bigger and bigger. So I said it to symbolize my
22 relevancy in New York.
23 Q.  Okay. And you did just testify, if I recall
24 correctly, that you did perform Starboy at Madison
25 Square Garden, correct?

Page 31

1  A.  Yes, sir.
2      (Plaintiff's Exhibit No. 14 was marked
3      for identification and is attached hereto.)
4  Q.  BY MR. LOWE: All right. Now, if you go to
5  Exhibit 14, is it correct that you also played in
6  Brooklyn, in June 2017, on the Starboy Tour? I can't
7  tell what the venue was -- oh, Barclays Center?
8  A.  Barclays.
9  Q.  Yeah.
10     Did you play the Barclays Center in Brooklyn
11 on June 7th, 2017, on the Starboy Tour?
12 A.  Yes, I did, sir.
13 Q.  Okay. The Starboy Tour, was that only in
14 2017, or did that go into 2018 as well?
15 A.  No. It ended in 2017.
16 Q.  Now, you personally have lived, at least for
17 some periods of time, in New York City; is that a
18 correct statement?
19 A.  Sorry. You cut out.
20     Can you repeat that?
21 Q.  Okay. I said, you have personally lived in
22 New York City for some periods of time over the last
23 five years; is that an accurate statement?
24 A.  No. It's not an accurate statement.
25 Q.  All right. Did you live for any period of

Page 32

1  time in New York City while you were dating
2  Selena Gomez?
3  A.  No.
4  Q.  All right. So prior to this condominium
5  apartment lease that we're going to get to in a minute,
6  in Exhibit 15, have you ever actually lived in New York
7  City before then?
8      MR. ANDERSON: Objection as to form.
9      THE WITNESS: No. I've never lived in New
10 York City.
11 Q.  BY MR. LOWE: In the last five years, what's
12 the longest amount of time that you've stayed in
13 New York City during any one period of time?
14 A.  That I can recall, my recent stay in October
15 is the longest I've stayed in New York.
16 Q.  What about prior to then, what's the longest
17 period of time you stayed in New York?
18 A.  Like the second longest, is that your
19 question?
20 Q.  Yeah. The second longest. There you go.
21 A.  While I was on tour, I would -- when I'm in
22 New York, I mean, I was performing for a week straight,
23 I would say 2017.
24 Q.  Okay.
25 A.  You're asking me when or how long?

Page 33

1  Q.  Well, how long and when.
2  A.  I don't know. I would say, maybe, a week,
3  week and a half.
4  Q.  Okay. That's the longest period you can
5  remember? And that was in 2017?
6  A.  Yeah. I would say, maybe, even two weeks,
7  because I would -- every time I performed in either
8  Boston or New York or New Jersey, I would fly back to
9  visit my ex-girlfriend and be with her.
10 Q.  And that was --
11 A.  All of Greater New York.
12     Go ahead.
13 Q.  And your ex-girlfriend, is that Selena Gomez?
14 A.  Yes, sir. And it was her apartment.
15 Q.  Got it.
16     MR. ANDERSON: I think he's talking about
17 consecutive without moving. Consecutive dates in
18 New York.
19     THE WITNESS: Oh, then I would say a week
20 tops.
21 Q.  BY MR. LOWE: All right. And so Ms. Gomez had
22 an apartment in New York?
23 A.  Yes, sir.
24 Q.  And how many days total would you say that you
25 spent at her apartment in the last three years?

Page 34

1  A.     How long at once?
2  Q.     All if you had to add up all the days,
3  approximately?
4  A.     Two-and-a-half weeks.
5  Q.     All together?
6  A.     All together.
7  Q.     Okay.  So the total amount of time that you
8  spent at Selena Gomez's apartment in New York over the
9  last three years is two-and-a-half weeks?
10 A.     That's what I'm recalling.  Yes.
11 Q.     Okay.  All right.
12         (Plaintiff's Exhibit No. 15 was marked
13      for identification and is attached hereto.)
14 Q.     BY MR. LOWE:  Let's go to Exhibit 15.
15 A.     Sure.
16 Q.     All right.  Now, again, we're going to be
17 referring to Bates stamped pages, and those are the
18 pages on the right-hand side at the bottom of the page.
19 A.     Okay.
20 Q.     Okay.  So first let's look at Bates stamped
21 page -92.
22         Do you see that?
23 A.     Yes, sir.
24 Q.     Is that your signature on that page?
25 A.     Yes.  It is.

