Icj1moha

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   YASMIN MOHAMED, personally
     known as Yasminah,
 4
                 Plaintiff,
 5
            v.                              18 Civ. 8469 (JSR)
 6
     REPUBLIC RECORDS, et al.,
 7
                 Defendants.                Oral Argument
 8
     ------------------------------x
 9                                          New York, N.Y.
                                            December 19, 2018
10                                          3:40 p.m.
11   Before:
12                       HON. JED S. RAKOFF,
13                                          District Judge
14                              APPEARANCES
15   DONIGER/BURROUGHS LAW FIRM
             Attorneys for Plaintiff
16   BY:   SCOTT ALAN BURROUGHS, ESQ.
17   DAVIS WRIGHT TREMAINE LLP
             Attorneys for Defendants
18   BY:   PETER J. ANDERSON, ESQ.
             AMANDA B. LEVINE, ESQ.
19
20
21
22
23
24
25
```

Icj1moha

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Will everyone please be seated and

 3    will the parties please identify themselves for the record.

 4              MR. BURROUGHS:  Good afternoon, your Honor.  Scott

 5    Burroughs from Doniger/Burroughs for the plaintiff.

 6              THE COURT:  Good afternoon.

 7              MR. ANDERSON:  Good afternoon, your Honor.  Peter

 8    Anderson, and with me is Amanda Levine of Davis Wright Tremaine

 9    for the defendants Abel Tesfaye; Jason Quenneville; The Weeknd;

10    XO, LLC; and UMG Recording, Inc.

11              THE COURT:  Good afternoon.

12              All right.  We're here on the motion to dismiss or, in

13    the alternative, the motion to transfer.

14              So let's start with the motion to dismiss.  Let me

15    hear from moving counsel.

16              MR. ANDERSON:  Your Honor, I apologize.  Argue from

17    here or --

18              THE COURT:  I think it's a little bit better in terms

19    of picking up your voice if you stand over there where the

20    microphone is right there.  Yes.

21              MR. ANDERSON:  Thank you, your Honor.

22              On the motion to dismiss, of course we have to look at

23    each defendant, and looking first at Jason Quenneville, he

24    clearly is not subject to jurisdiction here.

25    Mr. Quenneville -- and the evidence is undisputed that he is a
```

Icj1moha

1   resident of California.  He's had very infrequent visits to New

2   York.  He has no --

3          THE COURT:  He has my condolences, of course.

4          MR. ANDERSON:  He did testify that he visits a friend,

5   you know, from time to time here.  He has no contractual

6   relationship directly with UMG Recordings, Inc.  His

7   contractual relationship that relates to "Starboy" is with Abel

8   Tesfaye in California.  And he is the composer of the song.

9   That's basically it.  So the plaintiff hasn't identified any

10   contact between Mr. Quenneville and New York that would give

11   rise to personal jurisdiction.

12          THE COURT:  Well, do I have it right that Tesfaye --

13   I'm probably mispronouncing the name -- and Quenneville created

14   the song "Starboy" in California but it was mastered in New

15   York?

16          MR. ANDERSON:  Actually, it's a twist away from that,

17   your Honor.  Several years before, or a year before "Starboy"

18   was created, Mr. Quenneville and Mr. Tesfaye worked on a

19   different song, "Ebony."  "Ebony" has a few lyrics and a chord

20   progression that was then used in France when the "Starboy"

21   recording was -- the first rough demo of that was created by

22   Mr. Tesfaye and Daft Punk.  So Mr. Quenneville's only

23   relationship to "Starboy" in the creation of it is what he did

24   in California with respect to "Ebony," not even "Starboy."

25          And the mastering issue is really, frankly, I believe,

Icj1moha

1    a side issue, and a distraction.  The mastering did not

2    complete the recording.  The testimony from Mr. Tesfaye at his

3    deposition, he said in several instances, the recording was

4    completed in Los Angeles.

5            So if I can just sort of summarize the process, you

6    first had, I believe in 2015, maybe 2014, you had

7    Mr. Quenneville working with Mr. Tesfaye in Los Angeles to

8    create "Ebony."  You then, in 2016, have Mr. Tesfaye in France

9    with Daft Punk.  Daft Punk creates some music there.

10   Mr. Tesfaye adds some lyrics and apparently some chords that --

11           THE COURT:  Now I take it I have unanimous agreement

12   of the parties and the Court to transfer this case to Paris,

13   France, and as you well know, the Southern District extends

14   that far, but -- go ahead.

15           MR. ANDERSON:  When your Honor ordered the

16   jurisdictional discovery, including the depositions of each of

17   the defendants, my client, Mr. Tesfaye, was actually on a

18   concert tour.  If we had arranged it just four days earlier, I

19   would have been in France.  Unfortunately I was in Hong Kong,

20   which isn't a bad place, actually, but I did miss out on a

21   visit to France.

22           So, continuing.  So you have a rough demo created in

23   France that is then re-recorded in Los Angeles with the other

24   people involved that haven't yet been served, on Mr. Henry and

25   the other gentleman from Canada, and at that point, in the

Icj1moha

1    Conway Studios in Hollywood, California, that composition is

2    completed.