Page 35

1  Q.     Okay.  And then I want you to go to page -98
2  and tell me if that's your signature again, Bates
3  stamped page -98?
4  A.     Yeah.  That's me.
5  Q.     Okay.  And you signed this in both places on
6  behalf of The Weeknd XO US, LLC, correct?
7  A.     Yes, sir.
8  Q.     All right.  And that's an entity that you're
9  the sole owner of?
10 A.     My signature?
11 Q.     No.
12         I'm asking if whether or not The Weeknd XO US,
13 LLC, is an entity that you own?
14 A.     Yeah.  Yes.  It is.
15 Q.     Okay.  Are you the sole owner of that entity?
16 A.     Yes.  I am.
17 Q.     All right.  Now, I also notice that on page
18 Bates stamp -93 --
19 A.     Yes.
20 Q.     -- it says that, according to this, "the only
21 person who will be taking occupancy of the apartment is
22 Abel Tesfaye who is the sole member of lessee."
23         Do you see that?
24 A.     Sorry.  Repeat that again.
25 Q.     If you look at paragraph 2 on Bates stamped

Page 36

1  page -93 of this lease, it says that you are going to be
2  the sole occupant.
3         Do you see that?
4  A.     Yes.  I see that.
5  Q.     Okay.  I mean, it also says, at the bottom,
6  that you're permitted to have your girlfriend and
7  occasional guests, but you are identified as the sole
8  occupant, correct?
9  A.     Yes.
10         MR. ANDERSON:  Objection as to form.
11         THE WITNESS:  Yes, sir.
12 Q.     BY MR. LOWE:  Okay.  And you entered into this
13 lease in or about September of 2018, correct?
14         MR. ANDERSON:  Objection.  Mischaracterizes
15 the document.
16         THE WITNESS:  Well, I don't remember when I
17 signed it.  Sorry.
18 Q.     BY MR. LOWE:  Let me go --
19 A.     I read it wrong.  I read the date wrong.
20         Sorry.  Go ahead and ask your question again.
21 Q.     Okay.  So it says on the very first page of
22 this Bates stamped page -87, it says, "This lease is
23 made out as of September 2018."
24         Do you see that?
25 A.     Yes.  I saw that.

Page 37

1         What page is it?
2         MR. ANDERSON:  First page of the exhibit.  And
3  look to the language he's talking about.
4         THE WITNESS:  Okay.  Cool.  Sorry about that.
5  Q.     BY MR. LOWE:  Okay.  So it is correct that you
6  entered into this lease in September of 2018, correct?
7         MR. ANDERSON:  Objection.  Calls for a legal
8  conclusion.
9         THE WITNESS:  I don't remember.
10 Q.     BY MR. LOWE:  All right.  Well, do you have
11 any reason to believe that that's not correct?
12 A.     No.  I just believe I might have signed it --
13 or I might have -- it could have been after.  I don't
14 remember.
15 Q.     It could have been after September of 2018?
16 A.     Yes.  It could have been October.  I remember
17 it was a gift for my girlfriend.  So her birthday was in
18 October, so that's when I remember.
19 Q.     Okay.  All right.  You were actually entitled
20 to occupancy on October 3rd, right?
21 A.     Yes, sir.
22 Q.     All right.  So in terms of when you signed it,
23 it appears, it says, it's made as of September 2018.
24         Do you have any reason to believe that you did
25 not enter into this lease in September of 2018?

Page 38

1   MR. ANDERSON: Objection as to form.
2   Why don't you just ask him if he knows when he
3   signed it?
4   MR. LOWE: Well, he's already said he doesn't
5   know, so I'm asking whether or not he has any reason to
6   believe that the September 2018 date, in the first
7   paragraph, is incorrect.
8   THE WITNESS: I have no idea when I signed it.
9   Q.   BY MR. LOWE: All right. Well, could it have
10  been earlier than September of 2018?
11  A.   No.
12  Q.   Okay. So it had to be in September of 2018,
13  but you don't recall the date, or you think it could
14  have been on October 1st or on the 2nd?
15  MR. ANDERSON: Objection. He's already
16  testified to this. I'm not sure why you're going over
17  it.
18  MR. LOWE: All right. Okay.
19  Q.   BY MR. LOWE: Bottom line is, you don't know,
20  correct?
21  A.   Yeah. I don't know. Sorry.
22  Q.   No. That's okay.
23  All right. And there's articles that indicate
24  that you're living there with Bella Hadid.
25  Is that an accurate statement?

Page 39

1   MR. ANDERSON: Objection as to form.
2   What you just said or what the article said?
3   MR. LOWE: What I just said.
4   THE WITNESS: Sorry. Can you rephrase the
5   question?
6   Q.   BY MR. LOWE: Sure. Is Miss Hadid, Bella
7   Hadid, living in that condo with you?
8   A.   Yes. Her stuff is with me. Her name is not
9   on the lease, but she is living with me. Yes.
10  Q.   Okay. And is it your understanding that she
11  is a resident of New York?
12  A.   Yes.
13  Q.   Okay.
14  A.   She lives in New York. Yes.
15  Q.   All right. And is it a 5,000 square foot
16  condominium?
17  A.   Is that what it says? I have no idea.
18  Q.   Oh, okay. Well that's what the article said.
19  A.   Oh, okay. Maybe. I have no idea.
20  Q.   All right.
21  A.   I can tell you it's three floors.
22  Q.   Three floors. Got it.
23  In Tribeca?
24  A.   In Tribeca. Yes.
25  Q.   All right.