3          The evidence, including the testimony of Mr. Tesfaye

4    at his deposition, and in his declaration, is that the

5    recording was completed in Los Angeles.  Mastering is simply a

6    process that UMG Recordings arranged for, not Mr. Tesfaye, to

7    make the recording, to equalize the sound volume so that it

8    could be provided to a replicator and manufacturer, outside of

9    New York, by the way.  And so Mr. Tesfaye and Mr. Quenneville

10   had nothing to do with the mastering.  The mastering did not

11   complete the recording.  It was completed in California.  But

12   there are technical things that had to be done before UMG could

13   deliver it to the people who actually have the factories that

14   make the CDs and do the magic that they do.

15          THE COURT:  Go ahead.

16          MR. ANDERSON:  Okay.  Thank you.

17          So clearly there's no jurisdiction over

18   Mr. Quenneville.

19          Mr. Tesfaye is only a twist away, but there's still no

20   jurisdiction as to him.  Mr. Tesfaye -- first of all, there's

21   no general jurisdiction.  He resides in California.  The

22   plaintiff has pointed to the fact that after the case was

23   filed, he leased an apartment in Tribeca for a year because his

24   girlfriend lives here, and so it was as a birthday gift.  And

25   nowadays, when he happens to be in New York, he'll stay at the

Icj1moha

1    condo, as long as the lease lasts, rather than a hotel.  That

2    is far and away from the kind of activity that has to happen to

3    change his domicile from Los Angeles to New York.  He hasn't

4    given up his house in Los Angeles.  Plaintiff adduced testimony

5    at Mr. Tesfaye's deposition that he has what they call a

6    $20 million mansion.  I don't believe there's actually any

7    evidence of the price.  But he owns a home in Los Angeles.  His

8    testimony is that in 2012, prior to 2016, I believe, he was a

9    resident in Canada, and in 2016 he moved to Los Angeles, where

10   he rented an apartment on Wilshire Boulevard, and then in 2017,

11   early 2017, I believe, he bought a house in Hidden Hills, which

12   is in Los Angeles County, and he lives there today.  He has

13   spent -- in October, he spent several weeks, maybe even a

14   little bit more, in his newly leased apartment in Tribeca with

15   his girlfriend, and then he went on tour.  That is not general

16   jurisdiction as a matter of law.

17          On specific jurisdiction, he, back in 2012, entered

18   into an agreement with a Canadian company for the distribution

19   of -- actually his company entered into an agreement with a

20   Canadian company for the distribution of his recordings, or

21   recordings featuring him in Canada.  He also entered into an

22   agreement with UMG Recordings, which is a Delaware corporation

23   with a principal place of business in California.  It has a

24   division, an unincorporated division that has offices in New

25   York and Santa Monica.  And under that agreement, between what

Icj1moha

1    was then CP Records but now my client, The Weeknd/XO, LLC has

2    succeeded to that agreement -- under that agreement, The

3    Weeknd/XO, LLC authorizes UMG Recordings to basically arrange

4    for the distribution of recordings that feature the artist.

5    Plaintiff relies heavily on the fact that that agreement has a

6    New York forum clause.  However, we know from *Bristol-Myers*

7    *Squibb* that the mere fact that you enter into a contract with a

8    party that's in the forum for the distribution of a product is

9    not enough.  That's what the California Supreme Court thought

10   it was, and in *Bristol-Myers*, the Supreme Court reversed it and

11   said, just because the defendant had entered into a contract

12   with a California company for the distribution of -- I believe

13   it was a medication, in California, that that was not enough

14   under the specific jurisdiction analysis.

15          So the only thing they've really got on Mr. Tesfaye is

16   that he owns the company that contracted with UMG Recordings.

17   Now under those kinds of agreements, where a company is

18   agreeing to deliver a recording, no one wants to get a pig in

19   the poke and so you also ask the recording artist to say, yes,

20   I will in fact record.  And Mr. Tesfaye did.  You know, back in

21   2012 he signed an agreement -- an inducement letter, they're

22   called -- where he said, yes, in order to confirm that I will

23   in fact, you know, record and deliver my recordings to The

24   Weeknd/XO, what became The Weeknd/XO, LLC, and, you know, so

25   that it can fulfill its contractual relationship.

Icj1moha

1        But once again, you know, it's even a step away from

2   *Bristol-Myers Squibb*, because he didn't directly contract, he

3   just provided an inducement letter, but again, the recording

4   itself was done in California.

5        The other thing they point to is that he performs

6   concerts in New York.  And the evidence is undisputed that he

7   performed over 110 concerts throughout the US and

8   internationally, and of those, I think there were four that

9   were in New York.  So what we have is something very similar to

10  the case in the Eastern District of Missouri that we've cited

11  involving Katy Perry where, you know, if the courts were to say

12  that every place that a recording artist performs a song, that

13  is an alleged infringement, you can sue anywhere; you can sue

14  in Wyoming or anywhere you want to sue them.  And that clearly

15  is inconsistent with what the Supreme Court has said in the

16  cases that we've cited from 2017 and 2014.  You have to show a

17  special relationship that the defendant has with the forum and

18  that the claim arises from that.  There is no special

19  relationship here.  Mr. Tesfaye recorded a song in France and

20  then completed it in California, and it's been distributed

21  throughout the world.  New York happens to be in the world, and

22  so of course there are concerts and there are performances and,

23  you know, you can buy a CD in New York.