Page 40

1   (Plaintiff's Exhibit No. 17 was marked
2   for identification and is attached hereto.)
3   Q.   BY MR. LOWE: Why don't you go to Exhibit 17.
4   And this appears to be an article from Elle Magazine.
5   Have you ever seen this before?
6   A.   Yes. I have. It's not the greatest photo of
7   me.
8   Q.   Got it.
9   Well, let me ask you a couple of questions of
10  the statements that are in here.
11  First of all --
12  A.   Sure.
13  Q.   -- do you consider yourself bicoastal?
14  A.   Right now, I do.
15  Q.   All right.
16  A.   It's just, I fell in love with New York, so I
17  think I might stay a little longer. But I stay most of
18  my time in Los Angeles. The past month, I've been --
19  I've been in New York. So I guess I'm bicoastal. I'm
20  not sure.
21  Q.   All right. Would you consider yourself having
22  been bicoastal in or about September of 2018?
23  A.   No.
24  Q.   So you think you've just become bicoastal?
25  A.   How long does it take before you're bicoastal?

Page 41

1   Q.   I don't know. That's a good question.
2   Well, let me ask you this. When did you fall
3   in love with New York?
4   A.   I fell in love with New York right after my
5   girlfriend's birthday, which is October 18th.
6   Q.   Okay. So October 18th.
7   So it's your testimony that you fell in love
8   with New York on October 18th of 2018?
9   A.   That's an assumption. I'm going to estimate
10  that's when it was. But it was definitely after my
11  girlfriend's birthday.
12  Q.   Okay. All right. So it also says in this
13  article, "He" -- referring to you -- "and his
14  ex-girlfriend Selena Gomez shared a Greenwich Village
15  rental last September but only for a couple months while
16  she was filming that Woody Allen movie."
17  Is that an accurate statement?
18  A.   No. It's not.
19  Q.   Did Selena Gomez have an apartment in
20  Greenwich Village?
21  A.   Yes. She did.
22  Q.   But it's your previous testimony that the
23  maximum amount of time that you stayed there over the
24  last three years was only two-and-a-half weeks?
25  A.   Yes, sir.

Page 42

1  Q. Okay. Now, this article also mentions the
2  fact that you bought a mansion in Hidden Hills in
3  California.
4     Is that true?
5  A. Yes, sir.
6  Q. Prior to buying that mansion in Hidden Hills,
7  in California, where were you living?
8  A. I was living in Toronto -- oh, sorry. I'm so
9  sorry. Can I repeat that -- repeat my question -- or my
10 answer?
11 Q. Sure.
12 A. Or re-answer?
13    No. I was still living in Los Angeles. I was
14 renting an apartment on Wilshire.
15 Q. And were you also living in Toronto during
16 that time?
17 A. No. I was not.
18 Q. Well, do you have an apartment or a home in
19 Toronto?
20 A. No. I do not.
21 Q. Did you have one in 2017?
22 A. I was renting a place at -- at that time, it
23 was the Trump, and when I moved to Los Angeles I had
24 bought my parents a house in Toronto. It is under my
25 name, but I do not live there. It's not my house.

Page 43

1  Q. Okay.
2  A. It's under my name.
3  Q. All right. And at some point, you had -- do
4  you still have an apartment -- strike that.
5     I assume you terminated your lease on your
6  apartment on Wilshire?
7  A. Yes, sir.
8  Q. When did you terminate that lease?
9  A. I terminated it, I'm going to guess, a few
10 months before I bought my house in Hidden Hills.
11 Q. When did you buy your house in Hidden Hills?
12 A. 2017, I think. Yes. 2000 -- between the end
13 of 2016 and the summer of 2017. I'm not sure.
14 Q. Okay. Do you know what state you pay taxes
15 in?
16 A. Sorry. Can you repeat the question?
17 Q. Do you know what state you pay taxes in, if
18 any?
19 A. Yes. In California.
20 Q. Now it says, also, in the same article, that
21 you officially got back together in July of 2018.
22    Have you been exclusively dating Miss Hadid
23 since July of 2018?
24 A. Yes. Between July and August. I don't really
25 know the technicalities.

Page 44

1  Q. Okay.
2  A. But, yes.
3  Q. All right. Now, we've already talked about
4  Exhibit 18.
5     Why don't you go to Exhibit 19.
6     (Plaintiff's Exhibit No. 19 was marked
7     for identification and is attached hereto.)
8     THE WITNESS: Okay.
9  Q. BY MR. LOWE: All right. Now, first of all,
10 this is not a Bates stamped document.
11    Why don't you turn to page 5 of this document.
12 A. Okay.
13 Q. And do you see the split for Starboy on this?
14 A. Yes. I do.
15 Q. All right. And this agreement concerns the
16 song Starboy, correct?
17 A. Yes, sir.
18 Q. And if you turn to page 8 of this, is that
19 your signature on this document?
20 A. Yes. It is.
21 Q. And you signed on behalf of The Weeknd XO,
22 Inc.?
23 A. Yes. I did.
24 Q. All right. And on the previous page, on
25 paragraph 9, it says, "This agreement shall be governed