24        THE COURT:  Whether New York is in the world is, of

25  course, a matter subject to genuine dispute.

Icj1moha

1          But anyway, I think I have the gist of your argument.

2     Let's hear now from your adversary.  We'll come back to you in

3     a bit.

4          MR. ANDERSON:  Okay.  Thank you, your Honor.

5          MR. BURROUGHS:  Thank you, your Honor.

6          First, as to the long-arm statute that we're talking

7     about, we're talking about CPLR 302.  To the extent there's an

8     argument about Missouri and what the federal court in that

9     state would have done, it's irrelevant.

10          Under CPLR 302(a)(1), entering into a contract for the

11     distribution of a product that's infringing is sufficient to

12     confer jurisdiction.  Here, it's undisputed that

13     Mr. Quenneville entered into an agreement with Weeknd/XO,

14     Tesfaye's label, and Tesfaye enters into an agreement with UMG.

15     Both of those agreements, which included New York forum

16     clauses, were for the distribution and marketing of the

17     "Starboy" product, the product at issue in this case, in New

18     York and elsewhere.  And the evidence as it stands now is that

19     the only place that "Starboy" was sold or streamed is New York.

20     The evidence in the record establishes that UMG, per their

21     agreement with Tesfaye and protected agreement with

22     Quenneville, sold over 125,000 units of the infringing song in

23     New York, and streamed the infringing song over 33 million

24     times in New York.

25          I note that in the reply papers, there's no

Icj1moha

1    counterfactual.  There's no evidence of sales or streams of

2    "Starboy" anywhere but New York.  In the moving papers, on

3    page 6, there is a statement that the song was distributed and

4    performed worldwide, but there's no evidence of that.  That

5    statement doesn't cite to anything in the record.  As the

6    record stands now, the only evidence is that the

7    Tesfaye-Quenneville song was distributed and performed in New

8    York.  And the fact that it was distributed by UMG in New York

9    is of no moment.  The agreements that were entered into by both

10   Tesfaye and Quenneville specifically contemplated that song to

11   be marketed and sold in New York.  And it was.

12          And on the issue of Tesfaye's declaration, which

13   Mr. Anderson relied on quite a bit in his papers and in oral

14   argument, Mr. Tesfaye disavowed that declaration during his

15   deposition.  He said, "I did not read it before signing it."

16   And that was shocking, when I reviewed the transcript, to me,

17   so I went back and looked at his declaration to see what was on

18   it -- I wanted to give him the benefit of the doubt -- see what

19   was on the page that he did sign.  Maybe he only read those

20   paragraphs.  And I realized when I did that that the Tesfaye

21   declaration, his signature is by itself on its own page.  Even

22   the jurat, his under oath statement, is on the preceding page.

23   And the spacing for that is peculiar.  If your Honor looks at

24   it -- it's at Document 61 --

25          THE COURT:  Hang on.

Icj1moha

1              MR. BURROUGHS:  -- you'll see --

2              THE COURT:  Hang on just a second.

3              Document?  Give me the number again?

4              MR. BURROUGHS:  Document 61, your Honor.  And it's

5    page 5 of 5.

6              THE COURT:  Yes.  So you're talking about, in the

7    declaration of Scott Burroughs, attaching various exhibits?

8              MR. BURROUGHS:  No, your Honor.  I'm looking at

9    Document No. 61 filed 11/19, declaration of Abel Makkonen

10   Tesfaye.

11             THE COURT:  All right.  Oh, by 61, you mean the docket

12   number?

13             MR. BURROUGHS:  Yes, Document 61 as stamped by ECF.

14             THE COURT:  I see.  I thought you meant Exhibit 61.

15             Okay.  Now I'm with you.

16             All right.  So I'm looking at the Declaration of

17   Defendant Abel Makkonen Tesfaye in Support of the Motion to

18   Dismiss or Transfer, and what is it you say is wrong with this?

19             MR. BURROUGHS:  So, your Honor, during his deposition

20   Mr. Tesfaye was presented with the declaration and testified

21   under oath, "I did not read this before signing it."

22             THE COURT:  Right.  That would only be true normally,

23   in a case like this, in 99.9 percent of the declarations that

24   are submitted, because what normally happens is the lawyer

25   meets with the client, gets the facts, puts them into a

Icj1moha

1        declaration, the client is told, read it over and then sign it

2        if you agree, but in this cold, cruel world, the clients just

3        go ahead and sign.  So what's the matter?

4                    MR. BURROUGHS:  Well, it matters in this case, your

5        Honor, because at his deposition he also disavowed multiple

6        statements in the declaration.

7                    THE COURT:  Ah.  That's more relevant.  Okay.

8                    MR. BURROUGHS:  But when he was asked, well, did you

9        even read it, because it appears that everything in this

10       declaration you're now telling us is untrue, and that led us to

11       review the signature page, which is, of course, by itself, and

12       then the strange spacing on the one preceding it, which looks

13       to be, as your Honor indicated, they had him sign something and

14       then they appended it to this declaration.