Page 45

1  by and construed under the laws and judicial decisions
2  of the State of New York."
3     Do you see that?
4  A. Page 9?
5  Q. Page 7, paragraph 9.
6  A. Page 7, paragraph 9. "This agreement shall
7  be" -- yes, sir.
8  Q. All right. And this is the agreement that you
9  entered into with Daft Punk -- I may have asked this,
10 but this is the agreement you entered into with
11 Daft Punk with respect to the song Starboy?
12 A. Yes, sir.
13 Q. All right. Do you know who prepared this
14 contract?
15 A. I do not.
16 Q. Now, I notice in the split, on the one that we
17 have on page 5, it does not show Mr. Quenneville as
18 having any interest in the song.
19    Do you know why that is?
20 A. I do not know why.
21 Q. All right. Can you tell me the circumstances
22 under which Starboy work was created?
23    MR. ANDERSON: Objection as to form.
24    THE WITNESS: The circumstances?
25 Q. BY MR. LOWE: Yeah. In other words, how did

Page 46

1  it come about?
2  A.     I had originally written a song concept with
3  Quenneville. Never used it. And I ended up going to
4  Paris to meet up with Daft Punk while I was working on
5  Starboy. This is all while making Starboy.
6         And I had created -- they created a drum
7  pattern, and we made the music and the composition. And
8  I took some of the concepts idea, melody and lyrics from
9  the original song from Quenneville, and I put it on -- I
10 added it on to the Starboy record.
11 Q.     Okay. So let me see if I understand this
12 correctly.
13 A.     Sure.
14 Q.     So you went to Paris, at some point, to work
15 on the Starboy song with Daft Punk, correct?
16 A.     Yes, sir.
17 Q.     And they --
18        MR. ANDERSON: I think there's -- can I help
19 you, Steve? Is it Steven?
20        MR. LOWE: Well, I prefer not -- I prefer to
21 try to get this from the witness if at all possible.
22        MR. ANDERSON: Okay. Go ahead.
23 Q.     BY MR. LOWE: All right. So at the time that
24 you went to Paris to meet with Daft Punk, you had --
25 A.     Yes.

Page 47

1  Q.     -- some preexisting idea for a song from
2  something that you had done with Quenneville, correct?
3  A.     Yes, sir.
4  Q.     And was that a song called "Ebony" or
5  something that he mentioned?
6  A.     It was called -- yeah. It was a file was
7  called "Ebony."
8  Q.     File was called "Ebony."
9         And Mr. Quenneville testified, that idea ended
10 up becoming some portion, apparently, of the prechorus?
11 A.     Yes, sir.
12 Q.     Okay. Now, Daft Punk, what they did is they
13 came up with, like, a drum pattern?
14 A.     Yes. So they made the beat in front of me,
15 the rhythm, the drum pattern. And then Thomas, who is
16 one member of Daft Punk, started playing piano chords
17 that I started singing over.
18        And I had written a song over it. And I took
19 a piece of Ebony, and I puddled it into the prehook,
20 which then made -- automatically made Quenneville a part
21 of the song.
22 Q.     Okay. So you basically created the melody?
23 A.     The melody, the lyrics, yes, and the idea.
24 Q.     Okay. Did you create any of the -- were you
25 involved in producing, at all, the music?

Page 48

1  A.     Yes, sir.
2  Q.     Were Daft Punk, basically, taking instructions
3  from you in terms of the music?
4  A.     Yes. They were -- we were just vibing off
5  each other. I mean, they're such iconic musicians that
6  they weren't just taking direction from me. It was a
7  collaborative process.
8  Q.     Got it. Understood.
9  A.     Yeah.
10 Q.     And then what took place at Conway Studios, if
11 anything, in Hollywood?
12 A.     So what took place in Conway Studios is I had
13 recorded the song, the demo, in Paris, and along with we
14 had made a few other records. And I had been -- took it
15 back to L.A., finished the album, and I re-recorded the
16 song for Starboy with much cleaner vocals.
17        And I brought in Doc McKinney, who's a
18 longtime collaborator of mine, production collaborator
19 to -- and Henry as well, who's also a longtime
20 collaborator, kind of make it cohesive with the rest of
21 my record, and then that initially they got publishing
22 and co-production credit.
23 Q.     Got it.
24        Who is the actual quote/unquote "producer" of
25 Starboy?

Page 49

1  A.     It's really hard, in 2018, to call one person
2  a producer. It's just such a collaborative process now.
3  I'm a producer. Doc's a producer. Henry's a producer.
4  Daft Punk's a producer.
5         But Daft Punk is much more famous, so they're
6  going to be known more to the public as the producer of
7  the record. But we all produced it together.
8  Q.     Okay. So if I recall correctly, or if I
9  understand your testimony correctly, essentially, the
10 song was created in Paris with Daft Punk, and then you
11 came back to L.A. with a bunch of songs that you had
12 worked on with them, and you actually recorded it at
13 Conway Studios in Hollywood?
14        MR. ANDERSON: Objection to the form.
15        THE WITNESS: Well, the idea of the song,
16 genesis of the song, was created in Los Angeles, which
17 is Ebony. Just we can't take that fact away. It was
18 created in Los Angeles.
19        And when I went to Paris, we created a new
20 song, and I brought Ebony, and I made it a part of it.
21 And it was made in Paris. It was produced in Paris and
22 recorded/demoed in Paris, and it was recorded and
23 finished in Los Angeles.
24 Q.     BY MR. LOWE: Okay. And then mastered in
25 New York, correct?