15                   THE COURT:  Well, I don't find the spacing so

16       suspicious.  But maybe we should interrupt at this point and

17       ask defense counsel:  Who drafted this?

18                   MR. ANDERSON:  Your Honor, I did.  It went through

19       different versions.  Mr. Tesfaye was out of the country on the

20       tour that I mentioned before, and the final version was sent to

21       him.  Again, it was a revised version.  And I got back that

22       scanned signature which I think probably -- I don't know how

23       they did it, but they did it someplace outside the US and sent

24       it back.

25                   THE COURT:  So let me ask plaintiff's counsel:  So

Icj1moha

1   what was it that he disavowed at his deposition that's in this

2   declaration?

3         MR. BURROUGHS:  At least two things, your Honor, the

4   first of which is paragraph 13, where he indicates that the

5   song was created in Los Angeles.  During deposition, he

6   testified that he traveled to Paris, France, and met with the

7   two individuals that comprised Daft Punk and recorded the song.

8   In publicly available interviews, he also testified that he

9   traveled to France and met with the individuals in Daft Punk to

10  create this song.  So in paragraph 13, he testified, it's not

11  accurate.

12        In addition --

13        THE COURT:  Well, hold on a minute.  Just a minute.

14  Paragraph 13 says, "The 'Starboy' composition and sound

15  recording were created in 2016 by combining in Los Angeles

16  County, California.  Recording was provided by Guillaume

17  Emmanuel de Homem-Christo and Thomas Bangalter, who are known

18  professionally as Daft Punk, with music and lyrics that Martin

19  McKinney, Henry Walker, Jason Quenneville, and I created."

20        So he doesn't say there that his part of the creation

21  was in Los Angeles.

22        MR. BURROUGHS:  Your Honor, that's where I was getting

23  to.  That has to be read in conjunction with paragraph 17,

24  where he says, and I quote, "My contributions to 'Starboy' also

25  were created in Los Angeles County, California."

Icj1moha

1          THE COURT:  Ah.  So yes, 17 reads, "The contributions

2     of Mr. McKinney, Mr. Walter, and Mr. Quenneville to *Starboy*

3     were created in my presence at Conway Recording Studios in

4     Hollywood, California, and my contributions to *Starboy* were

5     also created in Los Angeles County, California, including at

6     Conway Recording Studios.  At Conway Recording Studios, these

7     various contributions to the creation of *Starboy* were combined

8     to create the musical composition and sound recording of

9     *Starboy*."

10          So let me go back to defense counsel.  What about

11     that?

12          MR. ANDERSON:  I think, frankly, it's just, with all

13     respect, quibbling about the language.  I mean, first of all,

14     as your Honor pointed out, paragraph 13 just says that it was

15     combined in 2016 from recordings from France and from

16     California.  The reference in 17 is more along the lines that

17     the contributions of Mr. McKinney, Mr. Walter, and

18     Mr. Quenneville were in the presence of Mr. Tesfaye when he

19     made additional contributions in 17.  And at his deposition, he

20     testified that it was completely re-recorded.  In other

21     words --

22          THE COURT:  Let me go back to plaintiff's counsel.

23     Wasn't the deposition testimony that while a demo may have been

24     recorded in Paris, the whole thing was re-recorded in Los

25     Angeles and the album was finished there?

Icj1moha

1          MR. BURROUGHS:  Well, the album then was again

2     re-recorded and rebalanced in New York, so it did take place in

3     multiple locations, but his testimony, both at deposition and

4     in the interview, the video of which we submitted to the Court,

5     Mr. Tesfaye says that he traveled to Paris, France, he met with

6     these two individuals in Daft Punk, and they made the song.

7     There's no discussion whatsoever of anything else.  It's true

8     that afterwards there was production done in Los Angeles and in

9     New York, but his statements throughout the entire case, both

10    in deposition and in publicly available interviews, have been

11    that this song was created in Paris, France.

12          THE COURT:  So that might help you on the transfer

13    motion, but it cuts against you on the motion to dismiss, does

14    it not?

15          MR. BURROUGHS:  It may, but for the fact that this

16    song was a choate project up until the point that it was

17    mastered.  As Mr. Anderson conceded, mastering happens before

18    it goes out into the wilderness, before it's marketed to the

19    public.  So during all of these phases, this is an inchoate

20    project that's waiting to be mastered.  It was mastered in New

21    York.  And under CPLR 302(a)(4), the Conway property was used

22    to finish the project that was then marketed by a New York

23    company from New York.  And that alone -- and that's another

24    argument actually that's not responded to in the reply papers,

25    but that alone is sufficient to confer jurisdiction.