Page 50

1  A.    I don't know.
2  Q.    All right. I believe that there's some
3  testimony to that effect already, but that's okay.
4         So when I was asking Mr. Quenneville, and I
5  believe you were there, whether he recognized anything
6  that he had done in the prechorus of Starboy, he was
7  unable to articulate anything that he had contributed.
8         Were you there for that testimony?
9  A.    Yes. I was. I saw that.
10 Q.    So are you able to better articulate anything
11 that Mr. Quenneville actually contributed to Starboy?
12 A.    Sure. I think I just said it.
13        But do you want a more specific -- a more
14 specific question?
15 Q.    Well, yeah.
16        So what is your understanding of exactly what
17 was it that Mr. Quenneville contributed to Starboy, if
18 anything?
19 A.    So he contributed to the genesis of the
20 record, the verse, and the idea of the record. And I
21 brought it to Paris, and I took pieces of it, which is
22 the prehook, and I put it into the prehook of Starboy.
23 Q.    Okay.
24 A.    So he had played chords -- okay. Sure.
25 Q.    No. Keep going.

Page 51

1  A.    Oh. He had played chords of the song, and I
2  started singing over it. And the prehook of Ebony was
3  created. It was in Los Angeles.
4         And then I went to Paris, and I took that
5  idea -- and it's something I do. I love doing. I love
6  singing different ideas that I had done on different
7  beats to create just a strong record. But he was there
8  for the genesis of it.
9  Q.    Okay. So in the prehook, if we were to listen
10 to the song Starboy and the prehook section, the
11 section, I guess, that leads up to the hook, what
12 exactly did Mr. Quenneville do?
13        Did he contribute some chords? Did he
14 contribute a baseline? I mean, some lyrics? He said it
15 was some lyrics.
16 A.    No. Well, no.
17        MR. ANDERSON: Wait. He didn't say that,
18 actually.
19        MR. LOWE: He said --
20        MR. ANDERSON: Objection to the form.
21        Go ahead.
22        MR. LOWE: He said so many different things.
23 I mean, at one point, he said, "lyrics."
24        MR. ANDERSON: Look, we can talk about what he
25 said, but I disagree with your characterization. Let's

Page 52

1  just go on.
2         MR. LOWE: All right.
3         THE WITNESS: So can you repeat the question
4  one more time? Sorry. I just want to be clear for you.
5  Q.    BY MR. LOWE: Okay. So I'm still unclear as
6  to what exactly, that is contained in the prehook, was
7  created by Jason Quenneville.
8         Can you explain that?
9  A.    Okay. Sure.
10        If I brought you the demo, the original song
11 Ebony, and I had played it for you, it's a totally
12 different song from Starboy. But I literally repeat the
13 melody and the lyrics from Ebony, and I put it on to
14 Starboy.
15        So if I had played that song for you now, and
16 I played Starboy, you would understand why Quenneville
17 deserves his percentage on the song.
18 Q.    Okay.
19 A.    The idea of that prehook that existed with
20 Quenneville, which legally gives him the right to have
21 publishing on the song.
22 Q.    All right. So in paragraph 18 of your
23 Declaration, you say, "My understanding is that the
24 Starboy sound recording was mastered at a studio in
25 New York."

Page 53

1         Do you know how you came about that
2  understanding?
3  A.    Repeat that. Sorry.
4  Q.    In the Declaration that you filed, in this
5  case, it says, "My understanding is that the Starboy
6  sound recording was mastered at a studio in New York."
7         Do you know how you came to that
8  understanding?
9  A.    No. To be honest with you, my lawyers handled
10 it, and I didn't read the entire Declaration.
11 Q.    Okay. All right. Well, we'll go through that
12 a little bit more in a minute.
13 A.    Okay.
14        MR. LOWE: So now let's turn to Exhibit 20.
15        (Plaintiff's Exhibit No. 20 was marked
16        for identification and is attached hereto.)
17 Q.    BY MR. LOWE: And this is, again, an article,
18 and it seems to mention that you attended the Harper's
19 Bazaar Icons by Carine Roitfeld party at The Plaza Hotel
20 on September 8th, 2017, in New York City.
21        Is that accurate?
22 A.    That's my picture. Yes.
23 Q.    Do you recall attending that function?
24 A.    Yes, sir. Yes. I do.
25 Q.    All right. Are you also involved in promoting