Icj1moha

| | |
|---|---|
| 1 | THE COURT:  So your adversary seemed to suggest that |
| 2 | the only mastering that occurred was of a fairly ministerial |
| 3 | nature. |
| 4 | MR. BURROUGHS:  We would disagree, your Honor. |
| 5 | There's a reason why labels spend a lot of money mastering |
| 6 | albums.  If you've ever listened to an unmastered album |
| 7 | compared to a mastered album, you immediately know the |
| 8 | difference.  It's making a professional sound recording out of |
| 9 | these other -- technically speaking, it's a demo up until it's |
| 10 | mastered.  It's not complete until it's mastered. |
| 11 | THE COURT:  I didn't really understand what being |
| 12 | mastered was until I got married. |
| 13 | MR. BURROUGHS:  And before we move on, Judge, just one |
| 14 | other statement in paragraph 17.  And this goes to both |
| 15 | Mr. Quenneville and Mr. Tesfaye.  Again, Mr. Tesfaye is |
| 16 | declaring under penalty of perjury that the contributions of |
| 17 | Mr. Quenneville to "Starboy" were performed in his presence in |
| 18 | California.  Mr. Quenneville in deposition said that that's |
| 19 | absolutely not true; he was not in the room.  So that's another |
| 20 | falsehood that's in his declaration.  So while it's |
| 21 | understandable that in the busy modern lives of lawyers and |
| 22 | artists that a declarant may not read a declaration before he |
| 23 | signs it -- |
| 24 | THE COURT:  No.  It's quite something else if it's not |
| 25 | accurate.  I mean, that is the more serious problem. |

Icj1moha

1        MR. BURROUGHS:  Right.

2        And to respond to Mr. Anderson's points, where he

3    indicated it was simply quibbling over language, that's

4    absolutely false.  The locus of the creation of the song at

5    issue is, you know, paramount in importance amongst all the

6    factors that we're talking about today.  So if he has in his

7    declaration that he recorded the song in Los Angeles when he

8    didn't, that is a material falsehood, and I think the

9    declaration should be stricken.  I don't believe it should be

10   considered.  And if that's the case, there's really no evidence

11   on which this Court could grant the motion.

12        But moving to some of the other statements that were

13   made in Mr. Anderson's opening remarks, the litigation history

14   of Universal, UMG, the record label with which Tesfaye and --

15   well, Tesfaye, again, contracted with UMG, Quenneville

16   contracted with Tesfaye through his company.  There, all the

17   agreements included New York forum clauses.  UMG in the past

18   his required litigation to take place in New York.  While they

19   do have an office in California and they do work out of

20   California, Republic, the division of UMG responsible for the

21   work at issue here, has its headquarters in New York.  Every

22   document that came from UMG to The Weeknd, from The Weeknd to

23   XO, and even from Tesfaye to our client, where he was trying to

24   settle this case, included New York forum selection clauses.

25        And as we cited, in I believe the *Indian Harbor* case,

Icj1moha

forum selection clauses are evidence that will go to the venue

question, which we'll discuss shortly, but also to this issue

of whether or not there's personal jurisdiction.  Tesfaye

disclaimed any connection with California in his agreement with

UMG.  Tesfaye indicated that any dispute between him and UMG,

including as to the songs, provided under the agreement, would

be subject to only New York courts.  And I have had many cases

with UMG, and in most cases they challenge jurisdiction in

California and try to move the cases here.  Just recently we

had a similar battle in front of a judge in California, and

they said, it's not convenient for us to litigate here in

California; we need to litigate these cases in New York,

especially when it comes to our division -- in that case it was

Def Jam Records.  In this case it's Republic Records, but they

both share offices right here in Manhattan.  Our records are at

those offices.  Our individuals responsible for the

manufacturing, the marketing, the distribution are in New York.

          And even in this case, in response to the

court-ordered discovery, UMG admitted that they marketed and

distributed the song at issue, "Starboy," from New York.  So to

the extent that Tesfaye entered into an agreement with UMG to

do that, Tesfaye is subject to jurisdiction here under CPLR

302(a)(1).  He entered into an agreement through which he knew

that the infringing material at issue would be distributed in

New York.  And then it was.  We know over 125,000 units were

Icj1moha

1  sold in New York and over 33 million streams took place in New

2  York.  That's the only evidence of anything --

3         THE COURT:  All right.  I'm going to interrupt you

4  because I want to hear from your adversary, and you were sort

5  of addressing not only the motion to dismiss but also the

6  motion to transfer, and I want to hear your adversary on that

7  as well.

8         MR. ANDERSON:  Your Honor, on the first point, the

9  evidence is undisputed that "Starboy" was distributed through

10  the services of UMG Recordings, which contracted with third

11  parties throughout the world, and counsel's suggestion that

12  there's no evidence of the number of streams is actually

13  contrary to his own declaration.  He identified as Exhibit 3

14  UMG Recordings' verified supplemental interrogatory response,

15  and that response states that there were sales of phono

16  records, CDs, for example, in New York of 128,000, but it also

17  states that there were over 1.6 million sold throughout the

18  United States.  So that's less than 8 percent were sold in New

19  York.  They just happened to -- again, they're sold throughout

20  the country.

21         As for the streams, he made a big point about there

22  being over 33 million streams through recipients in New York.

23  That same interrogatory response -- and I would refer the Court

24  to document 65-3, which is page 4 of the exhibit to counsel's

25  declaration -- while there were 33 million streams to residents

Icj1moha

1    in New York, there were 584 million streams to residents of the

2    US.  That's less than 6 percent going to New York residents.

3          So there is substantial evidence of a national and

4    international distribution of which it touched New York only

5    because it was an international distribution.