Page 54

1  any sort of fashion lines in New York at all?
2  **A.** Yes. I am.
3  **Q.** What fashion lines are those?
4  **A.** I have a strong collaboration with Puma. But
5  I've done pop-ups in New York. And I believe I've done
6  a merch pop-up for my tour in New York as well while I
7  was touring.
8  **Q.** While you were touring for the Starboy Tour or
9  another tour?
10 **A.** Starboy.
11 **Q.** Okay. And what do you mean by a "merch
12 pop-up"? Can you explain what that means?
13 **A.** Just merchandise for the tour. Just taking
14 the concept of the album and putting it on to T-shirts
15 and just promoting the tour and the album, pretty much.
16 **Q.** Got it.
17 **A.** Merch. Merchandise.
18 **Q.** Yeah.
19     So would the merchandise be, for example, a
20 T-shirt that says, you know, "Starboy Tour 2017,"
21 something like that?
22 **A.** Sure.
23     MR. ANDERSON: Well, don't speculate.
24     THE WITNESS: I don't know.
25 **Q.** BY MR. LOWE: Well, you've seen the

Page 55

1  merchandise, right?
2  **A.** Yes. It's definitely Starboy related. I
3  don't remember what it exactly says on the T-shirt.
4  **Q.** Okay.
5  **A.** It's Starboy related.
6      MR. ANDERSON: You mean Starboy the album, or
7  Starboy the single track?
8      THE WITNESS: Starboy the tour.
9      MR. ANDERSON: Starboy the tour?
10     THE WITNESS: Yeah. Starboy the tour.
11 **Q.** BY MR. LOWE: So what is a pop-up shop?
12 **A.** A pop-up shop is pretty much you just set up a
13 shop at a store that you like in New York that's famous,
14 and you pretty much take over that store for that day.
15 And fans line up, and you go there, and you do signings
16 and pretty much take over the store.
17 **Q.** Ah. So what store did you take over?
18 **A.** I don't remember.
19 **Q.** Okay. So how many times in the last five
20 years have you done these pop-up shops in New York?
21 **A.** I don't remember.
22 **Q.** Okay. What's your best estimate?
23 **A.** Three.
24     MR. LOWE: All right. Now let's go to
25 Exhibit 21.

Page 56

1      (Plaintiff's Exhibit No. 21 was marked
2      for identification and is attached hereto.)
3  **Q.** BY MR. LOWE: Before we get to Exhibit 21,
4  Mr. Quenneville testified that he was with you at a
5  performance at Radio City Music Hall.
6      Did you perform at Radio City Music Hall?
7  **A.** Yes. I have.
8  **Q.** Do you recall when? What year?
9  **A.** 2013.
10 **Q.** All right. Have you performed there since
11 2013?
12 **A.** No.
13 **Q.** Now, on Exhibit 21, it makes reference to a
14 Victoria's Secret show?
15 **A.** Uh-huh.
16 **Q.** Do you recall attending a fashion event in
17 New York City for Victoria's Secret?
18 **A.** Yes. I do.
19 **Q.** When was that?
20 **A.** It was in November. This month.
21 **Q.** Oh.
22 **A.** Right before I left to Asia.
23 **Q.** Oh, got it. Okay.
24     And then you also recall performing at
25 Central Park, correct?

Page 57

1  **A.** Yes, sir.
2  **Q.** And was that in September of 2018?
3  **A.** Yes, sir.
4      MR. LOWE: All right. Let's go to your
5  Declaration for a minute. And that is Exhibit 3.
6      (Plaintiff's Exhibit No. 3 was marked
7      for identification and is attached hereto.)
8  **Q.** BY MR. LOWE: But let me go to page 4 of this.
9  So, first of all, it mentions your personal managers,
10 Tony Wassim Salibi and Amir Esmailian?
11 **A.** Yes, sir.
12 **Q.** Are those your personal managers?
13 **A.** Yes. They are.
14 **Q.** All right. Where are they located?
15 **A.** They're located in Los Angeles.
16 **Q.** Do you know if they also have offices in
17 California?
18     MR. ANDERSON: Los Angeles is in California.
19     MR. LOWE: I'm sorry.
20 **Q.** BY MR. LOWE: Do they also have offices in
21 New York?
22 **A.** No. They do not.
23 **Q.** All right. Now, were they present in the
24 recording studio when Starboy was recorded?
25 **A.** No. They were not. They were present when I

Page 58

1 played the album.
2 **Q.** Right. When you first played the album?
3 **A.** I was playing it while making it, but they
4 weren't there during the process of the actual song
5 Starboy.
6 **Q.** Right.
7    So did you have some sort of listening party
8 after the album was made?
9 **A.** Yes. But Tony and Amir, they're in
10 California. They came in and out of sessions. Every
11 time I finished a record, that I'd play it for them.
12 They'd give their advice. I'd take it sometimes. But
13 they weren't there as I created the music.
14 **Q.** Right.
15    So was there a listening party afterwards for
16 the album?
17 **A.** Yes, sir.
18 **Q.** And where was that?
19 **A.** Los Angeles.
20 **Q.** Where?
21 **A.** Conway.
22 **Q.** Okay. Conway Studio?
23 **A.** Yes, sir.
24 **Q.** And is that when you played it to them?
25 **A.** Yes. One of the few times.