6          Counsel said repeatedly that at his deposition,

7    Mr. Tesfaye repudiated his declaration statements.  There are

8    two points to that: (1) even if that were so, which it isn't,

9    they deposed him at length, and the same subject matter is

10   covered in his deposition where he testified, for example, that

11   he lives in Los Angeles, that he has only this attenuated

12   contact and then only a few concerts in New York; but also, if

13   your Honor were to look at Exhibit 8 to my reply declaration

14   where we put in the transcript, the supposed repudiation of his

15   entire declaration, they rely on the testimony at page 14,

16   lines 4-10, where Mr. Tesfaye was asked specifically --

17          THE COURT:  I'm sorry.  Give me that page again.

18          MR. ANDERSON:  Yes, absolutely, your Honor.  It's

19   page 14, it's a newspaper-formatted copy of the deposition

20   transcript of Mr. Tesfaye.  It's in the lower right-hand

21   corner.

22          THE COURT:  Yes.

23          MR. ANDERSON:  And --

24          THE COURT:  I'm at page 14.  Go ahead.

25          MR. ANDERSON:  Right.

Icj1moha

 1             THE COURT:  And on what line?

 2             MR. ANDERSON:  Well, it actually starts on the square

 3     above that, where he's asked about mastering, and he indicates

 4     he's unsure where the mastering occurred.  Then beginning at

 5     line 4, which is page 53 of the transcript, page 14 of the

 6     exhibit, it says, "In your declaration, it's your understanding

 7     that was mastered -- it was mastered in New York."  And he's

 8     asked, "Do you know how you came to that understanding?"  And

 9     at his deposition, he said, "No.  To be honest with you, I

10     didn't read the entire declaration."

11             So at most, all that means is he didn't recall at his

12     deposition the basis for the assertion that it was mastered in

13     New York, which is really not an issue because we, on our own,

14     to be candid with everyone, said it was mastered in New York.

15     So it's not a repudiation of his entire declaration.  It's just

16     a clarification or a statement that he doesn't recall why he

17     thought it was mastered in New York, but it's irrelevant

18     because the evidence is it was mastered in New York.

19             As to what mastering constitutes, I would refer your

20     Honor to the reply declaration of Wendy Goldstein, which

21     replies to this point that was made in the opposition, and

22     that's Document 71 on the Court's docket, at pages 3-4,

23     paragraphs 9-11.  She specifically responds to the argument

24     that somehow this recording was completed not in Los Angeles,

25     as Mr. Tesfaye testified repeatedly in his deposition, but

Icj1moha

1   rather when it was mastered, and she explains that the

2   mastering did not do anything to change any of the music, it

3   just --

4           THE COURT:  Sorry.  I have the declaration.  What

5   paragraph are you reading from?

6           MR. ANDERSON:  Pages 3 to 4, beginning at paragraph 9,

7   going through paragraph 11.

8           THE COURT:  Okay.  So she says, "...mastering does not

9   change, and Sterling Sound's mastering in this instance did not

10  change, the final mix of *Starboy* created in California or any

11  of *Starboy's* music or lyrics."

12          So I'm not quite sure what to make of that.  Just

13  taking the last part, someone who directs a movie musical

14  never, or rarely, changes the music or lyrics but they make

15  huge changes in the ultimate product.  The director is maybe

16  the single most important person in the entire production.  I'm

17  not suggesting that mastering is the equivalent of that, but

18  the fact that the final mix did not change any of the music or

19  lyrics seems to me not so critical, and she doesn't really say

20  what the mastering did.  She says, "Once a final mix was

21  prepared and approved in California, Mr. Tesfaye provided it to

22  Republic Records' Santa Monica, California personnel and I

23  arranged for it to be mastered for CD replication at Sterling

24  Sound in New York and mastered for vinyl manufacture at Capitol

25  Studios and mastering in Los Angeles, California.  However,

Icj1moha

mastering does not change, and Sterling Sound's mastering in

this instance did not change, the final mix of *Starboy* created

in California or any of *Starboy's* music or lyrics."

So that's fine.  So what did it do?  She doesn't

really say, does she?

MR. ANDERSON:  Well, in the next paragraph, she

says -- first of all, she explains that it would have been

impossible for them to change the music because they were only

provided two tracks, the stereo, right and left.  And then she

says that the mastering only involved equalizing the sound

levels of the recording.

THE COURT:  Ah.  Only involved equalizing the sound

levels of the -- okay.  I see that now.  Okay.

MR. ANDERSON:  And the other point I would make about

that portion that your Honor just read is that UMG arranged for

the mastering.  UMG is not challenging jurisdiction.  And

that's not because of Republic Records.  It's because when we

got into this -- and I take responsibility for this -- what

they argued was that Republic Records had done all this stuff

in New York, and when I got into that, very early on, it was

clear they hadn't.  Santa Monica offices of Republic Records

was where this was created, where this was overseen, and they

were the ones involved.  But then, in going further, I learned

something else, which is, UMG Recordings has a separate

workforce in New York that did some -- not all, but some -- of

Icj1moha

1    the arrangement for the replication and manufacture.  A lot of

2    that, including all of the providing it to digital service

3    providers that are based in California, the big ones, you know,

4    took place in California.  But because of that, and after, you

5    know, considering it, then we felt that it would have been, you

6    know, not an appropriate use of this Court's time to challenge

7    jurisdiction on behalf of UMG Recordings.  So when counsel

8    argues about, well, they've been sued here many times and, you

9    know -- first of all, the docket entries that they produced,

10   most of them are prior to 2014, when the law appeared to be

11   different.  Many of them don't even involve UMG Recordings.