Page 59

1 **Q.** Okay. And in terms of your talent agents,
2 Joel Zimmerman, Sarah Newkirk, and John Marks --
3 **A.** Uh-huh.
4 **Q.** -- were they in the recording studio?
5 **A.** During the listening session?
6 **Q.** No.
7    During the time when you were recording the
8 song?
9 **A.** While I was recording it?
10 **Q.** Yes.
11 **A.** No.
12 **Q.** Were they there at the listening session?
13 **A.** Yes.
14 **Q.** Okay.
15 **A.** And, no, there were about three different
16 listening sessions.
17 **Q.** Got it.
18    So, basically, your managers and your talent
19 agents, they were invited to listen to the album after
20 it was complete?
21 **A.** Yes, sir.
22 **Q.** All right. And now in terms of your business
23 managers, I assume they were not present in the studio,
24 correct?
25 **A.** No.

Page 60

1 **Q.** All right. And so there was a music video
2 created for Starboy?
3 **A.** Yes, sir.
4 **Q.** And that was created, and that was actually
5 performed where? Where was that music video filmed?
6 **A.** In Los Angeles, California.
7 **Q.** Okay. Were there any listening sessions of
8 the album in New York?
9 **A.** No.
10 **Q.** All right. Now, Wendy Goldstein, was she
11 present in the studio when you were recording Starboy?
12    MR. ANDERSON: Objection. Again -- well,
13 sorry. Old habit. Objection as to form.
14    THE WITNESS: Same as everyone else. She
15 wasn't --
16 **Q.** BY MR. LOWE: Right.
17    She came to the listening session?
18 **A.** To listen. Yes.
19 **Q.** All right. I may have asked this question.
20 But in the agreement between you and Daft Punk, it does
21 not show Mr. Quenneville as a co-writer of having any
22 interest in the song.
23    Do you know why that was?
24 **A.** I do not know.
25 **Q.** All right. Who are Martin McKinney and

Page 61

1 Henry Walter?
2 **A.** Those are the other co-writers that you see on
3 the song, on the splits.
4 **Q.** Right.
5    And their contribution, if I recall correctly,
6 to the song was they came in to help kind of polish the
7 song and make it cohesive with the rest of the album?
8 **A.** Yes. Additional production.
9 **Q.** All right. Mr. McKinney and Mr. Walter, they
10 did not contribute any of the music or lyrics, did they?
11 **A.** No. They did not.
12 **Q.** All right. And why do you believe
13 Mr. McKinney resides in Toronto?
14 **A.** I don't like to speak on his behalf, but I can
15 assume it's because of his children are in Toronto.
16 **Q.** Okay.
17 **A.** And they're teenagers, so he wants to be with
18 them.
19 **Q.** So do you know where he lives?
20 **A.** In Toronto.
21 **Q.** All right. And has he told you that?
22 **A.** Not recently.
23 **Q.** Okay. And Henry Walter, where does he live;
24 do you know?
25 **A.** He lives in Los Angeles.

Page 62

1  Q.    How do you know?
2  A.    I spoke to him a few weeks ago.  I was telling
3  him that I want to start working on the new album, and
4  we were just catching up.
5  Q.    And what did he say about Los Angeles, if
6  anything?
7  A.    Well, he didn't say he still lives in
8  Los Angeles.  But I called him on a Los Angeles number,
9  so I would -- I'm just assuming he still lives in
10 Los Angeles.
11 Q.    Have you ever been to his residence in
12 Los Angeles?
13 A.    No.
14 Q.    And so as you sit here today, do you actually
15 know where Mr. Walter lives or lived over the last six
16 months?
17       MR. ANDERSON:  Objection as to form.
18       And I caution the witness to pay careful
19 attention to the question.  He's not asking you if he
20 still lives there, but why you believe he does live.
21       THE WITNESS:  Oh.  I don't know.
22 Q.    BY MR. LOWE:  Okay.  Now, The Weeknd XO, LLC,
23 that's a Delaware limited liability company?
24 A.    I do not know.
25       MR. LOWE:  Okay.  All right.  Let's take five

Page 63

1  minutes.  And I guess we'll just leave the line open.
2  I'll step out for a minute, okay, Peter, if we go off
3  the record for five minutes?
4        MR. ANDERSON:  Yeah.  Of course.
5        MR. LOWE:  Okay.
6        (Brief recess was taken from 8:21 p.m. to
7  8:23 p.m.)
8        MR. LOWE:  All right.  Well, I do not have any
9  more questions for you.
10       Does anybody else have any questions?
11       MR. ANDERSON:  Alex?
12       MR. SILAGI:  None from Alex.  Thank you.
13       MR. ANDERSON:  I just have two questions.
14
15              EXAMINATION
16 BY MR. ANDERSON:
17 Q.    First of all, to your knowledge, does
18 Republic Records have offices anywhere else other than
19 New York?
20 A.    Yes.
21 Q.    Where?
22 A.    Los Angeles.
23 Q.    Thank you.
24       And we were very careful, and Mr. Lowe was
25 very careful to ask you to testify from your own