12   And third, UMG Recordings isn't challenging specific

13   jurisdiction in this case, so it's irrelevant.

14           THE COURT:  With apologies, we have to move this

15   along, because there are counsel here in another matter that

16   follows yours.

17           Let me just ask you one question on the motion to

18   transfer.  I don't think I saw from either side much about the

19   nature of the federal docket in California.  So say the case

20   remains here.  This assumes arguendo there's jurisdiction, the

21   case remains here.  We would have it ready for trial by the end

22   of June.  Indeed, I had previously planned to have it ready for

23   trial by the end of March.  Because this was an important

24   motion, I put everything on hold while this motion practice was

25   occurring.  The chances I would move the June 26 ready for

Icj1moha

trial date are zero.  So that may be irrelevant were I to

transfer the case to California.  It could be handled promptly

there.  But if, by contrast, the dockets there are such -- we

don't know which judge will get it, but just looking at average

dockets -- are such that the case would not be tried for

another year and a half, that seems to me a factor.  Not the

only factor -- it's a multifactor test -- but a factor that

cuts in favor of keeping the case here.  It will be a more

efficient use of the processes of justice.

          MR. ANDERSON:  I have several responses to that.

          First of all, I believe your Honor's correct.  No

one's provided any statistical evidence.  I have seen it in the

past and I can say from other transfer motions, my recollection

is the Central District of California disposes of cases, I

think it's just under a year on average, maybe a little bit

above, but I'd have to check that.  I do think your Honor is

100 percent right that it depends on the judge.  I had one

transferred from Pennsylvania to the Central District that was

tried I believe nine months after the transfer.  So --

          THE COURT:  Well, if I were to transfer this -- no

one's asking me to and I'm not proposing this, but if I were to

hypothetically transfer it to the Eastern District of Virginia,

it would be tried next week.

          Anyway, I take your point.

          MR. ANDERSON:  Yes.  And just specifically with

Icj1moha

1    respect to the transfer motion, two points.

2                Counsel mentioned the Def Jam case.  Actually, and

3    that was a transfer case.  In the Def Jam case, one recent

4    opinion -- the reason that Universal, or UMG Recordings thought

5    it should be there was because the Def Jam New York offices

6    were responsible for the record project.  Here, it's the

7    complete opposite.  The Republic Records' Santa Monica offices,

8    the evidence is undisputed, were responsible for this record

9    project.

10               The other thing I just wanted to briefly mention is

11   that what they've done now, they've dropped all their

12   noncopyright claims.  They dropped the other California

13   co-authors and their company Squad Music, and if this were to

14   be kept here, I think, your Honor, it is guaranteeing a

15   multiplicity of suits.  The co-owner, Mr. Quenneville, only has

16   5 percent of the composition.  Mr. Tesfaye has 28 percent.  Two

17   thirds of the copyright is owned by people who aren't in the

18   case anymore.  Plaintiff will do one of two things.  If

19   plaintiff were to prevail here, he's got to go after the other

20   majority owners of the composition, and if he loses here, he's

21   got to go after the Squad Music people, who received the

22   settlement payment and as to which he has rights to share in

23   that settlement payment.  The Court would automatically, in

24   terms of judicial efficiency -- which I understand is the

25   significant concern -- they've carved down the case to try and

Icj1moha

make it look like it belongs here, but they're punching it on

over $5 million of claims that they dismissed without

prejudice, just for the purpose of this hearing, that they can

reassert at any point against Daft Punk, which has agreed to be

subjected to the jurisdiction in California, against

Mr. Uschold and Mr. Dangerfield, who are residents of

California and co-authors of the composition and who she sued,

until she dismissed the claim without prejudice, for $5 million

in breach of contract and breach of fiduciary duty.  We've

still got two California -- or one Canadian and one Californian

co-authors of "Starboy" who plaintiff hasn't bothered to serve.

I mean, these are significant reasons why, if this Court were

to keep the case, you're going to have multiple pieces of

litigation.  But on the other hand, if your Honor transfers it

to California, then you've got all the defendants and all the

claims and it gets resolved in a single case.

          THE COURT:  All right.  Thank you very much.

          Let me hear finally from plaintiff's counsel.

          MR. ANDERSON:  Thank you, your Honor.