Page 64

1  firsthand knowledge.
2        Do you have any information or what is the
3  basis of your belief that Mr. McHenry (sic) lives in
4  Los Angeles?
5  A.    Henry?
6  Q.    Henry.
7  A.    Well, he's a famous L.A. producer.  Worked
8  very close with Max Martin and Dr. Luke and
9  Benny Blanco.  So he's a famous L.A. -- everybody goes
10 to L.A. to work with him.
11       I like to bring him on board at the end of my
12 album cycle or album recording, because he polishes it
13 off.  That's what he does, is polish it.
14       MR. ANDERSON:  Okay.  Thank you.
15       That's all the questions I have.
16       MR. LOWE:  Okay.  I don't have any follow-up
17 questions on that.
18       So should we do the same stipulation?
19       MR. ANDERSON:  Yes.
20       And, again, we'll endeavor to try and get you
21 these as quickly as possible before your opposition
22 comes through.
23       MR. LOWE:  Okay.
24       MR. ANDERSON:  Again, this is out of
25 everyone's control, just because they're traveling.  But

Page 65

1  I will do what I can do.
2        And at the beginning, you said that you
3  thought the transcript may be ready by Friday.  I think
4  it's important that we try and get it to us as soon as
5  you can.
6        MR. LOWE:  Yeah.  No.  We're expediting it,
7  and we want it to be available by Friday.
8        So I don't think the court reporter has a
9  problem with that.  These aren't especially long
10 transcripts.
11       THE COURT REPORTER:  No.
12       MR. LOWE:  She says that's fine.
13       MR. ANDERSON:  Great.  Thank you.
14       MR. LOWE:  Well, then that's a wrap.
15       Thank you very much, Mr. Tesfaye.
16       THE WITNESS:  Thank you.  Great meeting you.
17       MR. LOWE:  Absolutely.  Take care.
18       (Stipulation taken in the Deposition of
19 Jason Quenneville, on Wednesday, November 28, 2018,
20 beginning on page 39 and ending on page 40, is as
21 follows:
22       "MR. LOWE:  Okay.  All right.  Well, with that
23 in mind, I guess let's enter into a stipulation, that
24 the court reporter can be relieved of her duties under
25 the code.

Page 66

1  "We're going to expedite this transcript to
2  get it, actually, on Friday, given the sort of tight
3  time frame that we're on.
4      "So, you know, if possible, can we have him
5  review and make any corrections to the transcript --
6      "It's going to be short, right?  It's only
7  going to be, how many pages do you think, Court
8  Reporter?
9      "THE COURT REPORTER:  About 40.
10     "MR. LOWE:  It's going to be about 40 pages.
11 So do you think we can get him to review it and make any
12 changes by a week from Friday?
13     "MR. ANDERSON:  Which Friday, though?  Are you
14 talking about two days from now?
15     "MR. LOWE:  Well, we're --
16     "MR. ANDERSON:  Or next Friday?
17     "MR. LOWE:  The transcript will be circulated
18 by e-mail, probably just by e-mail, for the most part,
19 this Friday, the 30th, and then what I'm asking him is
20 if he could read it and make any changes by the
21 following Friday.
22     "MR. ANDERSON:  We will try that.  I mean,
23 they're leaving Hong Kong and moving on to the next
24 venue, and so it may be difficult.  But I will endeavor
25 to get that done for you.

Page 67

1      "MR. LOWE:  Okay.  And the original transcript
2  will be maintained by you, Peter, and that will be
3  signed by the deponent.  And a certified copy can be
4  used in lieu of the original for all purposes.
5      "MR. ANDERSON:  So stipulated.
6      "MR. LOWE:  Okay.  So stipulated.")
7
8      (The deposition was concluded at 8:25 p.m.)
9              -OOO-

Page 68

1              DEPONENT'S DECLARATION
2
3      I, ABEL TESFAYE, hereby declare:
4      I have read the foregoing deposition
5  transcript, I identify it as my own, and I have made any
6  corrections, additions, or deletions that I was desirous
7  of making in order to render the within transcript true
8  and correct.
9      I declare under penalty of perjury, under
10 the laws of the State of California, that the foregoing
11 is true and correct.
12
13 _____,_____
      (Date)              (City and State)
14
15
16              _____
                     (Signature)
17

Page 69

1  STATE OF CALIFORNIA  )
                        ) SS.
2  COUNTY OF LOS ANGELES )
3
4      I, Tisha C. Okuma, Certified Shorthand
5  Reporter, Certificate No. 9774 in the State of
6  California, duly empowered to administer oaths, do
7  hereby certify:
8      I am the deposition officer that
9  stenographically recorded the testimony in the foregoing
10 deposition;
11     Prior to being examined, the deponent was by
12 me first duly sworn;
13     The foregoing transcript is a true record of
14 the testimony given;
15     I was relieved of my duty pursuant to Code
16 of Civil Procedure, Section 2025 (Q)(1), and therefore
17 any changes made by the deponent or whether or not the
18 deponent signed the transcript are not set forth.
19
20 Dated_____, Los Angeles, California.
21
22
23          _____