          MR. BURROUGHS:  First, on the issue of the Def Jam

case, the record -- and we provided your Honor with an order as

an exhibit to our opposition -- makes clear that UMG took a

position that's diametrically opposed to what it's now taking

in this case.  It said that despite the fact that it has Santa

Monica --

Icj1moha

```
 1          THE COURT:  That only shows they're represented by
 2   counsel.
 3          MR. BURROUGHS:  Right.  But actually different counsel
 4   in that case than in this case, which is interesting.
 5          But beyond that, the litigation history also bears
 6   that out.  We did point to 260 different cases in which UMG
 7   litigated in New York, and in eight of those cases, UMG is the
 8   plaintiff.  So they chose to bring a lawsuit in New York.  So
 9   for them to now argue that it's difficult for them to litigate
10   here, inconvenient, it doesn't pass the straight face test.
11          Now we note in our opposition that it doesn't appear
12   that UMG has ever, before this motion, tried to move a case out
13   of New York -- or from New York to California.  This is the
14   first time that we could ever find that happening.  The reply
15   doesn't cite anything to the contrary.  Every contract that UMG
16   has with Tesfaye and with everyone else in this case has a New
17   York forum selection clause.  So on the issue of convenience,
18   while there may be factors that support both venues, we have to
19   remember, on the venue test, the moving party bears the burden,
20   unlike jurisdiction, and as we cite, the *Capitol Records* case
21   says that even if it may tilt slightly in favor of another
22   forum, you maintain plaintiff's choice of forum, even if she
23   doesn't reside in that forum, and especially if the infringing
24   product is still being exploited in New York.  And that's what
25   we have here.
```

Icj1moha

1          On the issue -- going back real briefly to mastering,

2    I know we've talked a lot about that, but we're talking about

3    an infringing product, this song and the album upon which it

4    resides.  That infringing product was finished here in New York

5    at Conway Studios by a New York producer, who would testify to

6    his mastering of the final product.  He would be beyond the

7    subpoena power of California.  We could not compel him to

8    appear at trial through a trial subpoena.

9          Finally, on the Daft Punk issue and all these other

10   claims, we attempted to serve some of these other individuals.

11   They evaded service.  It doesn't appear they have assets to

12   support a judgment.  I'm speaking now of the Squad defendants.

13   So they were dismissed.  The remaining defendants, the Daft

14   Punk defendants, we have been in communication with them.

15   They've indicated they preferred to litigate the case in

16   France.  In fact, they believe the case should be litigated in

17   France.  Now I haven't pushed back against that, but we have

18   had that discussion.

19          So the real dispute here is between our client

20   Ms. Mohamed and Mr. Tesfaye, and while the settlement agreement

21   that Mr. Tesfaye sent through his New York lawyer at the New

22   York law office to our client, it's probably excludable at

23   trial and there are 408s and its relevance may be limited, but

24   it did initially include a New York forum selection clause.

25   That was later negotiated out of the agreement, but initially,

Icj1moha

1    when Tesfaye's New York attorneys sent that agreement, it

2    included that New York forum selection clause.

3           And the very fact that it was Mr. Tesfaye and not one

4    of these other defendants that sought to resolve the case, that

5    was a signature to that agreement, even though it wasn't

6    eventually executed, also indicates that Mr. Tesfaye who's the

7    primary infringer in this action, and as indicated in the

8    papers, he now lives in New York.  He has a long-term

9    relationship with New York.  He feels at home here.  For him to

10   claim it's inconvenient, again, there's no basis to that.

11   There's no evidence in the record to support that.  So we feel

12   that the case is --

13          THE COURT:  You said something before that I think I'm

14   not sure the case law supports.  While normally the plaintiff's

15   choice of forum is given heavy weight in a transfer motion,

16   where the plaintiff is not herself a resident of the judicial

17   district where the case is brought, I think the case law is

18   that it is given less weight.

19          MR. BURROUGHS:  That's correct, your Honor.

20   However -- and we cite to a number of cases for this.  *Kiss My*

21   *Face Corp.*, *It's a 10, Inc.*, and *Habrout*.  And what those cases

22   all stand for is the idea that even if a plaintiff does not

23   live in that forum, her selection of that forum should still be

24   deferred to unless the factors balance significantly against

25   her.  And one thing that the Court should consider in looking

Icj1moha

1    at those factors is whether or not the infringing product is

2    still being marketed and sold in New York.  And that's the case

3    here.

4            And the final point on that is, even if the plaintiff

5    doesn't live in the forum, if the acts that gave rise to this

6    action occurred in California, not New York, that's not

7    dispositive.  You look at whether or not the infringement --

8    because remember, infringement is a tort, and that tort takes

9    place at the point of sale.  Right now the record reflects only

10   152,000 sales of "Starboy" in New York.  And --

11           THE COURT:  All right.  I'm going to cut you off with

12   my apologies, not because you aren't saying useful things, as

13   was your adversary, but we really have to get on to the next

14   matter.

15           I previously told you that I would give you a

16   bottom-line order ruling by December 31st.  This is a colorable

17   motion.  I'm not sure where I'm coming out, so I'm going to

18   give myself a few extra days.  So I will get you a bottom-line

19   ruling by January 4.  That still is before the first discovery

20   start date, filing your request for documents on January 10.

21   So it will still be sufficient one way or the other.

22           All right.  So thank you very much.  And I will take

23   the matter *sub judice*.

24           MR. BURROUGHS:  Thank you, your Honor.

25           MR. ANDERSON:  Thank you, your Honor.
                            o0o